# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| ALL-OPTIONS, INC.; WHOLE WOMAN'S HEALTH ALLIANCE; ALISON CASE, M.D.; WOMEN'S MED GROUP PROFESSIONAL CORP.; WILLIAM MUDD MARTIN HASKELL, M.D.; and PLANNED PARENTHOOD GREAT NORTHWEST, HAWAI'I, ALASKA, INDIANA, AND KENTUCKY, INC., | ) ) ) ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ATTORNEY GENERAL OF INDIANA, in his official capacity; COMMISSIONER OF THE INDIANA STATE DEPARTMENT OF HEALTH, in her official capacity; MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA, in their official capacities; LAKE COUNTY PROSECUTOR, in his official capacity; and MARION COUNTY PROSECUTOR, in his official capacity; MONROE COUNTY PROSECUTOR, in her official capacity; ST. JOSEPH COUNTY PROSECUTOR, in his official capacity; TIPPECANOE COUNTY PROSECUTOR, in his official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

CASE NO. 1:21-CV-1231

CIVIL ACTION

## COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants and their employees, agents, and successors in office, and in support thereof allege the following:

## PRELIMINARY STATEMENT

1.     Abortion is a safe and common medical procedure.

2.      Access to abortion is critical to the dignity, equality, bodily integrity, and religious freedom of all people with the capacity for pregnancy.

3.      For nearly fifty years, the U.S. Supreme Court has recognized that abortion access is a fundamental component of the liberty protected by the Due Process Clause. *See, e.g.*, *June Med. Servs., L.L.C. v. Russo*, 140 S. Ct. 2103, 2112 (2020) (plurality); *id.* at 2135 (Roberts, CJ., concurring); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309-10 (2016); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851-53 (1992); *Roe v. Wade*, 410 U.S. 113, 152-54 (1973).

4.      Plaintiffs challenge certain provisions of Public Law No. 85-2021, 2021 Ind. Acts ___ (Ex. 1 hereto), and Public Law No. 218-2021, 2021 Ind. Acts ___ (Ex. 2 hereto) (collectively, the "Acts"), which jeopardize the health and safety of abortion patients, obstruct abortion access, and trample on constitutional protections.

5.      The "Telehealth Bans," Pub. L. No. 85-2021, §§ 5, 8, 2021 Ind. Acts ___ (codified at Ind. Code §§ 16-34-1-11, 25-1-9.5-0.5); Pub. L. No. 218-2021, § 4(d), Ind. Acts ___ (to be codified at Ind. Code § 16-34-2-1(d)), and "In-Person Dispensing and Consumption Requirement," Pub. L. No. 218-2021, § 4(a)(1), 2021 Ind. Acts ___ (to be codified at Ind. Code § 16-34-2-1(a)(1)), prohibit abortion providers from utilizing telehealth to deliver abortion care, thereby denying abortion patients the benefits of scientific progress and limiting their access to abortion services.

6.      The "Abortion Reversal Disclosure Requirement," Pub. L. No. 218-2021, §§ 4(a)(1), 5(a)(1)(C), 2021 Ind. Acts ___ (to be codified at Ind. Code §§ 16-34-2-1(a)(1), 16-34-2-1.1(a)(1)(C)), requires abortion providers to repeatedly tell their patients that "[s]ome evidence suggests" that a medication abortion can be reversed, a bogus claim that may lead some patients to have an abortion based on the mistaken belief that they can later undo its effects.

7.     None of these provisions writes on a blank slate.  Indiana already requires patients seeking abortions to run a gauntlet of burdensome, demeaning, and medically unnecessary legal requirements.  A case challenging related laws banning the use of telehealth in abortion care and requiring that abortion patients be given misleading and scientifically inaccurate information is currently pending in this District.  *See Whole Woman's Health Alliance v. Rokita*, 1:18-CV-1904-SEB-MJD (S.D. Ind.).  Trial in that case is scheduled to conclude on June 25, 2021, just days before many of the laws challenged in this case are set to take effect.

8.     Plaintiffs ask the Court to grant them declaratory and injunctive relief from the challenged provisions of Public Law Nos. 85-2021 and 218-2021 and intend to seek a preliminary injunction against their enforcement while this case proceeds.

## JURISDICTION, VENUE, AND CAUSES OF ACTION

9.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 because this case is a civil action "arising under the Constitution, laws, or treaties of the United States," and 28 U.S.C. § 1343(a)(3) because this case seeks to redress the deprivation of federal constitutional rights under color of state law.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because certain Defendants, who are government officers sued in their official capacities, operate and perform their official duties in this district.  Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

11.     42 U.S.C. § 1983 grants Plaintiffs a cause of action to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution.

12.     Declaratory relief is authorized by 28 U.S.C. §§ 2201-2202 and Federal Rule of Civil Procedure 57.

## PARTIES

### A. Plaintiffs

13.     All-Options, Inc. ("All-Options"), is a nonprofit organization incorporated under Oregon law.   Its mission is to provide people with unconditional, judgment-free support concerning pregnancy, parenting, adoption, and abortion.   All-Options operates a pregnancy resource center in Bloomington, Indiana, that offers peer counseling, referrals to medical and social service providers, and material goods such as diapers, baby clothes, and toys.   In addition, All-Options operates the "Hoosier Abortion Fund," which provides financial assistance to Indiana residents who need help paying for abortion care, and the "Practical Support Network," which connects abortion patients with volunteers willing to drive them to and from their abortion appointments.   The challenged laws will increase the cost of abortion care in Indiana, confuse patients about the prospect of abortion reversal, and increase the stigma associated with obtaining an abortion, thereby frustrating All-Options' mission and requiring the organization to divert scarce resources to deal with the laws' impact on its clients—including spending increased time counseling clients and increased money subsidizing the cost of abortion care.   All-Options brings this lawsuit on behalf of itself and its clients seeking abortion care in Indiana.

14.     Whole Woman's Health Alliance ("WWHA") is a nonprofit organization incorporated under Texas law.   Its mission is to provide abortion care in underserved communities and destigmatize abortion.   WWHA operates a medical clinic in South Bend, Indiana, that does business under the name Whole Woman's Health of South Bend ("South Bend Clinic").   In 2017, WWHA sought an abortion clinic license for the South Bend Clinic from the Indiana State Department of Health ("Health Department").   Although the Health Department denied WWHA's license application, an order of this Court permits the South Bend Clinic to provide medication abortions. *See Whole Woman's Health All. v. Hill*, 388 F. Supp. 3d 1010, 1013 (S.D. Ind. 2019),

*aff'd as modified*, 937 F.3d 864 (7th Cir. 2019), *cert. denied*, 141 S. Ct. 189 (2020). The South Bend Clinic currently provides medication abortions up to ten weeks of pregnancy, as measured from the first day of a patient's last menstrual period ("LMP"). WWHA brings this lawsuit on behalf of itself, its healthcare providers, and its Indiana abortion patients.

15.     Alison Case, M.D., is a physician licensed to practice medicine in Indiana. Dr. Case provides abortion care to patients at the South Bend Clinic. Dr. Case brings this lawsuit on behalf of herself and her Indiana abortion patients.

16.     Women's Med Group Professional Corp. ("Women's Med") is a for-profit corporation incorporated under Ohio law. It operates a licensed abortion clinic in Indianapolis, Indiana, that provides aspiration abortions up to thirteen weeks, six days LMP and medication abortions up to ten weeks LMP. Women's Med brings this lawsuit on behalf of itself, its healthcare providers, and its Indiana abortion patients.

17.     William Mudd Martin Haskell, M.D., is a physician licensed to practice medicine in Indiana and Ohio. Dr. Haskell owns Women's Med and has served as its Medical Director for more than twenty years. He supervises the medical staff and provides medical care, including abortion care, to patients. Dr. Haskell brings this lawsuit on behalf of himself and his Indiana abortion patients.

18.     Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, Kentucky, Inc. ("Planned Parenthood"), is a nonprofit organization incorporated under Washington law. Planned Parenthood provides sexual and reproductive health care services including abortion care in a number of states, including Indiana. Planned Parenthood's mission is to provide accessible, affordable, and high-quality evidence-based sexual and reproductive health care. Planned Parenthood provides a wide range of sexual and reproductive health care services to people in

Indiana, including wellness visits (also known as "well-person exams"), cancer screenings, birth control counseling, sexually transmitted infection ("STI") testing and treatment, annual gynecological exams, miscarriage management, and abortion care.  Planned Parenthood currently operates four health centers in Indiana that provide medication abortion, which is available to patients up to ten weeks LMP.  These four health centers are in Bloomington, Indianapolis, Lafayette, and Merrillville, and all four health centers are licensed abortion clinics.  The health centers in Merrillville, Indianapolis, and Bloomington also provide aspiration abortion up to thirteen weeks, six days LMP.  Planned Parenthood sues on behalf of itself, its healthcare providers, and its Indiana abortion patients.

### B. Defendants

19.     The Attorney General of Indiana ("Attorney General") is sued in his official capacity and designated by his official title pursuant to Federal Rule of Civil Procedure 17(d).  The Attorney General has broad powers to enforce Indiana's criminal laws.  *See* Ind. Code § 4-6-1-6; *State v. Harper*, 8 N.E.3d 694, 698 n.4 (Ind. 2014).  In addition, the Attorney General is charged with investigating and prosecuting complaints against licensed physicians.  The Attorney General maintains an office in this district.

20.     The Commissioner of the Health Department ("Commissioner") is sued in her official capacity and designated by her official title pursuant to Federal Rule of Civil Procedure 17(d).  The Health Department is responsible for licensing, inspecting, and disciplining medical clinics that provide abortion care.  Ind. Code §§ 16-21-2-2.5, 16-21-2-10, 16-21-3-1; 410 Ind. Admin. Code 26-2-8, 26.5-3-8.  The Health Department maintains an office in this district.

21.     The Members of the Medical Licensing Board of Indiana ("Medical Board") are sued in their official capacities and designated by their official titles pursuant to Federal Rule of Civil Procedure 17(d).  The Medical Board is responsible for licensing and disciplining physicians.

Ind. Code §§ 25-0.5-11-1, 25-0.5-11-5, 25-1-9-1, 25-1-9-4, 25-22.5-2-7. The Medical Board maintains an office in this district.

22. The Prosecutors of Lake, Marion, Monroe, St. Joseph, and Tippecanoe Counties ("County Prosecutors") are sued in their official capacities and designated by their official titles pursuant to Federal Rule of Civil Procedure 17(d). They are responsible for enforcing criminal laws in their respective counties. Planned Parenthood's Merrillville clinic is located in Lake County. The Indianapolis clinics operated by Planned Parenthood and Women's Med, respectively, are located in Marion County. Planned Parenthood's Bloomington clinic is located in Monroe County. WWHA's South Bend clinic is located in St. Joseph County. Planned Parenthood's Lafayette clinic is located in Tippecanoe County. The Marion and Monroe County Prosecutors maintain offices in this district.

## ALLEGATIONS

### A. Abortion Care in Indiana

23. Abortion is a common medical intervention. Nearly one in four American women will have an abortion by age forty-five.[1] Between 2015 and 2019, the most recent year for which data are currently available, an average of 7,738 abortions were performed annually in Indiana.[2]

---

[1] Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008–2014*, 107 Am. J. Pub. Health 1904, 1906–08 (2017).

[2] *See* Indiana State Dep't of Health, Terminated Pregnancy Report 2019 (June 30, 2020) ("Health Dep't 2019 Report") at 2, https://www.in.gov/isdh/files/2019%20Indiana%20Terminated%20Pregnancy%20 Report.pdf; Indiana State Dep't of Health, Terminated Pregnancy Report 2018 (June 30, 2019) ("Health Dep't 2018 Report") at 3, https://www.in.gov/isdh/files/2018%20Indiana%20Terminated%20 Pregnancy%20Report.pdf; Indiana State Dep't of Health, Terminated Pregnancy Report 2017 (June 30, 2018) ("Health Dep't 2017 Report") at Exec. Summ., https://www.in.gov/isdh/files/2017%20 Indiana%20Terminated%20Pregnancy%20Report.pdf; Indiana State Dep't of Health, Terminated Pregnancy Report 2016 (June 30, 2017) ("Health Dep't 2016 Report") at Exec. Summ., https://www.in.gov/isdh/files/2016%20Indiana%20Terminated%20Pregnancy%20Report.pdf; Indiana State Dep't of Health, Terminated Pregnancy Report 2015 (June 30, 2016) ("Health Dep't 2015 Report") at Exec. Summ., https://www.in.gov/isdh/files/2015%20TP%20Report.pdf.

24.     People seek abortions for a variety of reasons that are often complex and intersecting.  Relevant factors include health, family size, relationship status, financial resources, age, and professional or educational goals.

25.     Most abortion patients have prior experience with pregnancy and childbirth. Between 2015 and 2019, more than sixty percent of Indiana abortion patients had previously carried a pregnancy to term, and more than a third had carried two or more pregnancies to term.[3]

26.     Nationwide, most abortion patients (sixty-two percent) are religiously affiliated. Fifty-four percent are Christians and eight percent are affiliated with other religious traditions.[4]

27.     Three-quarters of abortion patients in the United States are poor or low-income. Nearly half live in households that are below the federal poverty level, and twenty-six percent live in households that earn 100%-199% of the federal poverty level.[5]  Currently, the federal poverty level for an individual is an annual income of $12,760, and the federal poverty level for a family of four is an annual income of $26,200.[6]

28.     Many Indiana abortion patients must pay for their abortions out of pocket because they lack health insurance coverage for abortion.  Indiana prohibits its public health insurance programs from covering abortion except in narrow circumstances.  Ind. Code § 16-34-1-2; *Humphreys v. Clinic for Women, Inc.*, 796 N.E.2d 247, 248-49 (Ind. 2003).  It also restricts private insurance coverage of abortion care in most circumstances.  *See* Ind. Code §§ 16-34-1-8, 27-8-

---

[3] *See* Health Dep't 2019 Report at 12; Health Dep't 2018 Report at 14; Health Dep't 2017 Report at 13; Health Dep't 2016 Report at 15; Health Dep't 2015 Report at 13.

[4] Jenna Jerman et al., *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, Guttmacher Institute 7 (May 2016),  https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

[5] *Id.*

[6] U.S. Dep't of Health and Human Services, *2020 Poverty Guidelines* (Jan. 21, 2020), https://aspe.hhs.gov/2020-poverty-guidelines.

13.4-2.  Abortion funds such as the Hoosier Abortion Fund operated by All-Options are only able to provide their clients with a small percentage of the funds needed to pay for abortion care, and they are not able to assist every person in need.

29.    Between 2015 and 2019, approximately thirty percent of Indiana abortion patients were Black, and eight percent were Hispanic.[7]  People of color face heightened barriers to accessing healthcare and disparities in pregnancy-related health outcomes.  For example, Black individuals experience substantially higher rates of maternal mortality and pregnancy-related complications than their White counterparts, even after controlling for income, educational attainment, and maternal health status.  People of color are also disproportionately affected by poverty.

30.    A significant proportion of people who seek abortion care have abusive partners.  Pregnancy is a common trigger for intimate partner violence.  People with abusive partners often seek to conceal their pregnancies to avoid or limit further abuse and prevent their partners from interfering with their access to abortion care.

31.    Few medical practices offer abortion care in Indiana.  Only seven abortion clinics are currently operating in the State.  Of those, only five are legally authorized to provide aspiration abortions, and none are legally authorized to provide abortion care after the first trimester of pregnancy.

32.    In Indiana, abortion is extremely limited after the first trimester of pregnancy (*i.e.*, the first thirteen weeks of pregnancy as measured by LMP) because of a statute mandating that abortions be performed in a hospital or ambulatory outpatient surgical center after the first

---

[7] *See* Health Dep't 2019 Report at 10; Health Dep't 2018 Report at 12; Health Dep't 2017 Report at 10; Health Dep't 2016 Report at 10-11; Health Dep't 2015 Report at 9.

trimester.  *See* Ind. Code § 16-34-2-1(a)(2)(B).  Between 2015 and 2019, only five Indiana hospitals provided abortions, all of which are within a twenty-mile radius of Indianapolis.[8] Collectively, those five hospitals provided 210 abortions during that five-year period, representing just one-half of one percent of the 38,689 abortions provided in Indiana then.[9]  No Indiana ambulatory outpatient surgical centers ("ASCs") provided abortion care between 2015 and 2019.[10]

33.     In all, only five of Indiana's 92 counties currently have abortion providers.  There are no Indiana abortion providers located east of Indianapolis, an area that includes Fort Wayne, Indiana's second-largest city.  Likewise, there are no Indiana abortion providers located south of Bloomington, an area that includes Evansville, Indiana's third-largest city.

34.     Between 2015 and 2019, individuals from every Indiana county sought abortion care.[11]

35.     In Indiana, as nationwide, two methods of abortion are commonly used during the first trimester of pregnancy: medication abortion and aspiration abortion.

36.     Medication abortion is typically used to end a pregnancy up to seventy days (*i.e.*, ten weeks) LMP.  It involves terminating a pregnancy through a combination of two medications: mifepristone and misoprostol.  Mifepristone works by blocking the hormone progesterone, which is necessary to maintain pregnancy, and increasing the efficacy of misoprostol.  Misoprostol causes the cervix to open and the uterus to contract and expel its contents, thereby completing the abortion.

---

[8] *See* Health Dep't 2019 Report at 15; Health Dep't 2018 Report at 17; Health Dep't 2017 Report at 16; Health Dep't 2016 Report at 19; Health Dep't 2015 Report at 17.

[9] *See* Health Dep't 2019 Report at 15; Health Dep't 2018 Report at 17; Health Dep't 2017 Report at 16; Health Dep't 2016 Report at 19; Health Dep't 2015 Report at 17.

[10] *See* Health Dep't 2019 Report at 15; Health Dep't 2018 Report at 17; Health Dep't 2017 Report at 16; Health Dep't 2016 Report at 19; Health Dep't 2015 Report at 17.

[11] *See* Health Dep't 2019 Report at 17; Health Dep't 2018 Report at 19; Health Dep't 2017 Report at 20; Health Dep't 2016 Report at 24; Health Dep't 2015 Report at 22.

37.     The current drug label for Mifeprex—the brand name for mifepristone—was approved by the U.S. Food and Drug Administration ("FDA") in 2016.  It sets forth the following regimen for medication abortion, which is typically referred to as the "evidence-based regimen": On day one, the patient takes 200 milligrams of mifepristone orally; twenty-four to forty-eight hours later, the patient takes 800 micrograms of misoprostol buccally (in the cheek pouch); seven to fourteen days later, the patient follows up with a healthcare provider to confirm that the pregnancy has been terminated.[12]

38.     The FDA has adopted a Risk Evaluation and Mitigation Strategy ("REMS") for mifepristone that limits how the medication may be distributed.  Among other things, the REMS for mifepristone provides that "[m]ifepristone must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber."[13]  Enforcement of this part of the REMS is currently suspended for the duration of the public health emergency created by the COVID-19 pandemic.[14]  When it is in effect, medication abortion patients may only obtain mifepristone at clinics, medical offices, and hospitals unless they are participating in FDA-approved research studies.

39.     Aspiration abortion, also called suction curettage, entails the use of suction to empty the contents of the uterus.  Although aspiration abortion is sometimes referred to as a surgical procedure, it does not actually constitute surgery because it does not require making an

---

[12] FDA, Mifeprex Label (2016),  https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687 s020lbl.pdf.

[13] FDA, Risk Evaluation and Mitigation Strategy (REMS) Single Shared System for Mifepristone 200mg (2019),   https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifepristone_2019_04_11_REMS_Docu ment.pdf.

[14] Letter from Janet Woodcock, Acting FDA Commissioner, to Maureen G. Phipps, CEO, Amer. Coll. of Obstetricians & Gynecologists (Apr. 12, 2021), ECF No. 155-1, *Amer. Coll. Of Obstetricians & Gynecologists v. U.S. Food & Drug Admin.*, No. 8:20-CV-1320-TDC (D. Md. Apr. 26, 2021).

incision in the patient's body.  Instead, a hollow curette is inserted into the uterus through the patient's cervix.  At the other end of the curette, a hand-held syringe or an electric device is applied to create suction and remove the products of conception from the uterus.  The procedure typically takes less than ten minutes to complete.  This abortion method is used in the first and early second trimester of pregnancy.

40.     A Committee of the National Academies of Sciences, Engineering, and Medicine ("National Academies") recently issued a Consensus Study Report on the Safety and Quality of Abortion Care in the United States after surveying the relevant literature.  It concluded that abortion in the United States is safe; serious complications of abortion are rare; and abortion does not increase the risk of long-term physical or mental health disorders.[15]

41.     The Committee assessed the quality of abortion care based on six factors: safety, effectiveness, patient-centeredness, timeliness, efficiency, and equity.  It concluded that the quality of abortion care depends to a great extent on geography.  In particular, it found that "[i]n many parts of the country, state regulations have created barriers to optimizing each dimension of quality care."[16]

42.     In a 2016 decision striking down a pair of Texas abortion restrictions, the U.S. Supreme Court likewise concluded that abortion is safe and complications from abortion are rare. *See Whole Woman's Health*, 136 S. Ct. at 2311, 2315.  Indeed, the Supreme Court found that abortion is safer than many other procedures commonly performed in outpatient settings.  *See id.* at 2315.  It also recognized that unnecessary regulation may diminish the quality of care that patients receive.  *See id.* at 2318.

---

[15] Nat'l Acads. of Scis., Eng'g, and Med., *The Safety and Quality of Abortion Care in the United States* 1–16 (2018) ("Nat'l Acads. Report"), https://doi.org/10.17226/24950.

[16] *Id.* at 10.

43.     Notably, abortion entails significantly less medical risk than carrying a pregnancy to term and giving birth.[17]  Every pregnancy-related complication is more common among those who give birth than among those having abortions.  This is not surprising given that pregnancies ending in abortion are substantially shorter than those ending in childbirth and thus entail less time for pregnancy-related complications to occur; many serious pregnancy-related complications such as pregnancy-related hypertension, gestational diabetes, and placental abnormalities occur later in pregnancy; and nearly one-third of U.S. births occur by cesarean delivery, a major abdominal surgery that entails significant risk.  In addition, while evidence shows that abortion does not increase a person's risk of mental illness, post-partum depression follows childbirth in at least fifteen percent of pregnancies.

**B.  The Acts**

*i.  Public Law No. 85-2021*

44.     Public Law No. 85-2021 was enacted on April 20, 2021, and took immediate effect. It amends Indiana laws concerning telehealth.

45.     It replaces the term "telemedicine" with the term "telehealth" throughout the Indiana Code.  *See generally* Pub. L. No. 85-2021, 2021 Ind. Acts ___.

46.     In addition, it relaxes Indiana's regulation of telehealth in several ways, including by authorizing the provision of telehealth services by telephone, Pub. L. No. 85-2021, §§ 4, 16(b), 28, 31, 2021 Ind. Acts ___ (codified at Ind. Code §§ 16-18-2-348.5, 25-1-9.5-6(b), 27-8-34-5, 27-13-1-34); and eliminating certain restrictions on the prescription of controlled substances by

---

[17] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 216–17 (2012).

13

telemedicine, Pub. L. No. 85-2021, § 18(b), 2021 Ind. Acts ___ (codified at Ind. Code § 25-1-9.5-8(b)).

47.     Nevertheless, Public Law 85-2021 contains two provisions that prohibit abortion providers from delivering abortion care through telehealth, using the following language: "Telehealth may not be used to provide any abortion, including the writing or filling of a prescription for any purpose that is intended to result in an abortion."  Pub. L. No. 85-2021, §§ 5, 8, 2021 Ind. Acts ___ (codified at Ind. Code §§ 16-34-1-11, 25-1-9.5-0.5).

48.     As used in Public Law No. 85-2021, § 5, 2021 Ind. Acts ___ (codified at Ind. Code § 16-34-1-11), "telehealth" means "a specific method of delivery of services, including medical exams and consultations and behavioral health evaluations and treatment, including those for substance abuse, using technology allowed under IC 25-1-9.5-6 to allow a provider to render an examination or other service to a patient at a distant location."  Ind. Code § 16-18-2-348.5.

49.     As used in Public Law No. 85-2021, § 8, 2021 Ind. Acts ___ (codified at Ind. Code § 25-1-9.5-0.5), "telehealth" means "the delivery of health care services using interactive electronic communications and information technology, in compliance with the federal Health Insurance Portability and Accountability Act (HIPAA) including: (1) secure videoconferencing; (2) store and forward technology; or (3) remote patient monitoring technology; between a provider in one (1) location and a patient in another location."  Ind. Code § 25-1-9.5-6(a).  "The term does not include the use of the following unless the practitioner has an established relationship with the patient: (1) Electronic mail[;] (2) An instant messaging conversation[;] (3) Facsimile[;] (4) Internet questionnaire[; or] (5) Internet consultation."  Ind. Code § 25-1-9.5-6(b).

50.     The Medical Board may impose disciplinary sanctions on licensed physicians who violate the Telehealth Bans set forth in Public Law No. 85-2021, *see* Ind. Code § 25-1-9-4(a)(1)(3),

and the Health Department may impose disciplinary sanctions on licensed abortion clinics and hospitals that permit, aid, or abet violations, Ind. Code § 16-21-3-2(2).

51.     Indiana law already prohibits licensed physicians and other "prescribers" from using telemedicine to prescribe "an abortion inducing drug." Ind. Code § 25-1-9.5-8(a)(4); *see also* Ind. Code § 25-1-9.5-4 (definition of prescriber).  That provision is being challenged in *Whole Woman's Health Alliance v. Rokita*, 1:18-CV-1904-SEB-MJD (S.D. Ind.).

### ii.   *Public Law No. 218-2021*

52.     Public Law No. 218-2021 was enacted on April 29, 2021, and is scheduled to take effect on July 1, 2021.

53.     It imposes numerous restrictions on the provision of abortion care in Indiana.

54.     Plaintiffs' challenge focuses on two sets of restrictions: (1) the Telehealth Ban and In-Person Dispensing and Consumption Requirement; and (2) the Abortion Reversal Disclosure Requirement.

55.     The Telehealth Ban set forth in Public Law No. 218-2021 provides that: "Telehealth and telemedicine may not be used to provide any abortion, including the writing or filling of a prescription for any purpose that is intended to result in an abortion."  Pub. L. No. 218-2021, § 4(d), Ind. Acts ___ (to be codified at Ind. Code § 16-34-2-1(d)).

56.     Knowing or intentional violation of this Telehealth Ban constitutes a felony.  Ind. Code § 16-34-2-7(a).  In addition, the Medical Board may impose disciplinary sanctions on licensed physicians who violate it, Ind. Code § 25-1-9-4(a)(1)(3), and the Health Department may impose disciplinary sanctions on licensed abortion clinics and hospitals that permit, aid, or abet violations, Ind. Code. § 16-21-3-2(2).

57.     The In-Person Dispensing and Consumption Requirement provides that: "A physician must dispense the abortion inducing drug in person and have the pregnant woman

consume the drug in the presence of the physician."  Pub. L. No. 218-2021, § 4(a)(1), 2021 Ind. Acts ___ (to be codified at Ind. Code § 16-34-2-1(a)(1)).  For purposes of this requirement, "'in person' does not include the use of telehealth or telemedicine services."  Ind. Code § 16-34-2-1(a)(1).

58.     Knowing or intentional violation of the In-Person Dispensing and Consumption Requirement constitutes a felony.  Ind. Code § 16-34-2-7(a).  In addition, the Medical Board may impose disciplinary sanctions on licensed physicians who violate the In-Person Dispensing and Consumption Requirement, Ind. Code § 25-1-9-4(a)(1)(3), and the Health Department may impose disciplinary sanctions on licensed abortion clinics and hospitals that permit, aid, or abet violations, Ind. Code. § 16-21-3-2(2).

59.     Indiana law already requires a physician to conduct an "in-person" examination "before prescribing or dispensing an abortion-inducing drug."  Ind. Code § 16-34-2-1(a)(1).  That provision is being challenged in *Whole Woman's Health Alliance v. Rokita*, 1:18-CV-1904-SEB-MJD (S.D. Ind.).

60.     These in-person requirements function as *de facto* bans on using telehealth to provide medication abortion.

61.     The Abortion Reversal Disclosure Requirement mandates that the following statement be made to an abortion patient on two separate occasions: "Some evidence suggests that the effects of Mifepristone may be avoided, ceased, or reversed if the second pill, Misoprostol, has not been taken.  Immediately contact the following for more information at (insert applicable abortion inducing drug reversal Internet web site and corresponding hotline number)."  Pub. L. No. 218-2021, §§ 4(a)(1), 5(a)(1)(C), 2021 Ind. Acts ___ (to be codified at Ind. Code §§ 16-34-2-1(a)(1), 16-34-2-1.1(a)(1)(C)).

16

62. First, "the physician who is to perform the abortion, the referring physician or a physician assistant . . ., an advance practice registered nurse . . ., or a certified nurse midwife . . . to whom the responsibility has been delegated by the physician who is to perform the abortion or the referring physician" must provide the statement to an abortion patient both "orally and in writing" "[a]t least eighteen (18) hours before the abortion." Ind. Code § 16-34-2-1.1(a)(1)(C).

63. Failure to provide the statement at this time is punishable as a Class A infraction. Ind. Code § 16-34-2-7(c); *see generally* Ind. Code § 34-28-5-4(a) ("A judgment of up to ten thousand dollars ($10,000) may be entered for a violation constituting a Class A infraction."). In addition, the Medical Board may impose disciplinary sanctions on licensed physicians who fail to comply with this portion of the Abortion Reversal Disclosure Requirement, Ind. Code § 25-1-9-4(a)(1)(3), and the Health Department may impose disciplinary sanctions on licensed abortion clinics and hospitals that permit, aid, or abet violations, Ind. Code § 16-21-3-2(2). Further, consent to an abortion is statutorily abrogated if this portion of the Abortion Reversal Disclosure Requirement is not satisfied. *See* Ind. Code § 16-34-2-1.1(a).

64. Other pre-abortion disclosure requirements, as well as the requirement that such disclosures be made in person, are being challenged in *Whole Woman's Health Alliance v. Rokita*, 1:18-CV-1904-SEB-MJD (S.D. Ind.).

65. Second, "[a] physician shall also provide" the required statement "orally and in writing" at the time an abortion patient is discharged from a healthcare facility. Pub. L. No. 218-2021, § 4(a)(1), 2021 Ind. Acts ___ (to be codified at Ind. Code § 16-34-2-1(a)(1)).

66. Failure to provide the statement at this time is punishable as a felony. Ind. Code § 16-34-2-7(a). In addition, the Medical Board may impose disciplinary sanctions on licensed physicians who fail to comply with this portion of the Abortion Reversal Disclosure Requirement,

Ind. Code § 25-1-9-4(a)(1)(3), and the Health Department may impose disciplinary sanctions on licensed abortion clinics and hospitals that permit, aid, or abet violations, Ind. Code. § 16-21-3-2(2).

67.     Public Law No. 218-2021 provides no information about the "abortion inducing drug reversal Internet web site and corresponding hotline number" referenced in the statement that abortion providers are required to make to their patients.

### C.  Impact of the Challenged Requirements

#### i.  *Telehealth Bans and In-Person Dispensing and Consumption Requirement*

68.     Outside Indiana, abortion providers have been using telemedicine to provide medication abortion since 2008.

69.     In site-to-site telemedicine, a patient visits an abortion clinic and uses telemedicine technology to communicate with a practitioner who is at a different location.

70.     In direct-to-patient telemedicine, a patient who is at home or another non-clinical location uses telemedicine technology to communicate with a practitioner.  When the REMS for mifepristone was fully enforced, direct-to-patient telemedicine was only permissible in connection with FDA-approved research studies.

71.     Providing medication abortion through telemedicine is as safe and effective as in-person treatment.

72.     A 2011 study of medication abortion in Iowa found that the success rates for telemedicine patients and in-person patients were similar: 98.7% for telemedicine patients and 96.9% for in-person patients.[18]  Likewise, there was no significant difference in the occurrence of

---

[18] Daniel Grossman, et al., *Effectiveness and Acceptability of Medical Abortion Provided Through Telemedicine*, 118 Obstetrics & Gynecology 296, 296-303 (2011), doi: 10.1097/AOG.0b013e318224d110.

adverse events among telemedicine patients compared to in-person patients.  A subsequent study, published in 2017, compared the safety of medication abortion provided in person and by telemedicine in Iowa over a seven-year period.[19]  The study encompassed 8,765 medication abortions performed via telemedicine and 10,405 medication abortions performed in person.  It found no significant difference in success rate or the prevalence of adverse events between telemedicine and in-person patients.

73.    A 2019 systematic review of evidence regarding the use of telemedicine to provide medication abortion found that the practice is safe, effective, and well-liked by both patients and providers.[20]  It further found that clinical outcomes for medication abortion via telemedicine, including the rates of unsuccessful abortion, hospitalization, and blood transfusions, are comparable to those reported for medication abortion in person.

74.    Before suspending enforcement of the REMS' requirement that mifepristone be dispensed in clinics, medical offices, or hospitals, the FDA reviewed the medical literature concerning direct-to-patient telemedicine for medication abortion as well as its own data concerning adverse events following medication abortion.  It found no evidence to suggest that permitting medication abortion patients to obtain mifepristone by mail or through a pharmacy poses serious safety concerns.[21]

75.    The American College of Obstetricians and Gynecologists ("ACOG") has concluded that "[m]edication abortion can be provided safely and effectively by telemedicine with

---

[19] Dan Grossman & Kate Grindlay, *Safety of Medical Abortion Provided Through Telemedicine Compared with In Person*, 130 Obstetrics & Gynecology 778, 778-82 (2017), doi:10.1097/aog.0000000000002212.

[20] Margit Endler, et al., *Telemedicine for Medical Abortion: A Systematic Review*, 126 BJOG 1094, 1094-1102 (2019), doi: 10.1111/1471-0528.15684.

[21] *See* Letter from Janet Woodcock, Acting FDA Commissioner, to Maureen G. Phipps, CEO, Amer. Coll. of Obstetricians & Gynecologists (Apr. 12, 2021), ECF No. 155-1, *Amer. Coll. Of Obstetricians & Gynecologists v. U.S. Food & Drug Admin.*, No. 8:20-CV-1320-TDC (D. Md. Apr. 26, 2021).

a high level of patient satisfaction, and telemedicine improves access to early abortion care, particularly in areas that lack a health care practitioner."[22]  Likewise, the National Academies has concluded that "[t]here is no evidence that the dispensing or taking of mifepristone tablets requires the physical presence of a clinician . . . to ensure safety or quality."[23]

76.     Outside the abortion context, Indiana has authorized a dramatic expansion in the use of telemedicine in recent years.  In 2015, Indiana enacted a law requiring health insurance policies to provide coverage for telemedicine services on the same terms as they provide coverage for healthcare services delivered in person. *See* Pub. L. No. 185-2015, §§ 25-27, 2015 Ind. Acts 2102-04 (codified at Ind. Code §§ 27-8-34-1 to 27-8-34-7, 27-13-1-34, 27-13-7-22).  In 2016, Indiana enacted a law broadly authorizing healthcare providers to use telemedicine to treat patients and prescribe medications.  *See* Pub. L. No. 78-2016, § 2, 2016 Ind. Acts 711-15 (codified at Ind. Code §§ 25-1-9.5-1 to 25-1-9.5-12).  In 2017, Indiana enacted a law authorizing prescribers to prescribe controlled substances via telemedicine.[24]  *See* Pub. L. No. 150-2017, § 7, 2017 Ind. Acts 1430-31 (codified in relevant part at Ind. Code § 25-1-9.5-8).  Apart from abortion-inducing drugs and certain opioids, Indiana law does not prohibit practitioners from prescribing any medications via telemedicine, Ind. Code § 25-1-9.5-8, and it does not prohibit practitioners from prescribing

---

[22] Am. Coll. of Obstetricians & Gynecologists, *Medication Abortion Up to 70 Days of Gestation: ACOG Practice Bulletin, Number 225*, 136 Obstetrics & Gynecology e31, e35 (2020) ("ACOG Practice Bulletin on MAB"), doi: 10.1097/AOG.0000000000004082.

[23] Nat'l Acads. Report at 79.

[24] On its face, the law exempts certain opioids.  *See* Ind. Code § 25-1-9.5-8(a)(3)(B).  The exemption is currently suspended by a pandemic-related executive order permitting "DEA-registered practitioner[s] to issue prescriptions for all schedule II-IV controlled substances to patients for whom they have not conducted an in-person medical evaluation" provided that certain minimal safeguards are satisfied.  Ind. Exec. Order No. 20-13 (Mar. 30, 2020), https://www.in.gov/gov/files/Executive-Order-20-13-Medical-Surge.pdf.

mifepristone and misoprostol for purposes other than inducing an abortion, *see* Ind. Code § 16-18-2-1.6.

77.    Today, healthcare providers throughout Indiana utilize telemedicine to deliver a wide variety of services to patients, including services that are far more complex than medication abortion.  For example, the St. Joseph Health System, whose hospitals are licensed by the Health Department, has a telemedicine program aimed at improving care for acute stroke patients. Beacon Health System, whose hospitals are licensed by the Health Department, operates a telemedicine program to serve patients with urgent care needs.  Indiana University Health, whose hospitals are licensed by the Health Department, uses telemedicine to deliver various services to patients, including follow-up care to kidney transplant patients.

78.    Indiana practitioners also provide a broad range of reproductive healthcare via telemedicine, including contraceptive care, infertility treatment, diagnosis and treatment of sexually transmitted infections, and prenatal care.

79.    The risks of medication abortion are similar in magnitude to the risks of taking commonly prescribed and over-the-counter medications such as antibiotics and nonsteroidal anti-inflammatory drugs ("NSAIDs").[25]

80.    The same evidence-based regimen of mifepristone and misoprostol used for medication abortion is also used to treat patients experiencing a miscarriage.  Neither the Telehealth Bans nor the In-Person Dispensing and Consumption Requirement apply in that context.

---

[25] Nat'l Acads. Report at 79.

81.     Abortion clinics throughout Indiana—including those operated by WWHA, Women's Med, and Planned Parenthood—would utilize telemedicine to provide medication abortion if the law permitted them to do so.

82.     That would enable patients to obtain abortions earlier in pregnancy, which would reduce the medical risks they face from both pregnancy and abortion as well as the risk of violence or interference by an abusive partner or family member.

83.     Permitting telemedicine abortion would reduce the number of abortion patients who are delayed past ten weeks LMP, when medication abortion is no longer available in Indiana.  It would also reduce the number of patients who are delayed past the first trimester, when Indiana abortion clinics are no longer permitted to provide abortion care.  *See* Ind. Code § 16-34-2-1(a)(2).

84.     For some patients, using telemedicine would meaningfully reduce the cost of obtaining abortion care.

85.     Absent relief from the Court, the Telehealth Bans and In-Person Dispensing and Consumption Requirement will irreparably harm Plaintiffs and the abortion patients whose interests they represent, including by denying abortion patients the benefits of scientific progress, delaying their access to abortion care, and violating their constitutional rights.

### ii.  *Abortion Reversal Disclosure Requirement*

86.     There is no credible or reliable scientific evidence that "the effects of mifepristone can be avoided, ceased, or reversed."

87.     The evidence-based regimen for medication abortion has a failure rate of approximately 2.6%.  That means that, in approximately 2.6% of cases, patients will continue to be pregnant despite completing the regimen.  Taking mifepristone alone—not followed by misoprostol—has a substantially higher failure rate.

22

88. No medical intervention has been shown to avoid, cease, or reverse the effects of mifepristone or increase the likelihood that a medication abortion will fail.

89. Upon information and belief, the Act's contention that "[s]ome evidence suggests that effects of Mifepristone may be avoided, ceased, or reversed . . ." is based on an experimental treatment proposed by California physicians George Delgado and Mary Davenport, who have alleged that they can reverse the effects of mifepristone by administering large doses of the hormone progesterone to abortion patients. Upon information and belief, certain other practitioners have also experimented with this practice. While there is no consensus on the protocol for administering this so-called "abortion reversal" treatment, some practitioners have experimented with weekly progesterone injections, in some cases until the end of pregnancy, as well as oral and vaginal routes of progesterone administration.

90. The safety and efficacy of this experimental treatment is unknown. It has never been tested in animals, and the only clinical trial involving human subjects had to be halted early due to safety concerns after one-quarter of the participants experienced severe hemorrhage.

91. So-called "abortion reversal" treatment is opposed by leading medical organizations. ACOG has concluded that "[t]here is no evidence that treatment with progesterone after taking mifepristone increases the likelihood of the pregnancy continuing," but "limited available evidence suggests that use of mifepristone alone without subsequent administration of misoprostol may be associated with an increased risk of hemorrhage."[26] The American Medical Association ("AMA") opposes legislation requiring physicians to tell their patients about abortion reversal experiments and has sued to block a North Dakota requirement similar to the Abortion Reversal Disclosure Requirement challenged here. *See Am. Med. Ass'n v. Stenhjem*, 412 F. Supp.

---

[26] ACOG Practice Bulletin on MAB at e33.

3d 1134 (D.N.D. 2019) (preliminarily enjoining enforcement of an abortion reversal disclosure requirement).

92.     After reviewing the available evidence, the National Academies found that claims that the effects of mifepristone can be reversed are based primarily on a case series report of patients "who did not receive standardized doses or formulations of the medications (i.e., mifepristone or progesterone)."[27]   It noted that "[c]ase series are descriptive reports that are considered very low-quality evidence for drawing conclusions about a treatment's effects."[28]

93.     The statement that "[s]ome evidence suggests that the effects of Mifepristone may be avoided, ceased, or reversed if the second pill, Misoprostol, has not been taken" is untruthful and misleading because no credible or reliable scientific evidence supports the conclusion that the effects of mifepristone can be avoided, ceased, or reversed under any circumstances.

94.     Absent a legal mandate, the abortion-provider Plaintiffs would not initiate a conversation about abortion reversal experiments with their patients.

95.     The abortion-provider Plaintiffs consistently counsel their patients that they must be firm in their decision to have an abortion before beginning the medication abortion regimen. The Abortion Reversal Disclosure Requirement undermines this message, requiring Plaintiffs in the same breath to tell their patients that the effects of mifepristone can be avoided, ceased, or reversed.  This disclosure threatens to encourage some patients who are not firm in their decision to proceed with a medication abortion nevertheless, based on the mistaken belief that it could later be blocked or reversed.  The irreparable harm that would result is manifest.

---

[27] Nat'l Acads. Report at 54 (citation omitted).

[28] *Id.* (citation omitted).

96.     Further, compliance with the Abortion Reversal Disclosure Requirement would violate fundamental norms of the informed consent process.

97.     Obtaining a patient's informed consent prior to performing a medical intervention is a key ethical and legal duty of medical practitioners.

98.     The foundational ethical principle guiding informed consent is respect for persons, commonly referred to as autonomy.  This principle requires practitioners to enable their patients to make voluntary choices about medical interventions based on relevant and scientifically accurate information.

99.     The Abortion Reversal Disclosure Requirement undermines patient autonomy by mandating that patients be given irrelevant and scientifically inaccurate information about unproven claims that a medication abortion can be reversed.  Accordingly, compliance with the Abortion Reversal Disclosure Requirement would require practitioners to violate a key ethical duty to their patients.

100.    By requiring practitioners to provide untruthful, misleading, and irrelevant information, the Abortion Reversal Disclosure Requirement would also undermine patients' trust in their healthcare providers.

101.    The Abortion Reversal Disclosure Requirement singles out abortion patients and providers for disfavored treatment.  No other healthcare providers are required to inform their patients about experimental medical interventions, the safety and efficacy of which are wholly unsupported by reliable scientific evidence, and no other patients are required to receive such information as a condition of treatment.  Similarly, no other healthcare providers are required to give their patients untruthful, misleading, or irrelevant information, and no other patients are required to receive such information as a condition of treatment. *See Spar v. Cha*, 907 N.E.2d 974,

984 (Ind. 2009) (explaining that "physicians have a duty to disclose to their patients information *material* to a proposed course of treatment" (emphasis added)); *id.* ("A physician must disclose the facts and risks of a treatment which a reasonably prudent physician would be expected to disclose under like circumstances, and which a reasonable person would want to know.").

102.    Absent relief from the Court, the Abortion Reversal Disclosure Requirement will irreparably harm Plaintiffs and the abortion patients whose interests they represent, including by violating their constitutional rights, undermining patient trust in and goodwill for the abortion-provider Plaintiffs, and encouraging patients who are not firm in their decisions to end their pregnancies to begin the medication abortion regimen nevertheless.

**CLAIMS**

**COUNT I**
**(Free Speech)**

103.    The allegations of paragraphs 1 through 102 are incorporated as though fully set forth herein.

104.    The Abortion Reversal Disclosure Requirement compels speech by abortion providers in violation of the Free Speech Clause of the First Amendment.

**COUNT II**
**(Substantive Due Process)**

105.    The allegations of paragraphs 1 through 102 are incorporated as though fully set forth herein.

106.    The Telehealth Bans impose an undue burden on access to pre-viability abortion in violation of the Due Process Clause of the Fourteenth Amendment.

107.    The In-Person Dispensing and Consumption Requirement imposes an undue burden on access to pre-viability abortion in violation of the Due Process Clause of the Fourteenth Amendment.

26

108.    The Abortion Reversal Disclosure Requirement requires the provision of untruthful or misleading information to pre-viability abortion patients in violation of the Due Process Clause of the Fourteenth Amendment.

## COUNT III
### (Equal Protection)

109.    The allegations of paragraphs 1 through 102 are incorporated as though fully set forth herein.

110.    The Telehealth Bans deny equal protection of the laws to abortion patients and providers in violation of the Equal Protection Clause of the Fourteenth Amendment.

111.    The In-Person Dispensing and Consumption Requirement denies equal protection of the laws to abortion patients and providers in violation of the Equal Protection Clause of the Fourteenth Amendment.

112.    The Abortion Reversal Disclosure Requirement denies equal protection of the laws to abortion patients and providers in violation of the Equal Protection Clause of the Fourteenth Amendment.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

a.      Declare the Telehealth Bans unconstitutional and permanently enjoin their enforcement;

b.      Declare the In-Person Dispensing and Consumption Requirement unconstitutional and permanently enjoin its enforcement;

c.      Declare the Abortion Reversal Disclosure Requirement unconstitutional and permanently enjoin its enforcement;

d.      Award Plaintiffs attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

e.      Grant such other and further relief as the Court may deem just, proper, and equitable.

Dated: May 18, 2021

Respectfully submitted,

/S/ *Stephanie Toti*

Stephanie Toti
Sneha Shah*
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Tel.: 646-490-1083
stoti@lawyeringproject.org
sshah@lawyeringproject.org

Kathrine D. Jack
JACK LAW OFFICE LLC
One Courthouse Plaza
P.O. Box 813
Greenfield, IN 46140
Tel: 317-477-2300
kjack@jacklawoffice.com

*Attorneys for Plaintiffs All-Options, Inc.;
Whole Woman's Health Alliance; Alison
Case, M.D.; Women's Med Group
Professional Corp.; and William Mudd
Martin Haskell, M.D.*

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU OF INDIANA
1031 E. Washington St.
Indianapolis, IN 46202
Tel.: 317-635-4059
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

*Attorneys for All Plaintiffs*

Christine Clarke*
PLANNED PARENTHOOD FEDERATION OF
AMERICA
123 Williams St., 9th Fl.
New York, NY 10038
Tel: 646-689-2958
christine.clarke@ppfa.org

Hannah Swanson*
PLANNED PARENTHOOD FEDERATION OF
AMERICA
1110 Vermont Ave. NW, Ste. 300
Washington, DC 20005
Tel: 202-973-4800
hannah.swanson@ppfa.org

Hannah Brass Greer*
PLANNED PARENTHOOD GREAT NORTHWEST,
HAWAI'I, ALASKA, INDIANA, KENTUCKY, INC.
2001 E. Madison St.
Seattle, WA 98122
Tel: 206-427-3208
hannah.brassgreer@ppgnhaik.org

Rebecca Chan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Fl.
New York, NY 10004
Tel.: 646-885-8338
rebeccac@aclu.org

*Attorneys for Plaintiff Planned Parenthood
Great Northwest, Hawai'i, Alaska, Indiana,
Kentucky, Inc.*

*Motion for admission *pro hac vice* forthcoming