# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ALL-OPTIONS, INC.; *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:21-cv-1231-JPH-MJD |
| ATTORNEY GENERAL OF INDIANA, | ) | |
| in his official capacity, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## <u>DECLARATION OF DR. CHRISTINA FRANCIS</u>

I, Christina Francis, M.D., pursuant to the provisions of 28 U.S.C. § 1746, do hereby declare as follows:

1.    I am at least 18 years of age and am competent to testify. I have personal knowledge of the statements contained in this declaration. The opinions expressed in this report are my own and do not represent the views of any organization with which I am associated.

**Professional Background**

2.    I have been a practicing board certified obstetrician and gynecologist for twelve years, and currently practice in Fort Wayne, Indiana. I work as an OB/GYN Hospitalist, which entails caring for pregnancies ranging from routine to high-risk in the inpatient setting. I also serve as chair of the board for the American Association

of Pro-Life Obstetricians and Gynecologists, a national professional organization of nearly 7,000 pro-life medical practitioners.

3.     I graduated from medical school at Indiana University in 2005 and completed my obstetrician and gynecologist residency at St. Vincent Hospital in Indianapolis in 2009.

4.     On March 31, 2021, I testified before the Indiana Senate Health Committee on HB 1577 (subsequently enacted into law as Public Law 218-2021). I spoke in favor of two aspects of the bill: the requirement that woman obtaining medication abortions be informed about the availability of abortion pill reversal (APR) and the importance of an in-person consultation with a physician before being given the abortive drug regimen, mifepristone and misoprostol. It is my professional opinion that both requirements enhance the safety and well-being of Hoosiers and lead to better informed medical decisions.  By providing women with information about the availability of APR, it is expanding, not limiting their options.  Part of fully informed consent is counseling a woman on the risks, benefits, and alternatives to any recommended therapy.  APR represents an alternative to completing her abortion when a woman changes her mind after taking the first medication of the medication abortion regimen.  Also, by requiring an in person visit with a physician prior to being given a medication abortion, the state of Indiana is ensuring that women are able to receive full counseling, free of coercion by someone else in her life, as well as having her gestational age and pregnancy location accurately assessed.  If women undergo a medication abortion beyond the FDA limit of 10 weeks gestation or with an ectopic

2

pregnancy, the results can be devastating for her due to serious complications or death.

5.      I volunteered in 2015 to provide Abortion Pill Reversal (APR) through the Abortion Pill Reversal Network.  The APR network is a network of medical practitioners who are readily available to administer the APR protocol to women who regret their abortion decision and desire to save their unborn child.  Women are connected to those practitioners through the network hotline, which is manned 24/7 by a trained nurse.  In fall 2015, I assisted a patient who began an abortion at a Planned Parenthood clinic and then immediately regretted her decision. She knew the very minute she left the clinic that she made the wrong choice. She found out about APR by google web search. The patient was connected to me through the APR hotline. By administering progesterone according to the APR protocol (explained in more detail below), that patient was able to successfully continue her pregnancy and delivered a healthy baby with no medical issues in the spring of 2016.

**Chemical Abortions and How They Can Be Reversed**

6.      Chemical abortions typically involve a two-drug regimen: mifepristone followed by misoprostol. Mifepristone is a progesterone receptor antagonist, which inhibits the effect of progesterone, a crucial hormone for normal fetal development. The mifepristone drug binds with high affinity to progesterone receptors,[1] thereby blocking the action of progesterone and resulting in fetal death, in most cases.

---

[1] *See* C.H. Spilman et al., *Progestin and Antiprogestin Effects on Progesterone Receptor Transformation*, 24 j. Steroid Biochem. 383, 383 (1986).

Misoprostol, a prostaglandin analogue, is then given 24–48 hours after mifepristone. It leads to uterine contractions to expel the fetus and gestational sac. Chemical abortions of this type are approved by the FDA for use through the 10th week of gestation.

7.     Abortion pill reversal (APR), first performed in 2011, is based on the scientific principle of reversible competitive inhibition. APR specifically seeks to displace mifepristone from progesterone receptors using natural progesterone, thus counteracting the effects of mifepristone. Because mifepristone and progesterone compete for the same receptors, high amounts of substrate (in this case, progesterone) can displace the introduced competitive inhibitors (mifepristone) and therefore allow for normal placental development and growth of the fetus.

8.     Counteracting the effects of a competitive inhibitor by introducing higher doses of substrate is not a new idea. Similar techniques are used in other contexts. For example, in chemotherapy, a "rescue" treatment of leucovorin and methotrexate is introduced to the body where the leucovorin "out competes" the methotrexate to prevent damage to non-cancer cells.

9.     APR is suitable for pregnant women who have taken mifepristone but who have not yet taken the second drug, misoprostol.  For women who have begun APR therapy and have a viable pregnancy, progesterone is continued through the end of the first trimester.

10.     Women typically access APR treatment by calling the hotline number, which is staffed around the clock by nurses who conduct an initial screening for the

appropriateness of APR. If the patient is deemed suitable for APR and desires to proceed, the nurse connects her to a local APR provider.

**APR is Effective in Reversing Chemical Abortions**

11.     Empirical evidence suggests that APR is effective in reversing the effects of mifepristone. In the largest study to date, Dr. George Delgado and Dr. Mary Davenport examined 754 cases where women attempted reversal of chemical abortion. The study found a fetal survival rate following APR of 48%, with rates rising to 64% and 68% respectively for intramuscular and oral administration of progesterone.[2] The oral regimen involved women receiving a 400-milligram progesterone bid for three days, followed by 400 milligrams daily.

12.     When considering the context where women did not take misoprostol or progesterone after taking mifepristone, a 2017 study by Dr. Davenport found that ongoing viable pregnancies—not merely incomplete abortions—had a fetal survival rate of 10–23%.[3] This was used as a historical control group for the Delgado and Davenport 2018 study on APR, where it was shown that, so long as the progesterone is taken within 72 hours of the administration of mifepristone, the chances of fetal survival increases from 23% to as high as 68% (with the oral progesterone regimen). This result is consistent with the pharmacokinetics of mifepristone—the drug does not immediately kill the fetus, instead starving it of nutrition over the course of days. It was also found that survival rates increased with gestational age.

---

[2] George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21, 26 (2018).

[3] Mary L. Davenport et al., *Embryo Survival After Mifepristone: A Systematic Review of the Literature*, 32 Issues L. & Med. 3, 3(2018).

13.     Delgado's findings are well-explained by biological theory. The principle behind these findings—that the effects of a competitive inhibitor can be undone by greater amounts of substrate—is firmly established.

14.     Pro-choice experts agree that Delgado's theory is sound. Dr. Harvey Kliman of the Yale School of Medicine, who has supported pro-choice causes, admits that mifepristone reversal makes "biological sense."[4] Accordingly, he said that if one of his daughters mistakenly ingested mifepristone, he would recommend 200 milligrams of progesterone three times a day until mifepristone is metabolized.[5]

15.     The latest version of the Delgado study clearly states that "[t]he study was reviewed and approved by an institutional review board." Although the Delgado study was briefly withdrawn over a previous granting of institutional review board exemption, the article has since been reviewed and restored. Claims that the Delgado study has been withdrawn are therefore untrue.

16.     There are other studies that support the fact that mifepristone is reversible. Mifepristone was shown to be reversible in the manufacturer's studies during its development.[6]   In a 1989 study by Yamambe,[7] scientists separated pregnant rats into three groups. The first group received no drugs; the second group

---

[4] Ruth Graham, *A New Front in the War Over Reproductive Rights: 'Abortion Pill Reversal,'* N.Y. Times Mag. (July 18, 2017), https://www.nytimes.com/2017/07/18/magazine/a-new-front-in-the-war-over-reproductive-rights-abortion-pill-reversal.html.
[5] *Id.*
[6] Etienne-Emile Baulieu & Sheldon J. Segal, *The Antiprogestin Steroid RU486 and Human Fertility Control* 91 Figure 3 (1985).
[7] S. Yamabe (山辺晋吾) et al., *The Effect of RU486 and Progesterone on Luteal Function During Pregnancy*, 65 Nihon Naibunpi Gakkai Zasshi 497 (1989).

received mifepristone; the third group received mifepristone followed by natural progesterone. Of the no-drug group, 100% of the animals delivered live offspring. The mifepristone group had much lower live birth rate, with only 33% delivering live offspring. However, in the group that received progesterone after mifepristone, 100% delivered live offspring. Mifepristone binding to another hormonal receptor, glucocorticoid receptors, has also been shown to be reversible by the addition of glucocorticoids.[8]

**APR is Safe for Pregnant Women and Fetuses**

17.    There is no documented risk that mifepristone exposure or APR leads to increased incidence of birth defects. Although abortion providers sometimes tell women that not completing the two-drug regimen could lead to birth defects, such claims are unsupported. Multiple studies have shown, to the contrary, that neither progesterone nor mifepristone are associated with an increased risk of birth defects.

18.    A study published in the BJOG, an international journal of obstetrics and gynecologists, found that the incidence of birth defects in children exposed to mifepristone in the first trimester was equivalent to the incidence in the general population.[9] Delgado's 2018 study similarly found no increased risk of birth defect.[10] Further, according to the package insert for mifepristone, no teratogenic effects have

---

[8] JI Webster & EM Sternberg, *Role of the hypothalamic-pituitary-adrenal axis, glucocorticoids and glucocorticoid receptors in toxic sequelae of exposure to bacterial and viral products*, 181 J. ENDOCRINOLOGY 212 (2004).

[9] N. Bernard et al., *Continuation of Pregnancy After First-Trimester Exposure to Mifepristone: An Observational Prospective Study*, 120 BJOG 568 (2013).

[10] *See* Delgado, *supra* note 2, at 26.

been noted in experiments with rats and mice.[11] A birth defect—Mobius syndrome—is known to occur when fetuses are exposed to misoprostol (the second drug in the two-drug regimen),[12] but this is distinct from and unrelated to mifepristone exposure.

19.   Progesterone is FDA-approved for use during pregnancy. Natural progesterone has been safely used during pregnancy for over 50 years, notably to support IVF pregnancies and in women who have a history of pregnancy loss.

20.   In 1999, the FDA conducted a comprehensive review of relevant scientific literature and concluded that there was no increased risk of birth defects associated with the use of progesterone and that "use of [progesterone] for luteal phase support in IVF cycles had become routine and that the agency had itself recently approved a [progesterone] gel for use in infertile women under treatment with ART."[13]

21.   The American Society for Reproductive Medicine (ASRM) concluded in a bulletin on progesterone supplementation during pregnancy: "The weight of available evidence indicates that the most common forms of [progesterone] supplementation during early pregnancy pose no significant risk to mother or fetus."[14]

---

[11] FDA, MIFEPREX Prescribing Information, at 9 (2000), https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.
[12] A.L. Pastuszak, *Use of Misoprostol During Pregnancy and Möbius' Syndrome in Infants*, 338 N. Eng. J. Med. 1881, 1882–83 (1998).
[13] Prac. Comm. of the Am. Soc. for Reprod. Med., *Progesterone Supplementation During the Luteal Phase and in Early Pregnancy in the Treatment of Infertility: an Educational Bulletin*, 89 Fertility & Sterility 789, 791 (2008).
[14] *Id.*

22.    Although the FDA has yet to approve the use of progesterone in the specific context of APR, giving progesterone to women in the first trimester of pregnancy is not experimental and is backed by more than 50 years of clinical experience.

**Leading Criticisms of APR are Unfounded**

23.    Critics focus their fire on the lack of randomized control trial (RCT) studies on mifepristone reversal, but they overlook the fact that such studies would be unethical. It would be contrary to medical ethics to administer a placebo to a patient seeking to reverse the feticidal effects of mifepristone, when we know through clinical experience and basic pharmacology studies that progesterone is safe and effective in this scenario.

24.    Where an RCT is not possible for ethical or other reasons, historical control groups, as were used in Delgado's study, are an acceptable alternative.

25.    Tellingly, none of the trials relied on in the approval of mifepristone were RCTs—they either used a historical control group or were dose comparison studies. As the FDA's statistical review of the application for mifepristone approval stated: "In the absence of a concurrent control group in each of these studies, it is a matter of clinical judgment whether or not the sponsor's proposed therapeutic regimen is . . . viable."[15]

---

[15] FDA, Statistical Review and Evaluation of Mifepristone 7–8 (1996) *quoted in* Byron C. Calhoun & Donna J. Harrison, *Challenges to the FDA Approval of Mifepristone*, 38 Annals of Pharmacotherapy 163, 164 (2004).

26.     The one attempted RCT study on APR, conducted by Mitchell Creinin et al., was stopped at an early stage.[16] Creinin, a well-known abortion provider from the pro-abortion Bixby Center at UCSF, conducted an experiment where women were given mifepristone, followed by either progesterone or a placebo, and not given misoprostol. They were scheduled to follow up two weeks later for an ultrasound, where investigators would determine whether they had an ongoing, viable pregnancy. If they had an ongoing pregnancy, the fetus would then be surgically aborted.

27.     There were five women in the final progesterone treatment group and five in the final control group. The trial was halted after three women required emergency room visits.[17] Of these three women, only one woman was from the progesterone treatment group, and she was found to be completing her abortion and required no treatment.[18] The other two women were from the placebo group—both presented with heavy vaginal bleeding and required emergency dilation and curettage.[19] One of the two received a blood transfusion. Therefore, the safety concerns that led to the end of the study are not actually related to the administration of progesterone treatment but rather the lack thereof.

28.     APR opponents state that this study disproves APR, the Creinin study actually supports the effectiveness of APR. In the placebo group, two out of five

---

[16] Mitchell D. Creinin et al., *Mifepristone Antagonization with Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*, 135 Obstetrics & Gynecology 158, 158 (2020).
[17] *Id.* at 160–61.
[18] *Id.* at 160.
[19] *Id.* at 160–61.

women had ongoing pregnancy (40% survival).[20] In the progesterone treatment group, however, four out of five women had ongoing pregnancies (80% survival).[21]

29.   Also, it is not surprising that the American College of Obstetricians and Gynecologists (ACOG) has not endorsed APR. ACOG has a long history of promoting the agenda of the abortion industry[22] and has never supported a single abortion safety regulation. Even the most basic safety restriction, like requiring a physician who performs surgical abortions to have the ability to admit patients with complications to get additional care, has not been supported by ACOG.

30.   ACOG has chosen to ignore the wealth of evidence that progesterone can be used to block the effects of mifepristone and help women who regret beginning an abortion have a chance at saving their child.

31.   Indeed, why would opponents to APR choose to limit women's options and hide this information from them? Telling a patient that this is available is not forcing her to do it.  It is, in fact, a part of truly informed consent. It is a well-accepted concept in the practice of medicine that informed consent involves discussing with the patient the risks, benefits and alternatives to a given procedure

---

[20] *Id.* at 160.

[21] *Id.*

[22] ACOG has filed amicus briefs on behalf of pro-choice causes. *See, e.g.*, Brief of *Amicus Curiae* Am. Assoc. of Pro-Life Obstetricians and Gynecologists in Support of Rebekah Gee, Secretary, Louisiana Dep't. of Health and Hosps., June Med. Services L.L.C. v. Gee, 905 F.3d 787 (5th Cir. 2018).

or intervention. APR is an alternative to a woman completing a medication abortion if she changes her mind mid-procedure. In saying that this should not be discussed with women, ACOG is opposing women who are seeking an abortion receiving fully informed consent.

32. This overwhelming empirical evidence demonstrates that not only is APR scientifically feasible but has also been proven through clinical experience and scientific testing. Accordingly, it would be unethical to withhold this life-saving treatment from women who are seeking it for purposes of reversing an abortion.

I declare under penalty of perjury that the foregoing is true and correct. Executed by me on June 10, 2021, in Fort Wayne, Indiana.

Dr. Christina Francis, MD

12

**Christina Francis, MD**
**1018 Kinnaird Ave.**
**Fort Wayne, IN 46807**
**260-443-6207**
**cmfranci@gmail.com**

**EMPLOYMENT**

**Parkview Physicians Group OB/GYN**
Fort Wayne, IN
August 2014 to present
OB/GYN Hospitalist (since July 2016, worked as OB/GYN generalist prior to that)
Member of Executive Committee May 2015 to December 2016
Duties include: Primary in-house OB/GYN for two busy labor and delivery units (approximately 4000 deliveries/year) providing emergent OB services as well as delivery coverage for unattached patients and PPG OB/GYN patients in the inpatient setting.  Managing and delivering all high-risk antepartum inpatients that are admitted under our Maternal Fetal Medicine physicians.  Managing transfers of high-risk antepartum patients from outlying community hospitals.  Coverage of inpatient and ER gynecologic consults.

**Global Outreach, International**
Tupelo, MS
September 2013 to July 2014
Short-term medical missionary at A.I.C. Kapsowar Mission Hospital in Kapsowar, Kenya

**Christie Clinic - OB/GYN**
Champaign, IL
August 2011 to June 2013
Duties included: seeing variety of patients in the office, including both OB and Gyn patients, covering laboring patients and deliveries, supervising 2 nurse midwives, performance off gynecologic surgery, rotating evening/weekend call.

**A.I.C. Kapsowar Mission Hospital (Employer - Samaritan's Purse) – OB/GYN**
Kapsowar, Kenya
August 2009 to June 2011
Duties included: Managing maternity ward (approximately 1200 deliveries/year), performing all operative vaginal deliveries and Cesarean sections during daytime hours and rotating evening/weekend call, supervising/teaching nursing students; Evaluation of all gynecologic outpatients and complicated antenatal clients; Performing all gynecologic surgeries; Organizing

and implementing mobile outreach clinics to surrounding areas; Teaching visiting medical
students; Performing neonatal resuscitation when required.


**BOARD CERTIFICATION**

OB/GYN Written Board Exam – passed June 2009
OB/GYN Oral Board Exam - passed December 2012
American Board of OB/GYN maintenance of certification maintained since 2013

**EDUCATION**

**Ball State University – BS Chemistry**
August 1996 – May 2000

**Indiana University School of Medicine – MD**
August 2001- May 2005

**OB/GYN Residency**
St. Vincent Hospital, Indianapolis, Indiana
July 2005 – June 2009

**PROFESSIONAL ACTIVITIES**

**Volunteer –** August 2000 – July 2001
Spent one year in Romania working with orphans.  Responsibilities included teaching English
and computers as well as being a mentor to teenage girls.

**Volunteer Physician** – January 2005/2007
Yangon, Myanmar – provided medical care to children and adults in a small village

**Volunteer Physician** – November 2007
CURE International Hospital, Kabul, Afghanistan

**Volunteer Physician** – October 2008
Ran maternity ward at a mission hospital in Kapsowar, Kenya

**Student Coordinator** – May 2008 to May 2009

St. Vincent Hospital, Indianapolis, Indiana.  Coordinate the many medical and physician assistant students that we have rotating with us and assure that they get a full OB/GYN experience.  Arrange student placements and address their concerns.

**Peer Review Committee** – June 2008 to June 2009
Review cases in our hospital deemed to be potential departures from standard of care


## RESEARCH

**Timing of Prophylactic Antibiotics for Cesarean Section: A prospective, randomized controlled trial.**  Published in Journal of Perinatology.

**Safety and Efficacy of Intrathecal Narcotic Analgesia.**  Poster presentation at SGO March 2006.

## AWARDS

**Best Resident Research Project** – 2007, 2008

**OB/GYN Medical Student Teaching Award** – 2005


## PROFESSIONAL SOCIETIES

**American Association of Pro-Life Obstetricians and Gynecologists**
Member since 2013
Board Member since February 2015
Current Chair of the Board (since 2016)
Advocacy Committee Chair since December 2020
Membership Committee Co-Chair since January 2021

**Christian Medical and Dental Association** – member since 2006

## PUBLISHED ARTICLES
Wall Street Journal, March 2020 - https://www.wsj.com/articles/the-ob-gyns-who-play-politics-with-womens-lives-11583279360

USA Today, March 2021 - https://www.usatoday.com/story/opinion/voices/2021/03/06/pro-life-abortion-fetal-abnormlity-statistics-column/4579657001/



# PRACTICE BULLETIN 6

**EVIDENCE DIRECTING PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS**

Number 6   November 16, 2019

## The Reversal of the Effects of Mifepristone by Progesterone

*Some women who take mifepristone, a progesterone receptor antagonist, in order to terminate their pregnancies, change their minds and desire to stop the medical abortion process before taking the second component, misoprostol. The purpose of this document is to summarize the medical literature regarding the use of progesterone for competitive reversal of the effects of mifepristone at the level of the progesterone receptor, and the application of this basic principle of toxicology in women who change their mind about abortion after taking mifepristone.*

## Background

### Mifepristone abortion background

Medical induced abortion utilizing mifepristone and misoprostol has been available in the United States since 2000. In 2014, 31% of non-hospital induced abortions were medical induced abortions.[1] The 2016 FDA protocol for the mifepristone abortion regimen involves the administration of mifepristone 200 mg orally as a single dose, which leads to embryonic or fetal demise, followed 24-48 hours later by misoprostol 800 mcg buccally as a single dose, which stimulates myometrial contractions. The protocol is approved up to 70 days after the first day of the last menstrual period.[2] Misoprostol is part of the protocol because mifepristone alone has an incomplete abortion rate of 20-40%, defined as incomplete expulsion of the uterine contents.[3]

By blocking progesterone receptors, mifepristone leads to the separation of the decidua basalis from the trophoblast. This separation is the primary embryocidal and feticidal effect of mifepristone.[4,5,6] Additionally, mifepristone causes softening and dilatation  of the cervix.[7] It also leads to myometrial contractions, increased myometrial sensitivity to prostaglandins[8,9] and the disinhibition of prostaglandin synthesis by the myometrium.[10] Progesterone has an autoregulatory effect on progesterone synthesis by the corpus luteum. Mifepristone blockade of progesterone receptors within the corpus luteum itself decreases progesterone secretion by the corpus luteum.[11] Mifepristone blockade of progesterone receptors is a reversible competitive inhibition.[12]  Some women who take mifepristone, a progesterone receptor antagonist, in order to terminate their pregnancies, change their minds and desire to stop

**Committee on Practice Bulletins.** This document was developed by the Practice Bulletin Committee to provide evidence for pro-life practice. Because of the gravity of issues addressed by AAPLOG, variation in practice regarding matters of fetal life should be undertaken only after serious consideration of the literature cited by this document.

the medical abortion process before taking the second component, misoprostol.[13]

*Evidence for Efficacy of Progesterone Reversal of Mifepristone Receptor Blockade*

There is pharmacological, animal and human data supporting the effects of mifepristone blockade of progesterone receptors in women who wish to provide an increased chance of embryo survival after ingestion of mifepristone.

1)  Biological Feasibility.

It is a fundamental principle of biochemistry that competitive inhibitors (like mifepristone) that replace and block out substrates (like natural progesterone) may be thwarted if there is enough substrate around. "The inhibitor creates a competing equilibrium to that of the substrate (S), removing a fraction of the enzyme to an inactive form. Adding more substrate will yield more of the active enzyme substrate (ES) form."[14] This basic medical principle is also the foundation of leucovorin "rescue" after treatment of cancer with methotrexate.  In the case of leucovorin "rescue" leucovorin (also known as the vitamin "folinic acid") out-competes the inhibitor,  which is methotrexate.[15]

Mifepristone was studied and developed as an abortifacient precisely because it antagonizes progesterone, competing for the progesterone receptor. It is well known that, in a biological system, increasing the concentration of a ligand will result in that molecule preferentially binding to the receptor compared to other molecules with similar receptor affinity.

2)  Mifepristone Pharmacology

Mifepristone is a reversible, competitive antagonist of progesterone at the progesterone receptor (PR).

It binds to the PR about twice as avidly as progesterone.[16] Mifepristone is an orally active compound with a nearly 70% absorption rate, but its bioavailability is reduced to approximately 40% because of the first-pass effect.[17] It is absorbed better with food than on an empty stomach. After metabolism by the CYP3A4 enzyme, three metabolites retain biologic activity. The half-life of mifepristone is about 18-25 hours. Mifepristone and its metabolites can be measured up to 72 hours after an ingested dose.[18,19] Progesterone's half-life is approximately 25-55 hours.[20,21]

The reversibility of mifepristone blockade of glucocorticoid nuclear receptors (GR) was clearly demonstrated by National Institutes of Health (NIH) researchers investigating mifepristone reversible binding of the glucocorticoid receptor. Sternberg reviewed multiple studies showing that the blockade of mifepristone at the glucocorticoid receptor is reversible by administration of additional glucocorticoids.[22,23]

The reversibility of mifepristone binding to progesterone receptors (PR) is supported by the basic pharmacological research conducted by the manufacturer.[24] It shows the rate at which RU486 could be removed from the progesterone receptor, clearly demonstrating that mifepristone's blockade of progesterone receptors is reversible—not permanent—and that high concentrations of progesterone will reverse the binding of mifepristone at the progesterone receptor.

3)  Mifepristone abortion reversibility in animal models

Investigation of progesterone reversal of mifepristone abortion in a pregnant animal model demonstrated clearly that mifepristone blockade of

progesterone receptors can be overcome by the administration of additional natural progesterone.[25] In that study, Yamabe separated pregnant rats into three groups. The first group received no drugs, the second group was given mifepristone, and the third group was given mifepristone followed by natural progesterone. 100% of the no-drug group delivered live offspring. Only 33.3% of the mifepristone-only group delivered live offspring. In the mifepristone and then progesterone group, 100% delivered live offspring.

Furthermore, the mifepristone group had characteristic mifepristone induced changes in the myometrium and ovaries; the group that received the mifepristone plus progesterone had no such changes.

Yamabe also examined the clearance rate of mifepristone. In the rats given mifepristone alone, the level of progesterone in the blood began to decrease at 48 hours and continued to decrease at 72 hours. In contrast, where mifepristone was followed by progesterone the progesterone levels were the same at 72 hours as the control group which received no mifepristone.

4)  Human data on embryo survival after mifepristone alone.

A systematic review of documented embryo survival by ultrasound after mifepristone alone was performed by analyzing published research during the time before prostaglandins were added to the mifepristone regimen. Davenport conducted a systematic review of published studies that met inclusion criteria of a documented living embryo after mifepristone ingestion without subsequent misoprostol or other prostaglandin. The analysis concluded that a documented living embryo or fetus after mifepristone alone was at most 23%.[26]

Grossman 2015 reviewed survival rate after mifepristone alone and claimed a survival rate after mifepristone alone at 40%.[27] However, this review included studies which did not actually document embryo survival, but used instead numbers of "incomplete abortions" (i.e. retained products of conception). Inclusion of studies which did not document a living fetus results **in falsely elevating the survival rate after mifepristone alone**. Thus the Grossman study cannot be relied upon to give an estimate of actual living embryo survival, but rather **provides a rate of "mifepristone failures"**, some of which include embryo survival, and others which include simply retained products of conception.

5)  Human data on embryo survival after mifepristone followed by natural progesterone

**2012 Delgado**

Delgado 2012[28] reported a small case series of six women who changed their minds about abortion after taking mifepristone, and sought help to enhance the chances that their embryo would survive the attempted abortion with mifepristone. Of the six women given natural progesterone, four of those women went on to complete delivery of live born infants. No malformations were observed in the children.

**2016 Garrett**

In a small case series from Australia, Garrett reported the results of three women who attempted to increase their chances of embryo survival after ingesting mifepristone by using natural progesterone. Two out of these three women who attempted reversal with progesterone delivered live, healthy neonates.[29]

**2018 Delgado**

In a much larger 2018 retrospective chart review, Delgado reviewed the records of 754 patients who decided to attempt to reverse the medical abortion process after taking mifepristone but before taking misoprostol, by administration of natural progesterone within 72 hours of the mifepristone ingestion. Two-hundred fifty-seven births after reversal were found. An historic control rate of 25% embryo or fetal survival after mifepristone exposure, if no treatment was offered, was used as the comparator. The overall reversal rate was 48% (p<0.001). With the high dose oral protocol, the reversal rate was 68% (p<0.001); the rate with the injection protocols was 64% (p<0.001).[30]

As a historical comparator, Delgado used a 25% survival rate with mifepristone alone, which was actually higher than the maximum survival rate determined by the historical review by Davenport. Despite comparing with a higher survival rate, Delgado demonstrated a statistically significant survival over mifepristone alone.

Dr. Delgado and his co-authors also analyzed their results by gestational age at the time of reversal attempt and found that the success rate increased with increasing gestational age.

In addition, Dr. Delgado and his co-authors analyzed the interval of time between mifepristone injection and progesterone administration and found that success rates were the same as long so the progesterone was given within 72 hours of the use of mifepristone. This is consistent with what we know about mifepristone, which is that it takes several days to act and thus does not kill the embryo immediately. This finding is also consistent with the Yamabe study, which found that in the rats given mifepristone alone, the level of progesterone in the blood began to decrease at 48 hours and continued to decrease at 72 hours. In contrast, where mifepristone was followed by progesterone the progesterone levels were the same at 72 hours as the group which had not received anything.

Safety analysis revealed no increase of birth defects when compared to the general population which is consistent with other studies which have found no increase in malformation rate over the general population in infants who are born after exposure to mifepristone in utero.[31,32]
In addition, Dr. Delgado found that the preterm delivery rate was 2.7%, as compared to the 10% of preterm births in the general population.

**2019 Creinin**

A recent study by Creinin,[33] which was halted for safety considerations, found a similar survival rate after mifepristone plus progesterone as the original small case series of Delgado in 2012.

In the control arm of the study, six women were given mifepristone plus placebo. The results were compared to six women who received mifepristone plus progesterone in the regimen recommended by Delgado. One woman in each arm withdrew. Of the remaining five women in each arm, four of the five women who received progesterone (80%) had living fetuses at the 2 week follow up as documented by ultrasound prior to their surgical abortion. 1 of the 5 (20%) women who received progesterone self-referred to the ER for heavy bleeding but was found to have completely passed the fetus and thus she did not require a D&C as the bleeding had stopped after passage of tissue. No further treatment was required.

In contrast, **in the placebo group which received only mifepristone**, 2 of the 5 women (40%) in the <u>mifepristone alone</u> group had severe hemorrhage requiring emergency D&C and one of those women also required a blood transfusion. It was **<u>due to the severe hemorrhage in the mifepristone alone group, not the progesterone group, that the study was halted.</u>** Of note, 2 of the 5 women (40%) in the mifepristone alone arm had ongoing pregnancies at follow up.

*Evidence for the safety of natural progesterone treatment in pregnancy.*

Natural progesterone has routinely been given to women during pregnancy for over 50 years and is in fact standard of care after in-vitro fertilization (IVF). The IVF industry has concluded that there is no increased risk from natural progesterone supplementation in early pregnancy.[34,35] Natural progesterone is commonly used to supplement hormonal deficiency in at-risk early pregnancies.[36]

Reported association of artificial progesterone like compounds (progestins) with hypospadias occurring in the male infants born to women who used progestins during pregnancy do not apply to natural progesterone, which has a long and demonstrated safety record in pregnancy. There is no evidence after decades of use for luteal support in IVF that natural progesterone has ever been shown to increase the risk of birth defects.

Further reassurance is derived from the large retrospective review of Delgado which showed no increased risk of birth defects in 257 births after abortion pill reversal,[37] and in the two studies demonstrating no increase in malformation rate in live births after mifepristone without progesterone.[38,39]

In summary, using natural progesterone to counter the effects of ingested mifepristone is logical, and founded on basic principles of biochemistry, animal studies, and analysis of human experience. Given the long history of progesterone use in pregnancy, the established safety of progesterone use in early pregnancy for both the mother and her fetus in IVF pregnancies, the known ability of progesterone to counteract the abortive effects of mifepristone in animal models, and the actual evidence in humans of the efficacy and safety of abortion pill reversal, it is reasonable to offer this treatment to women who desire to give their fetus increased chances for survival after ingestion of mifepristone.

## Clinical Considerations and Recommendations

Q   *Who is a candidate for Abortion Pill Reversal attempt?*

Mifepristone reversal with progesterone is indicated in a woman who has an intrauterine pregnancy, has taken mifepristone but not misoprostol and desires to halt the medical abortion process.

Q   *Who is not a candidate for Abortion Pill Reversal attempt?*

Mifepristone reversal with progesterone is contraindicated in a woman with ectopic pregnancy, nonviable embryo or fetus, septic abortion, hemodynamic compromise or allergy to progesterone. Oral micronized progesterone in peanut oil is contraindicated in women with peanut allergy, unless cleared by an allergist.

## Summary of Recommendations and Conclusion

*The following recommendations are based on good and consistent scientific evidence (Level A):*

Some women change their minds after starting the mifepristone abortion process and wish to reverse the effects of mifepristone to stop the medical abortion. The current research suggests that using progesterone to counter the effects of mifepristone and stop the abortion process is both safe and effective. Since there is no alternative treatment for women who change their minds, it is reasonable to offer this life-saving and life-changing treatment to women who desire to increase the chances of pregnancy survival.

Utilizing the data from the 2018 Delgado study, two protocols can be recommended for women who change their minds after taking mifepristone and want to halt the medical abortion process.(11)

### 1.  High Dose Oral Protocol

Progesterone micronized 200 mg capsule two by mouth as soon as possible and continued at a dose of 200 mg capsule two by mouth twice a day for three days, followed by 200 mg capsule two by mouth at bedtime until the end of the first trimester.(11) Oral progesterone should be taken with food to improve absorption.

### 2.  Intramuscular Protocol

Progesterone 200 mg intramuscular as soon as possible and continued at a dose of 200 mg intramuscular once a day on days two and three, then every other day for a total of seven injections. Some clinicians may choose to continue intramuscular treatment longer since this recommendation is based on relatively small numbers.(11)

A sonogram should be obtained as soon as possible to confirm intrauterine location, viability and gestational age. If ultrasonography is not immediately available, treatment should not be delayed unless there is suspicion of an ectopic pregnancy, septic abortion or other complication that requires immediate gynecologic attention in a hospital or similar setting.

## References

The MEDLINE database, bibliographies of relevant guidelines, and AAPLOG's internal sources were used to compile this document with citations from 1985 to the publication date.  Preference was given to work in English, to original research, and to systematic reviews. When high-quality evidence was unavailable, opinions from members of AAPLOG were sought.

1 Jones RK and Jerman J. Abortion incidence and service availability in the United States, 2014. Perspect Sex Reprod Health. 2017 Mar;49(1):17-27. doi: 10.1363/psrh.12015. Epub 2017 Jan 17. Full text: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5487028/

2 Medication Guide, Mifeprix. www.fda.gov/downloads/drugs/drugsafety ucm088643.pdf (accessed November 19, 2016).

3 Creinin, M, Gemzell Danielsson, K. Chapter 9, Medical abortion in early pregnancy, in Management of Unintended and Abnormal Pregnancy: Comprehensive Abortion Care. Published Online: 22 May 2009 DOI:10.1002/9781444313031.ch9

4 Ibid.

5 Johannisson E, Oberholzer M, Swahn ML, Bygdeman M. Vascular changes in the human endometrium following the administration of the progesterone antagonist RU 486. Contraception. 1989 Jan;39(1):103-17. DOI:10.1016/0010-7824(89)90019-x
https://www.ncbi.nlm.nih.gov/pubmed/?term=Vascular+changes+in+the+human+endometrium+following+the+administration+of+the+progesterone+antagonist+RU+486.

6 Schindler AM, Zanon P, Obradovic D, Wyss R, Graff P, Hermann WL. Early ultrastructural changes in RU-486-exposed decidua. Gynecol Obstet Invest. 1985;20(2):62-7. DOI:10.1159/000298974
https://www.ncbi.nlm.nih.gov/pubmed/?term=Gynecol+Obstet+Invest+1985%3B+20%3A+62%E2%80%9367.
7 Op. cit. Endnote 3 Creinin et al.
8 Ibid.
9 Swahn ML, Bygdeman M. The effect of the antiprogestin RU 486 on uterine contractility and sensitivity to prostaglandin and oxytocin. Br J Obstet Gynaecol. 1988 Feb;95(2):126-34. DOI:10.1111/j.1471-0528.1988.tb06840.x
https://www.ncbi.nlm.nih.gov/pubmed/?term=Br+J+Obstet+Gynaecol+1988%3B+95%3A+126%E2%80%93134.
10 Herrmann WL, Schindler AM, Wyss R, Bishof P. Effects of the antiprogesterone RU 486 in early pregnancy and during the menstrual cycle. In: Beaulieu EE, Siegel S, eds. The Antiprogestin Steroid RU 486 and Human Fertility Control. Plenum, New York,1985: 259–262. DOI https://doi.org/10.1007/978-1-4684-1242-0_15
https://link.springer.com/chapter/10.1007/978-1-4684-1242-0_15
11 Ottander U, et al. A Putative Stimulatory Role of Progesterone Acting via Progesterone Receptors in the Steroidogenic Cells of the Human Corpus Luteum. Biology of Reproduction March 1, 2000 vol. 62 no.3 655-663. Full text: https://academic.oup.com/biolreprod/article/62/3/655/2734786
12 Baulieu EE, Segal SJ. The Antiprogestin Steroid RU486 and Human Fertility Control. Proceedings of a Conference on the Antiprogestational Compound RU486. Oct 23-25. Bellagio, Italy. Published in the series Reproductive Biology 1984 Sheldon Segal Series Editor 1985 Plenum Press. At page 91 Figure 3.
13 Delgado G, Davenport M. Progesterone Use to Reverse the Effects of Mifepristone. Ann Pharmacother. 2012 Dec;46(12):e36. doi: 10.1345/aph.1R252. Epub 2012 Nov 27. DOI: 10.1345/aph.1R252.
https://www.ncbi.nlm.nih.gov/pubmed/23191936
14 Pelley, John W. in Elsevier Integrated Review Biochemistry (Second Edition), 2012 p 33-34
15 Drug Info: Folinic Acid, Chemocare.Com, available at: http://chemocare.com/chemotherapy/drug-info/folinic-acid.aspx.
16 Heikinheimo O, Kekkonen R, Lahteenmaki P. The pharmacokinetics of mifepristone in humans reveal insights into differential mechanisms of antiprogestins action. Contraception. 2003 Dec;68(6):421-6. DOI:10.1016/s0010-7824(03)00077-5 https://www.contraceptionjournal.org/article/S0010-7824(03)00077-5/fulltext
17 Sarkar NN. Mifepristone: bioavailability, pharmacokinetics and use-effectiveness. Eur J Obstet Gynecol Reprod Biol. 2002 Mar 10;101(2):113-20. DOI:10.1016/s0301-2115(01)00522-x https://www.ejog.org/article/S0301-2115(01)00522-X/fulltext
18 Op. cit. Endnote 16 Heikinheimo et al.
19 Yamabe S, et al. The effect of RU486 and progesterone on luteal function during pregnancy. Nihon Naibunpi Gakkai Zasshi. 1989 May 20;65(5):497-511. DOI:10.1507/endocrine1927.65.5_497
https://www.ncbi.nlm.nih.gov/pubmed/2776921
21 Drug Bank Progesterone. http://www.drugbank.ca/drugs/DB00396 (accessed 2011 Oct 8)
22 Webster JI, Sternberg EM "Review: Role of the hypothalamic-pituitary-adrenal axis, glucocorticoids and glucocorticoid receptors in toxic sequenlae of exposure to bacterial and viral products" J Endocrinol. 2004 May;181(2):207-21. Full text: https://joe.bioscientifica.com/view/journals/joe/181/2/207.xml
23 Department of Health and Human Services (HHS), Centers for Disease Control and Prevention (CDC), Food and Drug Administration (FDA), and National Institutes of Health (NIH), Emerging Clostridial Disease Workshop, May 11, 2006 (revised June 22, 2006), at page 23.
24 Op. cit. Endnote 12 Balieu et al.
25 Op. cit. Endnote 19 Yamabe et al.
26 Davenport M, Delgado G, Khauv V. Embryo survival after mifepristone: review of the literature. Issues Law Med. 2017 Spring;32(1):3-18. PMID:29108160
https://www.ncbi.nlm.nih.gov/pubmed/?term=Embryo+survival+after+mifepristone%3A+review+of+the+literature.+Issues+in+Law+and+Medicine+2017%2C+32+(1)%3A+3-18.
28 Op. cit. Endnote 13 Delgado et al.
29 Garratt D, Turner J.V. Progesterone for preventing pregnancy termination after initiation of medical abortion with mifepristone. Eur J Contracept Reprod Health Care. 2017 Dec;22(6):472-475.
DOI:10.1080/13625187.2017.1412424. Epub 2017 Dec 20.
https://www.tandfonline.com/doi/full/10.1080/13625187.2017.1412424
30 Delgado G, et al. A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone. Issues Law Med. Spring 2018;33(1):21-31. PMID:30831017
https://www.ncbi.nlm.nih.gov/pubmed/?term=Issues+in+Law+and+Medicine+(2018)+33(1)%3A+21-+31.

31 Bernard N, et al. Continuation of pregnancy after first-trimester exposure to mifepristone: an observational prospective study. BJOG. 2013 Apr;120(5):568-74. doi: 10.1111/1471-0528.12147. Epub 2013 Jan 24. Full text: https://obgyn.onlinelibrary.wiley.com/doi/full/10.1111/1471-0528.12147

32 Sitruk-Ware A, Davey A. Fetal malformation and failed medical termination of pregnancy. Lancet. 1998 Jul 25;352(9124):323. DOI:10.1016/S0140-6736(05)60300-5 Full text: https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(05)60300-5/fulltext

33 Creinin MD, Hou MY, Dalton L, Steward R, Chen M. Mifepristone antagonism with progesterone to prevent medical abortion: a randomized controlled trial.  Obstet Gynecol epub Dec 5 2019 available at: https://journals.lww.com/greenjournal/Abstract/publishahead/Mifepristone_Antagonization_With_Progesterone_to.97525.aspx

34 Progesterone: Risks and Benefits, Society for Assisted Reproductive Technology, available at: https://www.sart.org/patients/a-patients-guide-to-assisted-reproductive-technology/stimulation/progesterone/ .

35 American Society for Rep. Medicine. Practice Committee Opinion: Progesterone supplementation during the luteal phase and in early pregnancy in the treatment of infertility: an educational bulletin. Fert. Steril. (2008). 89 (4). Full text: https://www.fertstert.org/article/S0015-0282(08)03459-6/pdf

36 Progesterone: Risks and Benefits, Society for Assisted Reproductive Technology, available at: https://www.sart.org/patients/a-patients-guide-to-assisted-reproductive-technology/stimulation/progesterone/ .

37 Op. cit. Endnote 30 Delgado et al.

38 Op. cit. Endnote 31 Bernard et al.

39 Op. cit. Endnote 32 Sitruk-Ware et al.



**INTERIM UPDATE**

The American College of
Obstetricians and Gynecologists
WOMEN'S HEALTH CARE PHYSICIANS

# ACOG PRACTICE BULLETIN

**Clinical Management Guidelines for Obstetrician–Gynecologists**

NUMBER 200                    *(Replaces Practice Bulletin Number 150, May 2015)*

**Committee on Practice Bulletins—Gynecology**. This Practice Bulletin was developed by the ACOG Committee on Practice
Bulletins—Gynecology in collaboration with Sarah Prager, MD; Vanessa K. Dalton, MD, MPH; and Rebecca H. Allen, MD, MPH.

*INTERIM UPDATE: This Practice Bulletin is updated as highlighted to reflect recent evidence regarding the use of mife-
pristone combined with misoprostol for medical management of early pregnancy loss. This Practice Bulletin also includes
limited, focused updates to align with Practice Bulletin No. 181, Prevention of Rh D Alloimmunization.*

# Early Pregnancy Loss

*Early pregnancy loss, or loss of an intrauterine pregnancy within the first trimester, is encountered commonly in
clinical practice. Obstetricians and gynecologists should understand the use of various diagnostic tools to differentiate
between viable and nonviable pregnancies and offer the full range of therapeutic options to patients, including
expectant, medical, and surgical management. The purpose of this Practice Bulletin is to review diagnostic approaches
and describe options for the management of early pregnancy loss.*

## Background

### Definition

*Early pregnancy loss* is defined as a nonviable, intrauter-
ine pregnancy with either an empty gestational sac or
a gestational sac containing an embryo or fetus without
fetal heart activity within the first 12 6/7 weeks of ges-
tation (1). In the first trimester, the terms miscarriage,
spontaneous abortion, and early pregnancy loss are used
interchangeably, and there is no consensus on terminol-
ogy in the literature. However, early pregnancy loss is the
term that will be used in this Practice Bulletin.

### Incidence

Early pregnancy loss is common, occurring in 10% of all
clinically recognized pregnancies (2–4). Approximately
80% of all cases of pregnancy loss occur within the first
trimester (2, 3).

### Etiology and Risk Factors

Approximately 50% of all cases of early pregnancy loss
are due to fetal chromosomal abnormalities (5, 6). The
most common risk factors identified among women who
have experienced early pregnancy loss are advanced

maternal age and a prior early pregnancy loss (7, 8).
The frequency of clinically recognized early pregnancy
loss for women aged 20–30 years is 9–17%, and this
rate increases sharply from 20% at age 35 years to 40%
at age 40 years and 80% at age 45 years (7). Discussion
of the many risk factors thought to be associated with
early pregnancy loss is beyond the scope of this docu-
ment and is covered in more detail in other publications
(6, 7).

## Clinical Considerations and Recommendations

▶ *What findings can be used to confirm a diagnosis of
early pregnancy loss?*

Common symptoms of early pregnancy loss, such as
vaginal bleeding and uterine cramping, also are common
in normal gestation, ectopic pregnancy, and molar preg-
nancy. Before initiating treatment, it is important to
distinguish early pregnancy loss from other early pregnancy
complications. Treatment of an early pregnancy loss before
confirmed diagnosis can have detrimental consequences,
including interruption of a normal pregnancy, pregnancy
complications, or birth defects (9). Therefore, a thorough

**Copyright © by the American College of Obstetricians
and Gynecologists. Published by Wolters Kluwer Health, Inc.
Unauthorized reproduction of this article is prohibited.**



evaluation is needed to make a definitive diagnosis. In combination with a thorough medical history and physical examination, ultrasonography and serum β-hCG testing can be helpful in making a highly certain diagnosis.

Ultrasonography, if available, is the preferred modality to verify the presence of a viable intrauterine gestation. In some instances, making a diagnosis of early pregnancy loss is fairly straightforward and requires limited testing or imaging. For example, early pregnancy loss can be diagnosed with certainty in a woman with an ultrasound-documented intrauterine pregnancy who subsequently presents with reported significant vaginal bleeding and an empty uterus on ultrasound examination. In other instances, the diagnosis of early pregnancy loss is not as clear. Depending on the specific clinical circumstances and how much diagnostic certainty the patient desires, a single serum β-hCG test or ultrasound examination may not be sufficient to confirm the diagnosis of early pregnancy loss.

The use of ultrasound criteria to confirm the diagnosis of early pregnancy loss was initially reported in the early 1990s, shortly after vaginal ultrasonography became widely available. Based on these early studies, a crown–rump length (CRL) of 5 mm without cardiac activity or an empty gestational sac measuring 16 mm in mean gestational sac diameter have been used as diagnostic criteria to confirm early pregnancy loss (10, 11). Recently, two large prospective studies have been used to challenge these cutoffs. In the first study, 1,060 women with intrauterine pregnancies of uncertain viability were followed up to weeks 11–14 of gestation (12). In this group of women, 55.4% received a diagnosis of nonviable gestation during the observation period. A CRL cutoff of 5 mm was associated with an 8.3% false-positive rate for early pregnancy loss. A CRL cutoff of 5.3 mm was required to achieve a false-positive rate of 0% in this study (12). Similarly, the authors reported a 4.4% false-positive rate for early pregnancy loss when using a mean gestational sac diameter cutoff of 16 mm. A mean gestational sac diameter cutoff of 21 mm (without an embryo and with or without a yolk sac) on the first ultrasound examination was required to achieve 100% specificity for early pregnancy loss. In a second study of 359 women from the first study group, the authors concluded that growth rates for the gestational sac (mean gestational sac diameter) and the embryo (CRL) could not predict viability accurately (13). However, the authors concluded that if a gestational sac was empty on initial scan, the absence of a visible yolk sac or embryo on a second scan performed 7 days or more after the first scan was always associated with pregnancy loss (13).

Based on these studies, the Society of Radiologists in Ultrasound Multispecialty Panel on Early First Trimester Diagnosis of Miscarriage and Exclusion of a Viable Intrauterine Pregnancy created guidelines that are considerably more conservative than past recommendations and also have stricter cutoffs than the studies on which they are based (14) (Table 1). The authors of the guidelines report that the stricter cutoffs are needed to account for interobserver variability; however, this already was accounted for in the original study through its use of multiple ultrasonographers (12, 15). Other important limitations in the development of these guidelines should be recognized. For example, there were few cases at or near the measurements ultimately identified as decision boundaries. Similarly, the time between observing a gestational sac and expecting to see a yolk sac or embryo was increased from 7 days or more in the clinical study (13) to 14 days in the guidelines (14). The basis of this recommendation is unclear.

Obstetrician–gynecologists caring for women experiencing possible early pregnancy loss should consider other clinical factors when interpreting the Society of Radiologists in Ultrasound guidelines, including the woman's desire to continue the pregnancy; her willingness to postpone intervention to achieve 100% certainty of pregnancy loss; and the potential consequences of waiting for intervention, including unwanted spontaneous passage of pregnancy tissue, the need for an unscheduled visit or procedure, and patient anxiety. It is important to include the patient in the diagnostic process and to individualize these guidelines to patient circumstances.

Criteria that are considered suggestive, but not diagnostic, of early pregnancy loss are listed in Table 1 (14). Slow fetal heart rate (less than 100 beats per minute at 5–7 weeks of gestation) (16) and subchorionic hemorrhage also have been shown to be associated with early pregnancy loss but should not be used to make a definitive diagnosis (17). These findings warrant further evaluation in 7–10 days (14).

In cases in which an intrauterine gestation cannot be identified with reasonable certainty, serial serum β-hCG measurements and ultrasound examinations may be required before treatment to rule out the possibility of an ectopic pregnancy. A detailed description of the recommended approach to ectopic pregnancy diagnosis and management is available in Practice Bulletin Number 193, *Tubal Ectopic Pregnancy* (18).

▶ *What are the management options for early pregnancy loss?*

Accepted treatment options for early pregnancy loss include expectant management, medical treatment, or surgical evacuation. Although these options differ significantly in process, all have been shown to be reasonably effective and accepted by patients. In women without medical complications or symptoms requiring urgent surgical evacuation, treatment plans

Copyright © by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



**Table 1.** Guidelines for Transvaginal Ultrasonographic Diagnosis of Pregnancy Failure in a Woman With an Intrauterine Pregnancy of Uncertain Viability[*]

| Findings Diagnostic of Pregnancy Failure | Findings Suspicious for, but Not Diagnostic of, Pregnancy Failure[†] |
|---|---|
| Crown–rump length of 7 mm or greater and no heartbeat | Crown–rump length of less than 7 mm and no heartbeat |
| Mean sac diameter of 25 mm or greater and no embryo | Mean sac diameter of 16–24 mm and no embryo |
| Absence of embryo with heartbeat 2 weeks or more after a scan that showed a gestational sac without a yolk sac | Absence of embryo with heartbeat 7–13 days after a scan that showed a gestational sac without a yolk sac |
| Absence of embryo with heartbeat 11 days or more after a scan that showed a gestational sac with a yolk sac | Absence of embryo with heartbeat 7–10 days after a scan that showed a gestational sac with a yolk sac |
| | Absence of embryo for 6 weeks or longer after last menstrual period |
| | Empty amnion (amnion seen adjacent to yolk sac, with no visible embryo) |
| | Enlarged yolk sac (greater than 7 mm) |
| | Small gestational sac in relation to the size of the embryo (less than 5 mm difference between mean sac diameter and crown–rump length) |

[*]Criteria are from the Society of Radiologists in Ultrasound Multispecialty Consensus Conference on Early First Trimester Diagnosis of Miscarriage and Exclusion of a Viable Intrauterine Pregnancy, October 2012.

[†]When there are findings suspicious for pregnancy failure, follow-up ultrasonography at 7–10 days to assess the pregnancy for viability is generally appropriate.

Reprinted from Doubilet PM, Benson CB, Bourne T, Blaivas M, Barnhart KT, Benacerraf BR, et al. Diagnostic criteria for nonviable pregnancy early in the first trimester. Society of Radiologists in Ultrasound Multispecialty Panel on Early First Trimester Diagnosis of Miscarriage and Exclusion of a Viable Intrauterine Pregnancy. N Engl J Med 2013;369:1443–51.

can safely accommodate patient treatment preferences. There is no evidence that any approach results in different long-term outcomes. Patients should be counseled about the risks and benefits of each option. The following discussion applies to symptomatic and asymptomatic patients.

### Expectant Management

Because of a lack of safety studies of expectant management in the second trimester and concerns about hemorrhage, expectant management generally should be limited to gestations within the first trimester. With adequate time (up to 8 weeks), expectant management is successful in achieving complete expulsion in approximately 80% of women (19). Limited data suggest that expectant management may be more effective in symptomatic women (those who report tissue passage or have ultrasound findings consistent with incomplete expulsion) than in asymptomatic women (20, 21). Furthermore, studies that included women with incomplete early pregnancy loss tend to report higher success rates than those that included only women with missed or anembryonic pregnancy loss (22).

Patients undergoing expectant management may experience moderate-to-heavy bleeding and cramping. Educational materials instructing the patient on when and who to call for excessive bleeding and prescriptions for pain medications should be provided. It also is important to counsel patients that surgery may be needed if complete expulsion is not achieved. Studies among women with early pregnancy loss typically have used ultrasound criteria, patient-reported symptoms, or both, to confirm complete passage of gestational tissue. Although there is no consensus in the literature, a commonly used criterion for complete expulsion of pregnancy tissue is the absence of a gestational sac and an endometrial thickness of less than 30 mm (23). However, there is no evidence that morbidity is increased in asymptomatic women with a thicker endometrial measurement (24). Surgical intervention is not required in asymptomatic women with a thickened endometrial stripe after treatment for early pregnancy loss. Thus, the use of ultrasound examination for any diagnostic purpose other than documenting the absence of the gestational sac is not recommended. Other follow-up approaches, such as standardized follow-up phone calls, urine pregnancy tests, or

**Copyright © by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.**



serial quantitative serum β-hCG measurements, may be useful, especially for women with limited access to follow-up ultrasound examination (25). However, these approaches have not been studied sufficiently among women with early pregnancy loss to provide meaningful guidance.

## Medical Management

Medical management for early pregnancy loss can be considered in women without infection, hemorrhage, severe anemia, or bleeding disorders who want to shorten the time to complete expulsion but prefer to avoid surgical evacuation. Compared with expectant management, medical management of early pregnancy loss decreases the time to expulsion and increases the rate of complete expulsion without the need for surgical intervention (26).

Misoprostol-based regimens have been extensively studied for the medical management of early pregnancy loss (26). Most studies suggest that a larger dose of misoprostol is more effective than a smaller dose, and vaginal or sublingual administration is more effective than oral administration, although the sublingual route is associated with more cases of diarrhea (26). The largest randomized controlled trial conducted in the United States demonstrated complete expulsion by day 3 in 71% of women with first-trimester pregnancy loss after one dose of 800 micrograms of vaginal misoprostol (23). The success rate was increased to 84% after a second dose of 800 micrograms of vaginal misoprostol was administered if needed. Therefore, in patients for whom medical management of early pregnancy loss is indicated, initial treatment using 800 micrograms of vaginal misoprostol is recommended, with a repeat dose as needed (Box 1).

The addition of a dose of mifepristone (200 mg orally) 24 hours before misoprostol administration may significantly improve treatment efficacy and should be considered when mifepristone is available (Box 1). Although initial studies were unclear about the benefit of mifepristone for the management of early pregnancy loss (27), a 2018 randomized controlled trial showed that a combined mifepristone–misoprostol regimen was superior to misoprostol alone for the management of early pregnancy loss (28). Among 300 women undergoing medical management for early pregnancy loss, those who received mifepristone (200 mg orally) followed by misoprostol (800 micrograms vaginally) 24 hours later had significantly increased rates of complete expulsion (relative risk [RR], 1.25; 95% CI, 1.09–1.43) compared with women who received misoprostol alone (800 micrograms vaginally) (28). The mifepristone–misoprostol regimen also was associated with a decreased risk of surgical intervention with uterine aspiration to complete treatment (RR, 0.37; 95% CI,

---

### Box 1. Protocol for the Medical Management of Early Pregnancy Loss

- Misoprostol 800 micrograms vaginally, with one repeat dose as needed, no earlier than 3 hours after the first dose and typically within 7 days if there is no response to the first dose*
- A dose of mifepristone (200 mg orally) 24 hours before misoprostol administration should be considered when mifepristone is available.†
- Prescriptions for pain medications should be provided to the patient.
- Women who are Rh(D) negative and unsensitized should receive Rh(D)-immune globulin within 72 hours of the first misoprostol administration.
- Follow-up to document the complete passage of tissue can be accomplished by ultrasound examination, typically within 7–14 days. Serial serum β-hCG measurements may be used instead in settings where ultrasonography is unavailable. Patient-reported symptoms also should be considered when determining whether complete expulsion has occurred.
- If medical management fails, the patient may opt for expectant management, for a time determined by the woman and her obstetrician–gynecologist or other gynecologic provider, or suction curettage.

*Zhang J, Gilles JM, Barnhart K, Creinin MD, Westhoff C, Frederick MM. A comparison of medical management with misoprostol and surgical management for early pregnancy failure. National Institute of Child Health Human Development (NICHD) Management of Early Pregnancy Failure Trial. N Engl J Med 2005;353:761–9.

†Schreiber CA, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT. Mifepristone pretreatment for the medical management of early pregnancy loss. N Engl J Med 2018;378:2161–70.

---

0.21–0.68). Reports of bleeding intensity and pain as well as other adverse effects were generally similar for the two treatment groups, and the occurrence of serious adverse events was rare among all participants. These results are consistent with the demonstrated efficacy and safety of the mifepristone–misoprostol combined regimen for medication-induced abortion (29, 30). Currently, the availability of mifepristone is limited by U.S. Food and Drug Administration Risk Evaluation and Mitigation Strategy restrictions (31). The American College of Obstetricians and Gynecologists supports improving access to mifepristone for reproductive health indications (32).

A 2013 Cochrane review of limited evidence concluded that among women with incomplete pregnancy loss (ie, incomplete tissue passage), the addition of

Copyright © by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



misoprostol does not clearly result in higher rates of complete evacuation when compared with expectant management (at 7–10 days, success rates were 80–81% versus 52–85%, respectively) (33). Therefore, at this time, there is insufficient evidence to support or refute the use of misoprostol among women with incomplete pregnancy loss.

As with expectant management of early pregnancy loss, women opting for medical treatment should be counseled on what to expect while they pass pregnancy tissue, provided information on when to call regarding bleeding, and given prescriptions for pain medications. Counseling should emphasize that the woman is likely to have bleeding that is heavier than menses (and potentially accompanied by severe cramping). The woman should understand how much bleeding is considered too much. An easy reference for the patient to use is the soaking of two maxi pads per hour for 2 consecutive hours (34). The patient should be advised to call her obstetrician–gynecologist or other gynecologic provider if she experiences this level of bleeding. As with expectant management, it also is important to counsel patients that surgery may be needed if medical management does not achieve complete expulsion.

Follow-up typically includes confirmation of complete expulsion by ultrasound examination, but serial serum β-hCG measurement may be used instead in settings where ultrasonography is unavailable. Patient-reported symptoms also should be considered when determining whether complete expulsion has occurred.

## Surgical Management

Surgical uterine evacuation has long been the traditional approach for women presenting with early pregnancy loss and retained tissue. Women who present with hemorrhage, hemodynamic instability, or signs of infection should be treated urgently with surgical uterine evacuation. Surgical evacuation also might be preferable in other situations, including the presence of medical comorbidities such as severe anemia, bleeding disorders, or cardiovascular disease. Many women prefer surgical evacuation to expectant or medical treatment because it provides more immediate completion of the process with less follow-up.

In the past, uterine evacuation often was performed with sharp curettage alone. However, studies show that the use of suction curettage is superior to the use of sharp curettage alone (35, 36). Furthermore, the routine use of sharp curettage along with suction curettage in the first trimester does not provide any additional benefit as long as the obstetrician–gynecologist or other gynecologic provider is confident that the uterus is empty. Suction curettage also can be per-

formed in an office setting with an electric vacuum source or manual vacuum aspirator, under local anesthesia with or without the addition of sedation (37, 38). Surgical management in the office setting offers significant cost savings compared with the same procedure performed in the operating room (38–40). Patients often choose management in the office setting for its convenience and scheduling availability (38).

▶ **How do the different management options for early pregnancy loss compare in effectiveness and risk of complications?**

Studies have demonstrated that expectant, medical, and surgical management of early pregnancy loss all result in complete evacuation of pregnancy tissue in most patients, and serious complications are rare. As a primary approach, surgical evacuation results in faster and more predictable complete evacuation (22). The success of surgical uterine evacuation of early pregnancy loss approaches 99% (23). The largest U.S. trial reported that success rates after medical management of anembryonic gestations (81%) was lower than with embryonic or fetal death (88%) or incomplete or inevitable early pregnancy loss (93%) (23). However, a subsequent multivariable analysis of the same data revealed that only active bleeding and nulliparity were strong predictors of success (41). Therefore, medical management is a reasonable option for any pregnancy failure type.

Overall, serious complications after early pregnancy loss treatment are rare and are comparable across treatment types. Clinically important intrauterine adhesion formation is a rare complication after surgical evacuation. Hemorrhage and infection can occur with all of the treatment approaches. In the Management of Early Pregnancy Failure Trial, women randomized to the misoprostol group were significantly more likely to have a decrease in their hemoglobin levels greater than or equal to 3 g/dL than women in the vacuum aspiration group (23, 42). However, rates of hemorrhage-related hospitalization with or without transfusion are similar between treatment approaches (0.5–1%) (23, 43). Pelvic infection also can occur after any type of early pregnancy loss treatment. One systematic review concluded that although infection rates appeared lower among those undergoing expectant management than among those undergoing surgical evacuation (RR, 0.29; 95% CI, 0.09–0.97), the overall rates of infection were low (1–2%) (43). Because neither approach was clearly superior, the reviewers concluded that patient preference should guide choice of intervention (43).

**Copyright © by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.**



The risk of infection after suction curettage for missed early pregnancy loss should be similar to that after suction curettage for induced abortion. Therefore, despite the lack of data, antibiotic prophylaxis also should be considered for patients with early pregnancy loss (44, 45). The use of a single preoperative dose of doxycycline is recommended to prevent infection after surgical management of early pregnancy loss. Some experts have recommended administration of a single 200-mg dose of doxycycline 1 hour before surgical management of early pregnancy loss to prevent postoperative infection. The use of antibiotics based only on the diagnosis of incomplete early pregnancy loss has not been found to reduce infectious complications as long as unsafe induced abortion is not suspected (46). The benefit of antibiotic prophylaxis for the medical management of early pregnancy loss is unknown.

▶ *How do the different treatment approaches to early pregnancy loss differ with respect to cost?*

Studies have consistently shown that surgical management in an operating room is more costly than expectant or medical management (47, 48). However, surgical management in an office setting can be more effective and less costly than medical management when performed without general anesthesia and in circumstances in which numerous office visits are likely or there is a low chance of success with medical management or expectant management (49). Findings from studies comparing the cost-effectiveness of medical and expectant management schemes are inconsistent. However, a U.S. analysis of all three management approaches concluded that medical management with misoprostol was the most cost-effective intervention (48). One limitation of the available studies on cost of early pregnancy loss care is that none of these studies can adequately consider clinical nuances or patient treatment preferences, which can affect patient adherence to the primary treatment regimen and, subsequently, the effectiveness of that treatment. For instance, in one observational study, the effectiveness of medical management of early pregnancy loss was far lower than rates reported in randomized clinical trials, which was due in large part to patients' unwillingness to complete the treatment regimen (50).

▶ *How should patients be counseled regarding interpregnancy interval after early pregnancy loss?*

There are no quality data to support delaying conception after early pregnancy loss to prevent subsequent early pregnancy loss or other pregnancy complica-tions. Small observational studies show no benefit to delayed conception after early pregnancy loss (51, 52). Abstaining from vaginal intercourse for 1–2 weeks after complete passage of pregnancy tissue generally is recommended to reduce the risk of infection, but this is not an evidence-based recommendation.

▶ *How should patients be counseled regarding the use of contraception after early pregnancy loss?*

Women who desire contraception may initiate hormonal contraception use immediately after completion of early pregnancy loss (53). There are no contraindications to the placement of an intrauterine device immediately after surgical treatment of early pregnancy loss as long as septic abortion is not suspected (53). The expulsion rate with immediate intrauterine device insertion after suction curettage in the first trimester is not clinically significantly different than placement 2–6 weeks postoperatively (5% versus 2.7% at 6 months) (54).

▶ *How should patients be counseled regarding prevention of alloimmunization after early pregnancy loss?*

Although the risk of alloimmunization is low, the consequences can be significant, and administration of Rh D immune globulin should be considered in cases of early pregnancy loss, especially those that are later in the first trimester. If given, a dose of at least 50 micrograms should be administered. Because of the higher risk of alloimmunization, Rh D-negative women who have surgical management of early pregnancy loss should receive Rh D immune globulin prophylaxis (55).

▶ *What type of workup is needed after early pregnancy loss?*

No workup generally is recommended until after the second consecutive clinical early pregnancy loss (7). Maternal or fetal chromosomal analyses or testing for inherited thrombophilias are not recommended routinely after one early pregnancy loss. Although thrombophilias commonly are thought of as causes of early pregnancy loss, only antiphospholipid syndrome consistently has been shown to be significantly associated with early pregnancy loss (56, 57). In addition, the use of anticoagulants, aspirin, or both, has not been shown to reduce the risk of early pregnancy loss in women with thrombophilias except in women with antiphospholipid syndrome (58, 59).

**Copyright © by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.**



▶ *Are there any effective interventions to prevent early pregnancy loss?*

There are no effective interventions to prevent early pregnancy loss. Therapies that have historically been recommended, such as pelvic rest, vitamins, uterine relaxants, and administration of β-hCG, have not been proved to prevent early pregnancy loss (60–62). Likewise, bed rest should not be recommended for the prevention of early pregnancy loss (63). A 2008 Cochrane review found no effect of prophylactic progesterone administration (oral, intramuscular, or vaginal) in the prevention of early pregnancy loss (64). For threatened early pregnancy loss, the use of progestins is controversial, and conclusive evidence supporting their use is lacking (65). Women who have experienced at least three prior pregnancy losses, however, may benefit from progesterone therapy in the first trimester (7).

# Summary of Recommendations and Conclusions

*The following recommendation and conclusion are based on good and consistent scientific evidence (Level A):*

▶ In patients for whom medical management of early pregnancy loss is indicated, initial treatment using 800 micrograms of vaginal misoprostol is recommended, with a repeat dose as needed. The addition of a dose of mifepristone (200 mg orally) 24 hours before misoprostol administration may significantly improve treatment efficacy and should be considered when mifepristone is available.

▶ The use of anticoagulants, aspirin, or both, has not been shown to reduce the risk of early pregnancy loss in women with thrombophilias except in women with antiphospholipid syndrome.

*The following recommendations are based on limited or inconsistent scientific evidence (Level B):*

▶ Ultrasonography, if available, is the preferred modality to verify the presence of a viable intrauterine gestation.

▶ Surgical intervention is not required in asymptomatic women with a thickened endometrial stripe after treatment for early pregnancy loss.

▶ The routine use of sharp curettage along with suction curettage in the first trimester does not provide any additional benefit as long as the obstetrician–gynecologist or other gynecologic provider is confident that the uterus is empty.

*The following recommendations are based primarily on consensus and expert opinion (Level C):*

▶ Accepted treatment options for early pregnancy loss include expectant management, medical treatment, or surgical evacuation. In women without medical complications or symptoms requiring urgent surgical evacuation, treatment plans can safely accommodate patient treatment preferences.

▶ The use of a single preoperative dose of doxycycline is recommended to prevent infection after surgical management of early pregnancy loss.

▶ Although the risk of alloimmunization is low, the consequences can be significant, and administration of Rh D immune globulin should be considered in cases of early pregnancy loss, especially those that are later in the first trimester.

▶ Because of the higher risk of alloimmunization, Rh D-negative women who have surgical management of early pregnancy loss should receive Rh D immune globulin prophylaxis.

# References

1. National Institute for Health and Clinical Excellence. Ectopic pregnancy and miscarriage: diagnosis and initial management in early pregnancy of ectopic pregnancy and miscarriage. NICE Clinical Guideline 154. Manchester (UK): NICE; 2012. Available at: http://www.nice.org.uk/guidance/cg154/resources/guidance-ectopic-pregnancy-and-miscarriage-pdf. Retrieved January 20, 2015. (Level III)

2. Wilcox AJ, Weinberg CR, O'Connor JF, Baird DD, Schlatterer JP, Canfield RE, et al. Incidence of early loss of pregnancy. N Engl J Med 1988;319:189–94. (Level II-3)

3. Wang X, Chen C, Wang L, Chen D, Guang W, French J. Conception, early pregnancy loss, and time to clinical pregnancy: a population-based prospective study. Fertil Steril 2003;79:577–84. (Level II-3)

4. Zinaman MJ, Clegg ED, Brown CC, O'Connor J, Selevan SG. Estimates of human fertility and pregnancy loss. Fertil Steril 1996;65:503–9. (Level II-3)

5. Stephenson MD, Awartani KA, Robinson WP. Cytogenetic analysis of miscarriages from couples with recurrent miscarriage: a case-control study. Hum Reprod 2002;17:446–51. (Level II-2)

6. Alijotas-Reig J, Garrido-Gimenez C. Current concepts and new trends in the diagnosis and management of recurrent miscarriage. Obstet Gynecol Surv 2013;68:445–66. (Level III)

7. Evaluation and treatment of recurrent pregnancy loss: a committee opinion. Practice Committee of the American Society for Reproductive Medicine. Fertil Steril 2012;98:1103–11. (Level III)

8. Nybo Andersen AM, Wohlfahrt J, Christens P, Olsen J, Melbye M. Maternal age and fetal loss: population based register linkage study. BMJ 2000;320:1708–12. (Level II-3)

**Copyright © by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.**



9. Barnhart KT. Early pregnancy failure: beware of the pitfalls of modern management. Fertil Steril 2012;98:1061–5. (Level III)

10. Brown DL, Emerson DS, Felker RE, Cartier MS, Smith WC. Diagnosis of early embryonic demise by endovaginal sonography. J Ultrasound Med 1990;9:631–6. (Level III)

11. Pennell RG, Needleman L, Pajak T, Baltarowich O, Vilaro M, Goldberg BB, et al. Prospective comparison of vaginal and abdominal sonography in normal early pregnancy. J Ultrasound Med 1991;10:63–7. (Level II-3)

12. Abdallah Y, Daemen A, Kirk E, Pexsters A, Naji O, Stalder C, et al. Limitations of current definitions of miscarriage using mean gestational sac diameter and crown-rump length measurements: a multicenter observational study. Ultrasound Obstet Gynecol 2011;38:497–502. (Level II-3)

13. Abdallah Y, Daemen A, Guha S, Syed S, Naji O, Pexsters A, et al. Gestational sac and embryonic growth are not useful as criteria to define miscarriage: a multicenter observational study. Ultrasound Obstet Gynecol 2011;38:503–9. (Level II-3)

14. Doubilet PM, Benson CB, Bourne T, Blaivas M, Barnhart KT, Benacerraf BR, et al. Diagnostic criteria for nonviable pregnancy early in the first trimester. Society of Radiologists in Ultrasound Multispecialty Panel on Early First Trimester Diagnosis of Miscarriage and Exclusion of a Viable Intrauterine Pregnancy. N Engl J Med 2013;369:1443–51. (Level III)

15. Pexsters A, Luts J, Van Schoubroeck D, Bottomley C, Van Calster B, Van Huffel S, et al. Clinical implications of intra- and interobserver reproducibility of transvaginal sonographic measurement of gestational sac and crown-rump length at 6-9 weeks' gestation. Ultrasound Obstet Gynecol 2011;38:510–5. (Level II-3)

16. Doubilet PM, Benson CB, Chow JS. Long-term prognosis of pregnancies complicated by slow embryonic heart rates in the early first trimester. J Ultrasound Med 1999;18:537–41. (Level II-3)

17. Tuuli MG, Norman SM, Odibo AO, Macones GA, Cahill AG. Perinatal outcomes in women with subchorionic hematoma: a systematic review and meta-analysis. Obstet Gynecol 2011;117:1205–12. (Meta-analysis)

18. Tubal ectopic pregnancy. ACOG Practice Bulletin No. 193. American College of Obstetricians and Gynecologists. Obstet Gynecol 2018;131:e91–103. (Level III)

19. Luise C, Jermy K, May C, Costello G, Collins WP, Bourne TH. Outcome of expectant management of spontaneous first trimester miscarriage: observational study. BMJ 2002;324:873–5. (Level III)

20. Bagratee JS, Khullar V, Regan L, Moodley J, Kagoro H. A randomized controlled trial comparing medical and expectant management of first trimester miscarriage. Hum Reprod 2004;19:266–71. (Level I)

21. Ngai SW, Chan YM, Tang OS, Ho PC. Vaginal misoprostol as medical treatment for first trimester spontaneous miscarriage. Hum Reprod 2001;16:1493–6. (Level I)

22. Sotiriadis A, Makrydimas G, Papatheodorou S, Ioannidis JP. Expectant, medical, or surgical management of first-trimester miscarriage: a meta-analysis. Obstet Gynecol 2005;105:1104–13. (Meta-analysis)

23. Zhang J, Gilles JM, Barnhart K, Creinin MD, Westhoff C, Frederick MM. A comparison of medical management with misoprostol and surgical management for early pregnancy failure. National Institute of Child Health Human Development (NICHD) Management of Early Pregnancy Failure Trial. N Engl J Med 2005;353:761–9. (Level I)

24. Creinin MD, Harwood B, Guido RS, Fox MC, Zhang J. Endometrial thickness after misoprostol use for early pregnancy failure. NICHD Management of Early Pregnancy Failure Trial. Int J Gynecol Obstet 2004;86:22–6. (Level III)

25. Grossman D, Grindlay K. Alternatives to ultrasound for follow-up after medication abortion: a systematic review. Contraception 2011;83:504–10. (Level III)

26. Neilson JP, Hickey M, Vazquez JC. Medical treatment for early fetal death (less than 24 weeks). Cochrane Database of Systematic Reviews 2006, Issue 3. Art. No.: CD002253. DOI: 10.1002/14651858.CD002253.pub3. (Meta-analysis)

27. van den Berg J, Gordon BB, Snijders MP, Vandenbussche FP, Coppus SF. The added value of mifepristone to non-surgical treatment regimens for uterine evacuation in case of early pregnancy failure: a systematic review of the literature. Eur J Obstet Gynecol Reprod Biol 2015;195:18–26. (Systematic Review)

28. Schreiber CA, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT. Mifepristone pretreatment for the medical management of early pregnancy loss. N Engl J Med 2018;378:2161–70. (Level I)

29. Kulier R, Kapp N, Gülmezoglu AM, Hofmeyr GJ, Cheng L, Campana A. Medical methods for first trimester abortion. Cochrane Database of Systematic Reviews 2011, Issue 11. Art. No.: CD002855. (Systematic Review)

30. Medical management of first-trimester abortion. Practice Bulletin No. 143. American College of Obstetricians and Gynecologists. Obstet Gynecol 2014;123:676–92. (Level III)

31. U.S. Food and Drug Administration. Mifeprex (mifepristone) information. Postmarket drug safety information for patients and providers. Silver Spring (MD): FDA; 2018. (Level III)

32. American College of Obstetricians and Gynecologists. Improving access to mifepristone for reproductive health indications. Position Statement. Washington, DC: American College of Obstetricians and Gynecologists; 2018.

33. Neilson JP, Gyte GM, Hickey M, Vazquez JC, Dou L. Medical treatments for incomplete miscarriage. Cochrane Database of Systematic Reviews 2013, Issue 3. Art. No.: CD007223. DOI: 10.1002/14651858.CD007223.pub3. (Meta-analysis)

34. Paul M, Lichtenberg ES, Borgatta L, Grimes DA, Stubblefield PG, Creinin MD, editors. Management of unintended and abnormal pregnancy: comprehensive abortion care. Hoboken (NJ): Wiley-Blackwell; 2009. (Level III)

35. Tunçalp Ö, Gülmezoglu AM, Souza JP. Surgical procedures for evacuating incomplete miscarriage. Cochrane Database of Systematic Reviews 2010, Issue 9. Art. No.: CD001993. DOI: 10.1002/14651858.CD001993.pub2. (Meta-analysis)

36. Rogo K. Improving technologies to reduce abortion-related morbidity and mortality. Int J Gynaecol Obstet 2004;85 (suppl 1):S73–82. (Level III)

37. Goldberg AB, Dean G, Kang MS, Youssof S, Darney PD. Manual versus electric vacuum aspiration for early first-

Copyright © by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.


trimester abortion: a controlled study of complication rates. Obstet Gynecol 2004;103:101–7. (Level II-3)

38. Dalton VK, Harris L, Weisman CS, Guire K, Castleman L, Lebovic D. Patient preferences, satisfaction, and resource use in office evacuation of early pregnancy failure. Obstet Gynecol 2006;108:103–10. (Level II-3)

39. Blumenthal PD, Remsburg RE. A time and cost analysis of the management of incomplete abortion with manual vacuum aspiration. Int J Gynaecol Obstet 1994;45:261–7. (Level III)

40. Choobun T, Khanuengkitkong S, Pinjaroen S. A comparative study of cost of care and duration of management for first-trimester abortion with manual vacuum aspiration (MVA) and sharp curettage. Arch Gynecol Obstet 2012; 286:1161–4. (Level II-3)

41. Creinin MD, Huang X, Westhoff C, Barnhart K, Gilles JM, Zhang J. Factors related to successful misoprostol treatment for early pregnancy failure. National Institute of Child Health and Human Development Management of Early Pregnancy Failure Trial. Obstet Gynecol 2006;107:901–7. (Level II-2)

42. Davis AR, Hendlish SK, Westhoff C, Frederick MM, Zhang J, Gilles JM, et al. Bleeding patterns after misoprostol vs surgical treatment of early pregnancy failure: results from a randomized trial. National Institute of Child Health and Human Development Management of Early Pregnancy Failure Trial. Am J Obstet Gynecol 2007;196:31.e1–31.e7. (Level I)

43. Nanda K, Lopez LM, Grimes DA, Peloggia A, Nanda G. Expectant care versus surgical treatment for miscarriage. Cochrane Database of Systematic Reviews 2012, Issue 3. Art. No.: CD003518. DOI: 10.1002/14651858.CD003518. pub3. (Meta-analysis)

44. Achilles SL, Reeves MF. Prevention of infection after induced abortion: release date October 2010: SFP guideline 20102. Society of Family Planning. Contraception 2011; 83:295–309. (Level III)

45. Sawaya GF, Grady D, Kerlikowske K, Grimes DA. Antibiotics at the time of induced abortion: the case for universal prophylaxis based on a meta-analysis. Obstet Gynecol 1996;87:884–90. (Meta-analysis)

46. Prieto JA, Eriksen NL, Blanco JD. A randomized trial of prophylactic doxycycline for curettage in incomplete abortion. Obstet Gynecol 1995;85:692–6. (Level I)

47. Petrou S, McIntosh E. Women's preferences for attributes of first-trimester miscarriage management: a stated preference discrete-choice experiment. Value Health 2009;12: 551–9. (Level III)

48. You JH, Chung TK. Expectant, medical or surgical treatment for spontaneous abortion in first trimester of pregnancy: a cost analysis. Hum Reprod 2005;20:2873–8. (Level III)

49. Rausch M, Lorch S, Chung K, Frederick M, Zhang J, Barnhart K. A cost-effectiveness analysis of surgical versus medical management of early pregnancy loss. Fertil Steril 2012;97:355–60. (Level III)

50. Colleselli V, Schreiber CA, D'Costa E, Mangesius S, Wildt L, Seeber BE. Medical management of early pregnancy failure (EPF): a retrospective analysis of a combined protocol of mifepristone and misoprostol used in clinical practice. Arch Gynecol Obstet 2014;289:1341–5. (Level II-3)

51. Vlaanderen W, Fabriek LM, van Tuyll van Serooskerken C. Abortion risk and pregnancy interval. Acta Obstet Gynecol Scand 1988;67:139–40. (Level II-3)

52. Goldstein RR, Croughan MS, Robertson PA. Neonatal outcomes in immediate versus delayed conceptions after spontaneous abortion: a retrospective case series. Am J Obstet Gynecol 2002;186:1230–4; discussion 1234–6. (Level III)

53. U.S. medical eligibility criteria for contraceptive use, 2010. Centers for Disease Control and Prevention (CDC). MMWR Recomm Rep 2010;59(RR-4):1–86. (Level III)

54. Bednarek PH, Creinin MD, Reeves MF, Cwiak C, Espey E, Jensen JT. Immediate versus delayed IUD insertion after uterine aspiration. Post-Aspiration IUD Randomization (PAIR) Study Trial Group. N Engl J Med 2011;364:2208–17. (Level I)

55. Prevention of Rh D alloimmunization. Practice Bulletin No. 181. American College of Obstetricians and Gynecologists. Obstet Gynecol 2017;130:e57–70. (Level III)

56. McNamee K, Dawood F, Farquharson R. Recurrent miscarriage and thrombophilia: an update. Curr Opin Obstet Gynecol 2012;24:229–34. (Level III)

57. McNamee K, Dawood F, Farquharson RG. Thrombophilia and early pregnancy loss. Best Pract Res Clin Obstet Gynaecol 2012;26:91–102. (Level III)

58. Empson MB, Lassere M, Craig JC, Scott JR. Prevention of recurrent miscarriage for women with antiphospholipid antibody or lupus anticoagulant. Cochrane Database of Systematic Reviews 2005, Issue 2. Art. No.: CD002859. DOI: 10.1002/14651858.CD002859.pub2. (Meta-analysis)

59. de Jong PG, Kaandorp S, Di Nisio M, Goddijn M, Middeldorp S. Aspirin and/or heparin for women with unexplained recurrent miscarriage with or without inherited thrombophilia. Cochrane Database of Systematic Reviews 2014, Issue 7. Art. No.: CD004734. DOI: 10. 1002/14651858.CD004734.pub4. (Meta-analysis)

60. Rumbold A, Middleton P, Pan N, Crowther CA. Vitamin supplementation for preventing miscarriage. Cochrane Database of Systematic Reviews 2011, Issue 1. Art. No.: CD004073. DOI: 10.1002/14651858.CD004073.pub3. (Meta-analysis)

61. Lede RL, Duley L. Uterine muscle relaxant drugs for threatened miscarriage. Cochrane Database of Systematic Reviews 2005, Issue 3. Art. No.: CD002857. DOI: 10. 1002/14651858.CD002857.pub2. (Meta-analysis)

62. Devaseelan P, Fogarty PP, Regan L. Human chorionic gonadotrophin for threatened miscarriage. Cochrane Database of Systematic Reviews 2010, Issue 5. Art. No.: CD007422. DOI: 10.1002/14651858.CD007422.pub2. (Meta-analysis)

63. Aleman A, Althabe F, Belizán JM, Bergel E. Bed rest during pregnancy for preventing miscarriage. Cochrane Database of Systematic Reviews 2005, Issue 2. Art. No.: CD003576. DOI: 10.1002/14651858.CD003576.pub2. (Meta-analysis)

64. Haas DM, Ramsey PS. Progestogen for preventing miscarriage. Cochrane Database of Systematic Reviews 2013, Issue 10. Art. No.: CD003511. DOI: 10.1002/14651858. CD003511.pub3. (Meta-analysis)

65. Wahabi HA, Fayed AA, Esmaeil SA, Al Zeidan RA. Progestogen for treating threatened miscarriage. Cochrane Database of Systematic Reviews 2011, Issue 12. Art. No.: CD005943. DOI: 10.1002/14651858.CD005943.pub4. (Meta-analysis)




Copyright © by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

The MEDLINE database, the Cochrane Library, and the American College of Obstetricians and Gynecologists' own internal resources and documents were used to conduct a literature search to locate relevant articles published between January 2000–July 2014. The search was restricted to articles published in the English language. Priority was given to articles reporting results of original research, although review articles and commentaries also were consulted. Abstracts of research presented at symposia and scientific conferences were not considered adequate for inclusion in this document. Guidelines published by organizations or institutions such as the National Institutes of Health and the American College of Obstetricians and Gynecologists were reviewed, and additional studies were located by reviewing bibliographies of identified articles. When reliable research was not available, expert opinions from obstetrician–gynecologists were used.

Studies were reviewed and evaluated for quality according to the method outlined by the U.S. Preventive Services Task Force:

I    Evidence obtained from at least one properly designed randomized controlled trial.

II-1 Evidence obtained from well-designed controlled trials without randomization.

II-2 Evidence obtained from well-designed cohort or case–control analytic studies, preferably from more than one center or research group.

II-3 Evidence obtained from multiple time series with or without the intervention. Dramatic results in uncontrolled experiments also could be regarded as this type of evidence.

III  Opinions of respected authorities, based on clinical experience, descriptive studies, or reports of expert committees.

Based on the highest level of evidence found in the data, recommendations are provided and graded according to the following categories:

Level A—Recommendations are based on good and consistent scientific evidence.

Level B—Recommendations are based on limited or inconsistent scientific evidence.

Level C—Recommendations are based primarily on consensus and expert opinion.

Published online on August 29, 2018.

Copyright 2018 by the American College of Obstetricians and Gynecologists. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, posted on the Internet, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without prior written permission from the publisher.

Requests for authorization to make photocopies should be directed to Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400.

**American College of Obstetricians and Gynecologists**
**409 12th Street, SW, PO Box 96920, Washington, DC 20090-6920**

Early pregnancy loss. ACOG Practice Bulletin No. 200. American College of Obstetricians and Gynecologists. Obstet Gynecol 2018;132:e197–207.

**Copyright © by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.**



*This information is designed as an educational resource to aid clinicians in providing obstetric and gynecologic care, and use of this information is voluntary. This information should not be considered as inclusive of all proper treatments or methods of care or as a statement of the standard of care. It is not intended to substitute for the independent professional judgment of the treating clinician. Variations in practice may be warranted when, in the reasonable judgment of the treating clinician, such course of action is indicated by the condition of the patient, limitations of available resources, or advances in knowledge or technology. The American College of Obstetricians and Gynecologists reviews its publications regularly; however, its publications may not reflect the most recent evidence. Any updates to this document can be found on www.acog.org or by calling the ACOG Resource Center.*

*While ACOG makes every effort to present accurate and reliable information, this publication is provided "as" is without any warranty of accuracy, reliability, or otherwise, either express or implied. ACOG does not guarantee, warrant, or endorse the products or services of any firm, organization, or person. Neither ACOG nor its officers, directors, members, employees, or agents will be liable for any loss, damage, or claim with respect to any liabilities, including direct, special, indirect, or consequential damages, incurred in connection with this publication or reliance on the information presented.*

*All ACOG committee members and authors have submitted a conflict of interest disclosure statement related to this published product. Any potential conflicts have been considered and managed in accordance with ACOG's Conflict of Interest Disclosure Policy. The ACOG policies can be found on acog.org. For products jointly developed with other organizations, conflict of interest disclosures by representatives of the other organizations are addressed by those organizations. The American College of Obstetricians and Gynecologists has neither solicited nor accepted any commercial involvement in the development of the content of this published product.*

**Practice Bulletin** *Early Pregnancy Loss*   **e207**

**Copyright © by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.**

# Progesterone supplementation during the luteal phase and in early pregnancy in the treatment of infertility: an educational bulletin

*The Practice Committee of the American Society for Reproductive Medicine in collaboration with the Society for Reproductive Endocrinology and Infertility*

American Society for Reproductive Medicine, Birmingham, Alabama

Exogenous progesterone supplementation is a common element of treatment regimens for infertility, particularly those relating to the assisted reproductive technologies. (Fertil Steril® 2008;90:S150–3. ©2008 by American Society for Reproductive Medicine.)

The modulating effects of progesterone (P) on endometrial structure and function are essential to the success of human reproduction. After ovulation, P produced by the corpus luteum (CL) induces "secretory" maturation of the endometrium, involving a cascade of molecular events that ultimately renders the endometrium receptive to implantation of the embryo. After nidation, continued P stimulation, driven by rapidly increasing concentrations of hCG, decidualizes the endometrial stoma and supports early embryonic development.

Considering the important role that P plays in human reproduction, it is not surprising that exogenous supplemental P is a common element of treatment regimens in infertility, particularly those relating to the assisted reproductive technologies (ART). This document will review the effects of various treatments on endogenous P secretion and the rationale for supplementation, the available forms and routes of administration for exogenous P, and the benefits and the risks of exogenous P supplementation during early pregnancy.

## NOMENCLATURE

Progestogens are a class of steroidal compounds having P-like actions that includes natural P and various synthetic progestins derived from P itself (containing 21 carbons; C-21), T (C-19), or aldosterone (C-18) precursors.

## THE IMPORTANCE OF PROGESTERONE IN EARLY PREGNANCY

A classic series of studies conducted more than three decades ago demonstrated that P secretion by the CL is absolutely required for the success of early human pregnancy. Surgical excision of the CL ("luteectomy") before 7 weeks' gestation (using traditional methods for dating pregnancy from onset of last menstrual period) uniformly precipitated an abrupt

decrease in serum P concentrations followed by miscarriage (1). When luteectomy was performed more than 27 days after the missed menstrual period (8 weeks' gestation or later), P levels decreased only slightly and transiently, and pregnancy continued (1). Finally, exogenous P replacement after early luteectomy (before 7 weeks' gestation) prevented otherwise inevitable miscarriage. These and other related studies demonstrated clearly that the success of early pregnancy depends on P that derives primarily from the CL before 7 weeks' gestation, almost entirely from the trophoblast after 9 weeks' gestation, and from both sources to varying extent during the time between, known as the luteal–placental shift (2).

## MEASURES OF LUTEAL FUNCTION

There are no reliable methods for diagnosis of P deficiency during the luteal phase or early pregnancy. Serum P concentrations range widely during the mid and late luteal phases because P secretion by the CL is pulsatile. Levels as low as 2.3 and as high as 40.1 ng/mL have been observed within the relatively short interval of time spanning a single secretory pulse (60–90 minutes) (3). Consequently, single and even serial serum P measurements have limited clinical utility and may not provide a truly accurate gauge of the quality of luteal function. Progesterone levels in early pregnancy also range widely, particularly when conception follows treatment with ovulation-inducing drugs. Histologic endometrial dating was widely accepted for decades as the gold standard among methods for assessing the quality of luteal function (4), but more recently has been proven invalid (5, 6). Progesterone supplementation necessarily is empiric and has been applied liberally in clinical circumstances wherein the amount or duration of P production is reasonably suspect.

## EFFECT OF GONADOTROPIN-RELEASING HORMONE ANALOGS ON LUTEAL FUNCTION

Gonadotropin-releasing hormone analogs, both agonists and antagonists, are used widely to synchronize early follicular development and to prevent premature luteinization and ovulation during controlled ovarian hyperstimulation (COH) with exogenous gonadotropins for superovulation or IVF.

Position Statement
Recently Published April 11, 2008.
Received February 4, 2008; accepted February 4, 2008.
Correspondence to: Practice Committee, American Society for Reproductive Medicine, 1209 Montgomery Highway, Birmingham, Alabama 35216.
No reprints will be available.

Copyright ©2008 American Society for Reproductive Medicine, Published by Elsevier Inc.
0015-0282/08/$34.00
doi:10.1016/j.fertnstert.2008.08.064

However, their mechanisms of action also threaten the quality of luteal function that follows ovulation or oocyte retrieval.

Long-acting GnRH agonists (e.g., leuprolide, nafarelin, goserelin) have a two-phased action on pituitary gonadotropin secretion. Initially, agonists stimulate gonadotropin release directly, but continued stimulation ultimately downregulates pituitary GnRH receptors and thereby suppresses gonadotropin secretion. Once down-regulated, pituitary function is slow to recover and does not return to normal until 2–3 weeks after agonist treatment ends (7). Because normal CL function depends on pituitary LH stimulation, some form of luteal phase support is considered prudent, if not essential, to prevent any P deficiency that might jeopardize the success of implantation or early pregnancy (7, 8).

The GnRH antagonists block pituitary GnRH receptors directly. Consequently, their onset of action is immediate and their effects more profound than those of long-acting agonists. Like the GnRH agonists, antagonists often are used to prevent a premature LH surge during stimulation with exogenous gonadotropins for ovulation induction, superovulation, or IVF. Whereas treatment with long-acting agonists typically begins during the luteal phase of the cycle preceding stimulation, antagonists are administered for a shorter interval of days, usually beginning when the lead follicle reaches 13–14 mm in mean diameter. Although the corresponding duration of pituitary suppression is shorter than after treatment with an agonist, GnRH antagonist treatment also predisposes to poor luteal function, regardless of whether recombinant LH, hCG, or a GnRH agonist is used to trigger ovulation (9, 10).

Overall, the weight of available evidence supports using some form of luteal phase support when treatment has included any GnRH analog, agonist or antagonist. A 2002 meta-analysis of randomized controlled trials of IVF cycles using GnRH agonists observed that all luteal phase support regimens (IM or vaginally administered P and hCG) yield significantly higher pregnancy rates (PR), compared with placebo or no treatment (11). A 2004 Cochrane systematic review of 59 studies concluded that in IVF cycles involving down-regulation with a long-acting GnRH agonist, P supplementation (administered vaginally or by IM injections) achieved higher ongoing PRs per embryo transfer compared with placebo or no treatment (odds ratio [OR] 2.38, 95% confidence interval [CI] 1.32–4.29) (12).

## METHODS OF LUTEAL SUPPORT

Progesterone can be administered orally, vaginally, or by IM injections. Oral P supplementation is the least common method because two randomized controlled trials observed significantly lower implantation rates and PRs, higher miscarriage rates, or both, in women receiving oral micronized P supplementation, compared with women receiving IM or vaginally administered P (13, 14). Intramuscular P in oil (50 mg/day) generates circulating P concentrations at or above the physiological range. Vaginally administered P yields lower serum levels, but nonetheless achieves endometrial tissue concentrations up to 30-fold greater than those achieved with IM P (15).

Progesterone can be administered vaginally in an 8% gel, compounded suppositories, or in tablets containing micronized P. The effects of treatment with vaginal suppositories or tablets in doses ranging between 200 and 600 mg/day appear comparable to those achieved by administration of a gel containing 90 mg of P, but investigations aimed at comparing the efficacy of the differing forms of vaginally administered P have been limited by relatively small study cohorts.

The relative effectiveness of the vaginal and IM routes of P supplementation has been controversial. A clinical trial involving 250 women in a first IVF cycle, randomized to receive IM P (50 mg/day) or vaginal micronized P supplementation (200 mg/day), observed higher PRs in the group treated with IM P (16). A second open label randomized trial involving 201 women yielded similar results; the age-adjusted odds ratios for clinical PR, implantation rates, and live birth rates all favored the group that received IM P supplementation over the one receiving treatment with a vaginally administered P gel (17). In contrast, another study of IVF outcomes in a group of 262 women supplemented with $E_2$ valerate in combination with either IM P (50 mg/day) or vaginal micronized P (600 mg/day) observed no differences in clinical PRs between the groups (18). In addition, first trimester miscarriage rates were significantly lower in women receiving vaginal P supplementation, although their plasma concentrations also were lower than in those treated with IM P. The Cochrane systematic review of clinical trials examining outcomes in IVF cycles involving treatment with a long-acting GnRH agonist concluded that [1] clinical PRs per embryo transfer in women receiving vaginal or IM P supplementation were not significantly different (OR 0.82, CI 0.67–1.01), and [2] the optimal route of P administration has not been established (12).

The necessary or optimal duration of supplemental P therapy also has not been established firmly. Evidence derived from the classic luteectomy studies described previously indicates that P supplementation is most important during the first 5 weeks after conception (7 weeks' gestation) and almost certainly unnecessary beyond 7 weeks after conception (9 weeks' gestation) (1, 2).

Luteal support is most commonly provided by treatment with supplemental P but also can be achieved effectively by administration of exogenous hCG. In IVF cycles involving treatment with a long-acting GnRH agonist, hCG stimulation of luteal function and P supplementation have similar effectiveness. In an analysis of combined data from six clinical trials involving a total of 1,038 women, the ongoing PR per embryo transfer in cycles supplemented directly with P was not significantly different from that in cycles supplemented with hCG (OR 0.94, 95% CI 0.70–1.27) (12). However, the risk for ovarian hyperstimulation syndrome (OHSS) was significantly lower for women receiving P supplementation than for those treated with hCG (OR 0.46, 95% CI 0.26–0.81) (12).

## RISKS OF PROGESTERONE SUPPLEMENTATION

The weight of available evidence indicates that the most common forms of P supplementation during early pregnancy pose no significant risk to mother or fetus. One retrospective case control study has observed an association between maternal exposure to exogenous progestogens during early pregnancy and an increased risk for hypospadias in their infants (OR 2.2, 95% CI 1.0–5.0) [19]. However, for 30 of the 42 cases described in the report, the type and duration of progestogen treatment was not known or specified. Because certain progestogens possess weak androgenic and antiandrogenic properties, it is quite possible that the observed association between early maternal progestogen exposure and the risk of hypospadias may be attributed largely, if not entirely, to use of progestins that bind to the androgen receptor. There is no direct evidence to indicate that supplementation with P itself during early pregnancy poses any significant risk of hypospadias or other types of birth defects. The increased risk for hypospadias observed in infants conceived by intracytoplasmic sperm injection (ICSI) most likely can be attributed to genetic factors related to paternal subfertility [20].

In 1999, the US Food and Drug Administration (FDA) conducted a thorough review of the relevant published scientific data, which yielded the following key findings:

- Controlled studies show no increase in congenital anomalies, including genital abnormalities in male or female infants, resulting from maternal exposure to P or 17$\alpha$-hydroxyprogesterone (17-OHP) during early pregnancy.
- Analysis of the published literature relating to maternal progestogen exposure during pregnancy and virilization of the genitalia in female infants indicates that most reported cases involved high doses of progestins derived from androgens, particularly ethisterone and norethindrone.
- Most reported cases of masculinized female infants are associated with maternal exposure to methyltestosterone, methandriol, and danazol.

The FDA concluded that class labeling for all progestogens warning of an increased risk of birth defects was inappropriate because it would apply without regard to the indication for which the drug is prescribed. The FDA also noted that use of P for luteal phase support in IVF cycles had become routine and that the agency had itself recently approved a P gel for use in infertile women under treatment with ART [21].

## SUMMARY AND RECOMMENDATIONS

- Currently, there is no reliable method for specific diagnosis of P deficiency during the luteal phase of the menstrual cycle or early pregnancy.
- During ovarian stimulation with exogenous gonadotropins, use of a long-acting GnRH agonist or a GnRH antagonist to prevent a premature LH surge frequently results in poor luteal function due to residual suppression of pituitary LH secretion.

- In IVF cycles involving down-regulation with a long-acting GnRH agonist, P supplementation (50 mg/day administered IM or 200–600 mg/day administered vaginally) yields significantly higher PRs, compared with treatment with placebo or no treatment.
- Luteal phase supplementation with hCG is associated with greater risk for OHSS compared with supplementation with P.
- Although maternal exposure to exogenous progestogens during early pregnancy has been associated with an increased risk of hypospadias in their infants, the risk appears to be limited to treatment with progestins that bind to the androgen receptor.
- There is no evidence to indicate that maternal exposure to P or 17-OHP during pregnancy increases risk for birth defects.

*Acknowledgments:* This report was developed under the direction of the Practice Committee of the American Society for Reproductive Medicine as a service to its members and other practicing clinicians. Although this document reflects appropriate management of a problem encountered in the practice of reproductive medicine, it is not intended to be the only approved standard of practice or to dictate an exclusive course of treatment. Other plans of management may be appropriate, taking into account the needs of the individual patient, available resources, and institutional or clinical practice limitations. The Practice Committee of the American Society for Reproductive Medicine and the Board of Directors of the American Society for Reproductive Medicine have approved this report.

## REFERENCES

1. Csapo AI, Pulkkinen MO, Ruttner B, Sauvage JP, Wiest WG. The significance of the human corpus luteum in pregnancy maintenance. I. Preliminary studies. Am J Obstet Gynecol 1972;1128:1061–1067.
2. Csapo AI, Pulkkinen MO, Wiest WG. Effects of luteectomy and progesterone replacement therapy in early pregnant patients. Am J Obstet Gynecol 1973;115:759–765.
3. Filicori M, Butler JP, Crowley WF Jr. Neuroendocrine regulation of the corpus luteum in the human. Evidence for pulsatile progesterone secretion. J Clin Invest 1984;73:1638–1647.
4. Noyes RW, Hertig AT, Rock J. Dating the endometrial biopsy. Fertil Steril 1950;1:3–25.
5. Murray MJ, Meyer WR, Zaino RJ, Lessey BA, Novotny DB, Ireland K, et al. A critical analysis of the accuracy, reproducibility, and clinical utility of histologic endometrial dating in fertile women. Fertil Steril 2004;81: 1333–1343.
6. Coutifaris C, Myers ER, Guzick DS, Diamond MP, Carson SA. NICHD National Cooperative Reproductive Medicine Network, et al. Histological dating of timed endometrial biopsy tissue is not related to fertility status. Fertil Steril 2004;825:1264–1272.
7. Smitz J, Erard P, Camus M, Devroey P, Tournaye H, Wisanto A, et al. Pituitary gonadotrophin secretory capacity during the luteal phase in superovulation using GnRH-agonists and HMG in a desensitization or flare-up protocol. Hum Reprod 1992;7:1225–1229.
8. Smitz J, Bourgain C, Van Waesberghe L, Camus M, Devroey P, Van Steirteghem AC. A prospective randomized study on oestradiol valerate supplementation in addition to intravaginal micronized progesterone is buserelin and HMG-induced superovulation. Hum Reprod 1993;8: 40–45.
9. Beckers NG, Macklon NS, Eijkemans MJ, Ludwig M, Felberbaum RE, Diedrich K, et al. Nonsupplemented luteal phase characteristics after the administration of recombinant human chorionic gonadotropin, recombinant luteinizing hormone, or gonadotropin-releasing hormone (GnRH) agonist to induce final oocyte maturation in in vitro fertilization patients after ovarian stimulation with recombinant follicle-stimulating

hormone and GnRH antagonist cotreatment. J Clin Endocrinol Metab 2003;4186–4192.

10. Tavaniotou A, Devroey P. Luteal hormone profile of oocyte donors stimulated with a GnRH antagonist compared with natural cycles. Reprod Biomed Online 2006;13:326–330.

11. Pritts EA, Atwood AK. Luteal phase support in infertility treatment: a meta-analysis of the randomized trials. Hum Reprod 2002;9: 2287–2299.

12. Daya S, Gunby J. Luteal phase support in assisted reproduction cycles [Review]. Cochrane Database Syst Rev 2004;(3):CD004830.

13. Licciardi FL, Kwiatkowski A, Noyes NL, Berkeley AS, Krey LL, Grifo JA. Oral versus intramuscular progesterone for in vitro fertilization: a prospective randomized study. Fertil Steril 1999;71:614–618.

14. Friedler S, Raziel A, Schachter M, Strassburger D, Bukovsky I, Ron-El R. Luteal support with micronized progesterone following in-vitro fertilization using a down-regulation protocol with gonadotrophin-releasing hormone agonist: a comparative study between vaginal and oral administration. Hum Reprod 1999;14:1944–1948.

15. Miles RA, Paulson RJ, Lobo RA, Press MF, Dahmoush L, Sauer MV. Pharmacokinetics and endometrial tissue levels of progesterone after administration by intramuscular and vaginal routes: a comparative study. Fertil Steril 1994;62:485–490.

16. Perino M, Brigandi FG, Abate FG, Costabile L, Balzano E, Abate A. Intramuscular versus vaginal progesterone in assisted reproduction: a comparative study. Clin Exp Obstet Gynecol 1997;24:228–231.

17. Propst AM, Hill JA, Ginsburg ES, Hurwitz S, Politch J, Yanushpolsky EH. A randomized study comparing Crinone 8% and intramuscular progesterone supplementation in in vitro fertilization-embryo transfer cycles. Fertil Steril 2001;76:1144–1149.

18. Smitz J, Devroey P, Faguer B, Bourgain C, Camus M, Van Steirteghem AC. A prospective randomized comparison of intramuscular or intravaginal natural progesterone as a luteal phase and early pregnancy supplement. Hum Reprod 1992;7:168–175.

19. Carmichael SL, Shaw GM, Laurent C, Croughan MS, Olney RS, Lammer EJ. Maternal progestin intake and risk of hypospadias. Arch Pediatr Adolesc Med 2005;159:957–962.

20. Ericson A, Kallen B. Congenital malformations in infants born after IVF: a population-based study. Hum Reprod 2001;16:504–509.

21. William K. Hubbard, Acting Deputy Commissioner for Policy. Federal Register;64(70): April 13, 1999. Proposed Rules. FR Document 99–9146.



# PRACTICE BULLETIN 8

## EVIDENCE DIRECTING PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS

Number 8   February 25, 2020

## Medical Management of Elective Induced Abortion

*The advent of mifepristone abortion has been heralded by the abortion industry as the solution to the problems of declining numbers of abortion providers and the increasing requirements that abortion facilities comply with standard medical requirements. Seldom are women given accurate information that there is at least a four-fold increase in immediate complications, including of hemorrhage, retained tissue and subsequent ER visits, with complications increasing exponentially for increasing gestational age. It is important that medical professionals understand the increased risk presented to women from medical abortion in order to appropriately provide accurate informed consent.*

## Background

Medical abortion, which involves the use of medication rather than surgery to induce an abortion, has been commonly used in the U.S. since 2000 and is currently approved until 70 days of gestation (calculated from the first day of the last menstrual period). Whereas the total numbers of abortions are declining in the U.S., the numbers of medical abortions are increasing.[1] In 2004 only 14% of abortions were performed medically, but currently 39% of abortions in the U.S. are induced by medication.[2] There are many reasons to expect this rise to continue, including the lucrative nature of medical abortion, the dwindling numbers of physician abortionists[3,4] and the rise of laws placing restrictions on surgical abortions. Given

the expected increase in prevalence, it is important for physicians to be aware of the health risks associated with these medications.

In the U.S., the only Food and Drug Administration approved medical abortion regimen is induced with the provision of two medications: mifepristone and misoprostol. Mifepristone, (Mifeprex or RU486), a norethindrone derivative, binds to progesterone receptors but does not activate them, functioning as an anti-progesterone.[5] Blocking the hormonal support for the pregnancy results in disruption of the endometrial implantation site and fetal death.[6] Misoprostol (Cytotec), a prostaglandin E1 analogue, is taken 24-48 hours later to induce contractions to expel the pregnancy tissue.[7] Buccal, sublingual and

---

**Committee on Practice Bulletins.** This document was developed by the Practice Bulletin Committee to provide evidence for pro-life practice. Because of the gravity of issues addressed by AAPLOG, variation in practice regarding matters of fetal life should be undertaken only after serious consideration of the literature cited by this document.

vaginal misoprostol administration appear to be more effective than oral administration.[8] Other medications such as methotrexate, tamoxifen[9] and letrozole have been used in place of mifepristone on occasion, but almost all reported medical abortions in the U.S. currently are initiated with mifepristone. [10]

## History of Medical Abortion in the U.S.

It is instructive to examine the circumstances in which mifepristone was approved, as they illustrate the ways in which abortion provision is held to a different standard from other medical procedures in the U.S. In an unprecedented move, then President Bill Clinton wrote the French manufacturer, Rousell Uclaf, asking them to file a new drug application with the FDA. When they were hesitant to do so due to legal concerns, Rousell Uclaf then ceded the rights to manufacture and distribute in the United States to "Planned Parenthood/Population Council".  The Population Council gave manufacturing permission to a company created for this specific purpose, Danco,[11]whose assets were lodged in the Cayman Islands.  Danco then hired Hua Lin pharmaceuticals in China to manufacture mifepristone.  Hua Lin was at that point under discipline from the FDA for faulty quality control.

The FDA failed to follow its own rules on numerous occasions in order to approve this drug. A new drug must have at least two randomized, blinded placebo-controlled trials documenting its safety and efficacy, but the submitted trials had no placebo groups.[12]

Mifepristone was approved under a special category, "Subpart H: Accelerated Approval Regulations" which are intended for serious/life-threatening illnesses such as advanced cancer and HIV.[13] Also, the FDA based approval on the combined action of the mifepristone with misoprostol, because mifepristone does a poor job of completely evacuating the uterus on its own. They mandated the use of misoprostol over the objections of its manufacturer, Searle.[14]  The FDA is required to test a drug in a pediatric population but waived this requirement without explanation despite adolescent women comprising 1/4-1/3 of its users.[15] Finally, the approved regimen does not mimic clinical trial conditions as it lacked a required ultrasound, experienced surgeon dispensing, and nearby hospital admitting privileges.[16]

The FDA approved Mifepristone for U.S. distribution in 2000 under SubPart H, which was the only mechanism at the time which allowed FDA to require post-marketing restrictions of drugs considered at high risk for complications if not used in accordance with the FDA label. In 2006, the FDA instituted a Risk Evaluation Mitigation Strategy (REMS). This is a safety strategy applied to medications that have a known or potential serious risk associated with them.[17] Under this strategy, the risk of complications such as ruptured ectopic pregnancies, hemorrhage, infection and retained pregnancy tissue, which require surgery in as many as one in 20 women,[18,19] might be minimized. To decrease the likelihood of these negative effects, Mifepristone was initially only approved up to 49 days gestational age, the provider was registered after specific training, it was only to be dispensed in certain healthcare settings and the patients were to be informed of the risk of serious side effects. Mifepristone abortion providers were required to be able to accurately determine the gestational age, confirm an intrauterine location of the pregnancy,

and intervene surgically if the abortion was unsuccessful or a complication resulted (or alternatively the abortionist could have an agreement with another doctor and facility capable of providing this care). Complication reporting was mandated, as was a 14-day follow-up visit for the woman.[20]

Finally, a black box warning was assigned. "If mifepristone/misoprostol results in incomplete abortion, surgical intervention may be necessary. Prescribers should determine in advance and give clear instructions whom to call and what to do in case of emergency. Medical abortion is contraindicated if there is no access to medical facilities for emergency services."[21]

## Reality of Medical Abortion for women

Women often choose a medical abortion as a result of intense marketing of the assumption that it is more natural, private and safer than a surgical procedure,[22] but physicians and patients alike may be unaware that it takes much longer, involves far more bleeding and pain, and complications occur four times more frequently from medical as compared to surgical abortions.[23] The average woman bleeds for 9-16 days and eight percent will bleed longer than a month.[24] Approximately one percent will require hospitalization for serious complications, one percent will have ongoing viable pregnancies (it will fail to kill the fetus), and surgery for incomplete abortion will be required in three to eight percent.[25,26] The rate of all of these complications increase exponentially as gestational age increases.[27,28] If a pregnancy continues to birth after taking misoprostol, the second drug in the regimen, teratogenic effects such as clubfoot, cranial nerve anomalies (Mobius syndrome) and limb abnormalities related to misoprostol are

sometimes seen.[29] The side effects of cramping, vaginal bleeding, hemorrhage, nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness occur in almost all women.[30]

Within a few years of mifepristone's approval, four deaths from sepsis caused by Clostridium sordellii causes the FDA and CDC to investigate the potential for immune suppression and sepsis from mifepristone and misoprostol. Both mifepristone[31] and misoprostol are capable of profound immune suppression. This information led Planned Parenthood to change from vaginal to buccal administration of misoprostol. Unfortunately, buccal administration was also associated with septic deaths.[32] Currently there are over 5000 complications reported to the Adverse Event Reporting System.[33] To date, 24 deaths have been reported, many from an unusual Clostridium sordellii sepsis[34] or from ruptured ectopic pregnancies, because mifepristone has no effect on a pregnancy that is not implanted in the uterus. A previously healthy 21-year-old woman had a heart attack.[35] A new black box warning was generated: "Watch for atypical presentation of infection, prolonged heavy bleeding, ensure the patient knows who to call and to alert the ER of mifepristone use if she presents there."[36]

Despite the high reported complication rates, a supplemental application was approved by the FDA in 2016 which loosened these restrictions. The use was extended until 70 days gestational age, despite very few studies and much higher failure rates in higher gestational ages.[37] There was modification of the dose, timing and route of administration.[38] It was no longer required to report a complication unless it resulted in a woman's death, nor was it required to have a follow-up visit.[39]

Contraindications to medical abortion include hemoglobin < 9.5 g/dL, ectopic pregnancy, intrauterine device in place, long-term corticosteroid therapy, chronic adrenal failure, coagulopathy or anticoagulant therapy, and allergies to the medications. It is also not recommended if the woman has the inability to follow-up or is likely to be non-compliant.[40]

### What do studies say about medical abortion safety?

In examining the peer-reviewed literature on medical abortion, the alert reader will notice two disparate trends. Studies performed internationally or by non-biased researchers often find that failures and complications after medical abortion are common. Meanwhile, studies performed by vocal abortion advocates tend to find much lower incidences of adverse outcomes. These trends merit examination.

Many of the studies which conclude that medical abortion is extremely safe are published in *Contraception*, a journal affiliated with the Guttmacher Institute and Planned Parenthood, or *Obstetrics and Gynecology,* a journal published by The American College of Obstetricians and Gynecologists. These organizations are well known for their abortion advocacy.[41,42,43] Many studies are performed by researchers such as Daniel Grossman, Diana Greene Foster, Ushma Uphadhyay, and David Grimes, who are affiliated with the Bixby Center for Global Reproductive Health at the University of California, San Francisco, which describes itself as a "leader in clinical research to develop methods of abortion and improve abortion care."[44] Additionally, many of the most prolific researchers are paid employees of companies that profit from medical abortions:

Mitchell Creinin is a consultant for Danco, the company that manufactures Mifepristone.[45] Elizabeth Raymond is employed by Gynuity, a company which seeks to provide medical abortions by telemedicine.[46]

In 2018, the National Academy of Sciences, Engineering and Medicine published a book: *The Safety and Quality of Abortion Care in the U.S.*, which made the assertion that abortion is extremely safe for women, and this publication has been widely referenced. The researchers' bias is immediately apparent because it was funded by Packard, Buffett, and Hewlett Foundations, three of the top international funders of abortion advocacy.[47] These researchers performed an extensive literature review but excluded an extraordinary number of studies for perceived defects. Not surprisingly, by primarily utilizing studies performed by fellow abortion advocates, they concluded that serious complications or long term physical or mental health effects are virtually non-existent. In fact, they reported abortion is so safe that the only deterrent to its safety is legislative restrictions enacted by the states that may prevent a woman from accessing an abortion immediately, "creating barriers to safe and effective care."

They concluded that abortions can be performed safely in an office-based setting or by telemedicine without the need for hospital admitting privileges. No special equipment or emergency arrangements are required for medical abortions. Medical abortions do not need to be performed by physicians; they can safely be performed by trained certified nurse midwives, nurse practitioners, and physician assistants. They reported that abortion has no long-term adverse effects, and abortion specifically does not increase

the risk of preterm delivery, mental health disorders or breast cancer. However, when one examines the research studies they used for their conclusions, the poor quality of the literature regarding long-term complications becomes apparent. For many questions, there were very few or no studies that met their inclusion criteria, and they disqualified many studies due to perceived study defects. Thus, in all cases, there were less than five studies on which they based their definitive conclusion of "no long-term impact."  To make this determination, however, they rejected hundreds of other published peer-reviewed studies.[48,49,50,51,52]

A closer glance at some of the large studies the NAS referenced show that they also contain many flaws. One study reported a very small percentage of emergency room visits for abortion complications but ignored the reality that documentation specifying medical abortion complications is very difficult in the ICD-10 system.[53] Another study documented a very low incidence of serious abortion complications by reviewing Planned Parenthood's database, ignoring the fact that most abortionists do not maintain hospital admitting privileges or care for their own complications. A woman suffering a complication from medical abortion must be cared for by any emergency facility to which she presents due to EMTALA (Emergency Medical Treatment and Labor Laws), so many women receive post-abortion complication care by non-abortion providers. Thus, serious events would be unlikely to be documented in their clinic records.[54,55] Finally, another study reported that 99.6% of medical abortions were successful although 2.1% of the women in their clinics required surgical aspiration. The need for surgery, by definition, would indicate the medical abortions were

unsuccessful. Incidentally, that study examined over 30,000 women over two years who had abortions in one clinic system (Planned Parenthood) in one city (Los Angeles). The experiences of such high-volume abortion providers may not necessarily be comparable to other inexperienced or poorer-quality abortion providers.[56]

Immediate complications from surgical abortions usually occur due to a surgical misadventure such as cervical dilation creating a false passage, instrumental uterine perforation or incomplete evacuation of pregnancy tissue. The immediate complications of medical abortions are commonly attributed to hemorrhage or infection from incomplete uterine evacuation and retained pregnancy tissue. But recent research suggests that mifepristone itself may also cause complications of infection and mental health issues through direct pharmacologic effects. Mifepristone also blocks glucocorticoid receptors which may contribute to an impaired inflammatory response, increasing the risk of infection.[57] In addition, it causes the release of inflammatory cytokines which have been implicated in causing depression. In a rat model the mifepristone termination group had significantly decreased body weight, food intake, locomotor-related activity, and sucrose consumption, which are all animal proxies for depression and anxiety.[58]

There are less biased studies available internationally that give a far different picture of the safety of medical abortions. Epidemiologic studies in Finland are of better quality than those in the U.S. because single payer healthcare and meticulous medical record keeping ensure that all pregnancies and all medical events are accurately recorded. A study of over 42,000 women receiving abortions at <7 weeks gestational age documented

that adverse events occurred in one in five women who had medical abortions and almost 6% required surgery. The rate of complications was four times higher in medical than in surgical abortions.[59] Another Finnish study of 18,000 women found an 8% rate of surgery for medical abortion failures in the first trimester, and almost 40% surgery rate in the second trimester.[60] Finally, a meta-analysis of all available Mifepristone/Misoprostol studies worldwide including over 47,000 women found a 4.8% treatment failure rate, and 1.1% ongoing pregnancies.[61]

*Data limitations of abortion complication and abortion-related maternal mortality rates*

When considering the safety of abortion in the U.S., it is important to realize that there are many data limitations affecting the accuracy of these statistics. Due to privacy concerns and payment apart from insurance coverage for most abortions, there is no accurate central database that tracks this procedure. As reported earlier, recent studies documenting apparent low complication rates have been performed by high volume abortionists and do not reflect the quality of all abortion providers in the U.S. The data regarding abortion related maternal mortality is even more compromised. A widely reported study asserted that abortion is 14 times safer than childbirth by using four disparate and difficult to calculate numbers, with non-comparable denominators. Abortion-related deaths were compared to the number of legal abortions. Maternal deaths were compared to the number of live births.[62] Only live births can be accurately measured due to mandated birth certificates. Yet, only 2/3 of maternal deaths occur in association with a live birth.[63]

It is well documented in the U.S. that at least 50% of maternal deaths are not reported as pregnancy related on death certificates.[64,65] Mortality from events in the first half of pregnancy, which are unable to be linked to a birth certificate, are even more difficult to detect, but reliable records-linkage studies from Finland document that 94% of abortion-related deaths are not documented as such on the maternal death certificate.[66] This is particularly true for mental health related deaths that occur remote from the end of the pregnancy.[67] Maternal mortality encompasses all deaths occurring while a woman is pregnant, and within a year after the pregnancy ends. The authors of this misleading study are vocal abortion advocates who knew how limited the CDC data drawn primarily from death certificates was, because one of the authors was the former Chief of the CDC Abortion-Surveillance Branch.[68] This study was clearly performed for propaganda purposes.[69]

In the U.S., we don't even accurately know the number of abortions that occur. The estimated number of abortions are only voluntarily reported to the CDC by state health departments. In 2017 the states reported 638,169 abortions, but several states, including the state with the largest number (California), do not report any data.[70] By comparison, in 2017, the Guttmacher Institute, which receives their information directly from the abortion providers, reported 926,000 abortions.[71] Only 28 states require abortion providers to report their complications, but there is rarely an enforced penalty for noncompliance. Only 12 states require other physicians, coroners or emergency rooms to report abortion-related complications or deaths for investigation, and frequently these other providers are unaware of the reporting requirements.[72]

Multiple epidemiologic studies demonstrate that a woman is more likely to remain alive one year following term childbirth than following abortion.[73,74] Finnish studies show that following an abortion, a woman was two to three times as likely to die within a year,[75,76] six times as likely to commit suicide,[77] four times as likely to die from an accident,[78] and 14 times as likely to be murdered.[79] Danish studies and California Medicaid studies demonstrate similar findings.[80,81,82] It appears that a term birth is protective by reducing risk taking behavior, whereas an abortion may lead to increased social disruption and increased risk-taking behavior increasing the likelihood of death within a year.

## Medical abortion current advocacy

Abortion advocates have changed their strategy. Whereas once they claimed they wanted abortion to be "safe, legal and rare," they now favor immediate access and convenience, regardless of whether it might be more dangerous for a woman or whether the law prohibits it. Recent recommendations by pro-choice advocates illustrate this concerning trend, as there have been coordinated efforts to promote the use of medical abortions more widely.[83] Abortion advocates have stated that state level restrictions on abortion procedures place barriers to access for women who desire abortion, and they warn that women will resort to unsafe illegal procedures if they cannot readily access an abortion.[84] Conversely, they then recommend that women pursue medical abortions illegally if they encounter barriers.[85,86,87]

In 2017, the American Civil Liberties Union sued the FDA for removal of the Risk Evaluation Mitigation Strategy (REMS).[88] The FDA REMS is the only real barrier to over the counter distribution of mifeprex. It would shortly follow that all pharmacists will be pressured to distribute abortion drugs, even if it violates their conscience.[89]

There are efforts underway to force taxpayer payment of abortion even though surveys consistently demonstrate that most Americans oppose such actions. This could be accomplished in several ways: through repeal of the Hyde Amendment which prohibits federal funding of abortion,[90] increasing state Medicaid provision of abortion beyond the 15 states that will currently pay for this eugenic action,[91] and legislative mandates for university health systems to provide abortion pills to students.[92]

Although a physical examination and ultrasound[93] are standard care when evaluating a woman seeking an abortion, and counseling can best be performed in a face-to-face interview, telemedicine is also being promoted to women, especially those who live remote from an abortion clinic. This will clearly decrease the safety of medical abortion for rural women if there is limited access to emergency services.[94] One survey of abortion providers found that 1/3 had seen women experience complications from self-managed medical abortion, and only ½ felt it was safe.[95] Nonetheless, a clinical trial of telemedicine provision by Gynuity is ongoing in the U.S.[96] Mail order provision of abortion pills is also sought by abortion advocates.[97] A study on obtaining abortion pills from international distributors found that no prescription or clinical information was required, the pills averaged two weeks to arrive, analysis of the medications obtained demonstrated that some misoprostol pills contained only 15% of the advertised amount of medication, the packages often arrived damaged, and no instructions were

contained in any of the packages. Nonetheless, these pro-choice researchers concluded that it was "feasible" for women to obtain medical abortion pills on-line.[98]

Because of the restrictions that govern mifepristone prescriptions, sometimes abortion advocates will recommend that women obtain the second abortion pill component only, because it is more readily available. Misoprostol is also used to treat ulcers, so it can be prescribed by any physician. It is easily obtained over the counter in nearby countries such as Mexico. But unfortunately, misoprostol alone is a very poor abortifacient. Studies consistently demonstrate that one in four women will have a failed abortion that requires surgical completion with the use of misoprostol alone.[99,100,101]

Finally, we see promotion of so-called "menstrual regulation."[102] This refers to providing the abortion pill to women who report a late period without first ruling out pregnancy. This euphemism allows women to procure an abortion while avoiding the "stigma" of abortion.

There are many potential negative consequences to these recommendations which ultimately demonstrate abortion advocates' disregard for the health of women. For example, underestimation of gestational age may result in higher likelihood of failed abortion. Undetected ectopic pregnancies may rupture leading to life-threatening hemorrhages. Rh negative women may not receive prophylactic Rhogam resulting in isoimmunization in future pregnancies. Potential for misuse and coercion is high when there is no way to verify who is consuming the medication and whether they are doing so willingly. Sex traffickers, incestuous abusers and coercive boyfriends will all welcome more easily available medical abortion. Catastrophic complications can occur, and

emergency care may not be readily available in remote areas.

## Summary of Recommendations and Conclusion

*The following recommendations are based on good and consistent scientific evidence (Level A):*

1. **Abortion with mifeprex and misoprostol has four times the risk of complications as compared with surgical abortion.**

While there is heated disagreement in the U.S. about whether elective induced abortion should be legally permitted at all, presumably all would agree that if abortion is allowed, it should be performed in such a way as to optimize safety for the woman obtaining the abortion. Recent trends affecting the provision of medical abortions demonstrate that the woman's safety may no longer be a priority for some abortion advocates. Medical abortions are consistently documented to have four times the complication rates of surgical procedures. However, due to decreasing number of abortion providers, the abortion industry is increasingly encouraging women to choose this option, which minimizes abortion provider time and risk. Vocal abortion advocates are aggressively using the court systems and pro-choice media sources to advocate for removal of safety restrictions on medical abortions.

2. **Post-marketing restrictions are necessary to minimize the inherent dangers of abortion with mifeprex and misoprostol.**

The abortion industry is aggressively working for complete over the counter access for mifeprex. They have also begun to advocate for illegal use of mifepristone and misoprostol when restrictions are in place despite the demonstrated increase adverse events that occur when these medications are used

without close medical supervision.  The FDA REMS should be strengthened, not removed, in order to ensure that the risks of mifeprex abortion are minimized.

*The following recommendations are based on good and consistent scientific evidence (Level B):*

**Abortion industry marketing interferes with research and adequate informed consent for women.**

Biased studies performed by those who profit from abortion provision seek to downplay the common nature of complications. A review of the history of mifepristone's FDA approval demonstrates that

abortion provision abides by a standard different from other medical interventions. Medical providers who seek to advocate for their female patients' best interests should become aware that medical abortions result in complications far more often than its proponents advertise.

## References

The MEDLINE database, bibliographies of relevant guidelines, and AAPLOG's internal sources were used to compile this document with citations from 1985 to the publication date.  Preference was given to work in English, to original research, and to systematic reviews. When high-quality evidence was unavailable, opinions from members of AAPLOG were sought.

1 Kaiser Family Foundation. "Medication abortion" (anon). Available at https://www.kff.org/womens-health-policy/fact-sheet/medication-abortion/. Accessed Oct 15, 2019.

2 Guttmacher Institute. "Induced abortion in the United States" (anon). Available at https://www.gutmacher.org/fact-sheet/induced-abortion-united-states. Accessed Oct 15, 2019.

3 Dezai S, Jones R, Castle K. "Estimating abortion provision and abortion referrals among Unit4ed States obstetricians and gynecologists in private practice." *Contraception* 2018;97:297 302. DOI: 10.1016/j.contraception.2017.11.004. Epub 2017 Nov 21. Free full text: https://www.ncbi.nlm.nih.gov/pc/articles/PMC5942890/

4 Stuhlberg DB, Dude AM, Dahlquist I, Curlin FA. "Abortion provision among practicing ostretrician-gynecologists." *Obstet Gynecol* 2011;118(3):609 614. DOI: 10.1097/AOG.ob013e31822ad973. Free full text: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3170127/

5 Gravanis A, Shaison G, George M, et al. "Endometrial and pituitary responses to the steroidal RU486 in postmenopausal women." *J Clin Endocrinol Metab* 1985;60:156-163. DOI: 10.1210/jcem-60-1-156 Free full text: https://academic.oup.com/jcem/article/60/1/156/2676158

6 Johannisson E, Oberholzer M, Swahn ML, Bygdeman M. "The effect of the anti-progestin RU486 on uterine contractility and sensitivity to prostaglandin and oxytocin." *Br J Obstet Gynecol* 1988;95:126-134. DOI: 10.1111/j.1471-0528.1988.tb06840.x Available at: https://obgyn.onlinelibrary.wiley.com/doi/10.1111/j.1471-0528.1988.tb06840.x

7 Spitz IM, Bardin CW, Benton L, Robbins A. "Early pregnancy termination with mifepristone and misoprostol in the United States." *N Engl J Med* 1998;338:1241-1247. DOI: 10.1056/NEJM199804303381801 Free full text: https://www.nejm.org/doi/10.1056/NEJM199804303381801?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%3dwww.ncbi.nlm.nih.gov

8 Tang OS, Schweer H, Seyberth HW, Lee SH, Ho PC. "Pharmacokinetics of different routes of administration of misoprostol." *Hum Reprod* 2002;17:332-336. DOI: 10.1093/humrep/17.2.332 Free full text: https://academic.oup.com/humrep/article/17/2/332/568942

9 Weibe ER. "Tamoxifen compared to methotrexate when used with misoprostol for medical abortion." *Contraception* 1999;59:265-270. DOI: 10.1016/s0010-7824(99)00031-1  Available at: https://www.contraceptionjournal.org/article/S0010-7824(99)00031-1/fulltext

10 AAPLOG Practice Bulletin 6  Reversal of the Effects of Mifepristone by Progesterone, available at: https://aaplog.org/wp-content/uploads/2020/01/FINAL-PB-6-Abortion-Pill-Reversal-1.pdf  Accessed Feb 27, 2020.

11 Ulmann A. "Development of mifepristone." *J Am Med Womens Assoc* 2000;55(3 suppl):117-20. Available at: https://www.ncbi.nlm.nih.gov/pubmed/?term=J+Am+Med+Womens+Assoc+2000%3B55(3+suppl)%3A117-20.

12 Op. cit. Endnote 7, Spitz et al.

13 "FDA Subpart H Final Rule. New drug, antibiotic, and biological drug product regulations; accelerated approval. Final rule, 57 Fed. Reg. 58942" (Dec 11, 1992). www.fda.gov/cder/fedreg/fr19921211.txt Accessed Oct 15 2019.

14 Zimmerman R. "Clash between pharmacia and FDA may hinder the use of RU-486." *Wall Street Journal* Oct. 18, 2000:B1.Available at: https://www.wsj.com/articles/SB968103355754057093 Accessed Oct 15 2019.

15 "Regulations requiring manufacturers to assess the safety and effectiveness of new drugs and biological products in pediatric patients. Final rule." *Fed Register* 1998;63(Dec 2):66632. Available at: https://www.federalregister.gov/documents/2000/10/06/00-25705/regulations-requiring-manufacturers-to-assess-the-safety-and-effectiveness-of-new-drugs-and Accessed Oct 15 2019.

16 Calhoun B, Harrison D. "Challenges to the FDA approval of mifepristone." *Annals of Pharmacotherapy* 2004;38:163-8. DOI:10.1345/aph.1D448 Available at: https://journals.sagepub.com/doi/full/10.1345/aph.1D448?url_ver=Z39.88-2003&rfr_id=ori%3Arid%3Acrossref.org&rfr_dat=cr_pub%3Dpubmed

17 Danco: "Risk Evaluation Mitigation Strategy" (anon). Available at: https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_REMS_full.pdf. Accessed Oct 15, 2019.

18 American College of Obstetricians and Gynecologists Practice Bulletin 143: "Medical management of first trimester abortion." *Obstet Gynecol* 2104;123:676-692. DOI: 10.1097/01.AOG.0000444454.67279.7d. Available at: https://journals.lww.com/greenjournal/Abstract/2014/03000/Practice_Bulletin_No__143___Medical_Management_of.40.aspx

19 Chen M, Creinin M. "Mifepristone with buccal misoprostol for medical abortion: a systemic review." *Obstet Gynecol* 2015;126:12-21. DOI: 10.1097/AOG.0000000000000897 Free full text: https://escholarship.org/uc/item/0v4749ss

20 "U.S. FDA Questions and Answers on Mifeprex" (anon). Available at https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifeprex. Accessed Oct 15, 2019.

21 FDA Mifeprex tablets label. Available at: https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf Accessed Oct 15, 2019.

22 Ho PC. "Women's perceptions on medical abortion." *Contraception* 2006;74:11-15. Epub 2006 May 6. DOI: 10.1016/j.contraception.2006.02.012 Available at: https://www.contraceptionjournal.org/article/S0010-7824(06)00086-2/fulltext

23 Raymond E, Weaver S, Winikoff B. "First trimester medical abortion with mifepristone 200 mg and misoprostol: A systemic review." *Contraception* 2013;87(1):36-37. Available at: https://www.sciencedirect.com/science/article/abs/pii/S0010782412006439

24 "FDA Mifeprex tablets." Available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020TOC.cfm. Accessed Oct 15, 2019.

25 Op. cit. Endnote 12, Chen et al.

26 Winikoff B, Dzuba I, Creinin M, et al. "Two distinct oral routes of misoprostol in mifepristone induced medical abortion." *Obstet Gynecol* 2008;112:1303-1310. DOI: 10.1097/AOG.0b013e31818d8eb4. Free full text: https://journals.lww.com/greenjournal/fulltext/2008/12000/Two_Distinct_Oral_Routes_of_Misoprostol_in.18.aspx

27 Niinimaki M, Pouta A, Bloigu A, et al. "Immediate complications of medical compared with surgical termination of pregnancy." *Obstet Gynecol* 2009;114(4):795-804. DOI:10.1097/AOG.0b013e3181b5ccf9. Free full text: https://journals.lww.com/greenjournal/fulltext/2009/10000/Immediate_Complications_After_Medical_Compared.14.aspx

28 Mentula MJ, Niinimaki M, Suhonen S, et al. "Immediate adverse events after 2nd trimester termination of pregnancy." *Hum Reprod* 2011;26(4):927-932. DOI: 10.1093/humrep/der016 Free full text: https://academic.oup.com/humrep/article/26/4/927/627865

29 "Misoprostol safe usage guide for obstetrics and gynecology" (anon). Free text available at: http://www.misoprostol.org/misoprostol-teratogenicity/ Accessed Oct 15, 2019.

30 Op. cit. Endnote 17, FDA Mifeprex tablets.

31 Sternberg EM, Hill JM, Chrousos GP, Kamlaris T, Listwak SJ, Gold PW, Wilder RL. "Inflammatory mediator-induced hypothalamic-pituitary-adrenal axis activation is defective in streptococcal cell wall arthritis-susceptible Lewis rats." *Proc Natl Acad Sci USA; Medical Sciences* 1989 Apr;86:2374-2378. Full free text: https://www.pnas.org/content/pnas/86/7/2374.full.pdf

32 FDA Summary: "Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2018." RCM # 2007-525 NDA 20-687 Reference ID: 4401215 Text available at: https://www.fda.gov/media/112118/download

33 "FDA Information on Mifeprex labeling changes and ongoing monitoring efforts" (anon). Free text available at: https://www.gao.gov/assets/700/690914.pdf.  Accessed Oct 15 2019.

34 Fischer M, Batnagar J, Guarner J, et al. "Fatal toxic shock syndrome associated with *Clostridium sordellii* after medical abortion." *N Engl J Med* 2005;353:2352-2360. DOI:10.1056/NEJMoa051620 Free full text: https://www.nejm.org/doi/10.1056/NEJMoa051620?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%3dwww.ncbi.nlm.nih.gov

35 Mifepristone questions and answers (anon). Free text available at https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifeprex.  Accessed Oct 15, 2019.

36 Op. cit. Endnote 14, Mifeprex tablets label.

37 Winikoff B, Dzuba IG, Chong E. "Extending outpatient medical abortion services through 70 days of gestational age." *Obstet Gynecol.* 2012 Nov;120(5):1070-6. DOI: http://10.1097/AOG.0b013e31826c315f. Free full text: https://journals.lww.com/greenjournal/Fulltext/2012/11000/Extending_Outpatient_Medical_Abortion_Services.13.aspx

38 Op. cit. Endnote 12, Chen et al.

39 Op. cit. Endnote 13, Questions and answers on Mifeprex.

40 Op. cit. Endnote 11, ACOG Practice Bulletin 143.

41 United States Abortion. Free text available at https://www.guttmacher.org/united-states/abortion. Accessed Oct 16, 2019.

42 "Where can I get an abortion?" Free text available at https://www.plannedparenthood.org/. Accessed Oct 16, 2019.

43 "American College of Obstetricians and Gynecologists Committee Opinion 613: Increasing access to abortion." *Obstet Gynecol* 2014;124:1060-1065. DOI: 10.1097/01.AOG.0000456326.88857.31. Free full text: https://journals.lww.com/greenjournal/fulltext/2014/11000/Committee_Opinion_No__613___Increasing_Access_to.34.aspx

44 Bixby Center for Global Reproductive Health: "Abortion." Text available at https://bixbycenter.ucsf.edu/abortion. Accessed Oct 16, 2019.

45 Op. cit. Endnote 12, Chen et al.

46 Raymond E, Weaver S, Winikoff B. "First trimester medical abortion with mifepristone 200 mg and misoprostol: A systemic review." *Contraception* 2013;87(1):36-37. Available at: https://www.deepdyve.com/lp/elsevier/first-trimester-medical-abortion-with-mifepristone-200-mg-and-yPoCvfoGh3

47 Novielli, C. "Study claiming abortion is safe was funded by those how profit from it and the media fails to investigate." Free text available: https://www.nationalrighttolifenews.org/2019/08/study-claiming-abortion-is-safe-was-funded-by-those-who-profit-from-it-and-the-media-fails-to-investigate/ Accessed Oct 15 2019.

48 Academies of Science, Engineering and Medicine: "The Safety and Quality of Abortion Care in the United States." The National Academies Press, Washington DC, 2018. Available at: https://www.nap.edu/catalog/24950/the-safety-and-quality-of-abortion-care-in-the-united-states

49 Henney JE, Gayle HD. "Perspective: Time to reevaluate U.S. Mifepristone restrictions." *N Engl J Med* June 2019;381:597-598. DOI 10.1056/NEJMp1908305 Epub 2019 Jun 26. Available at: https://www.nejm.org/doi/full/10.1056/NEJMp1908305?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%3dpubmed

50 AAPLOG Practice Bulletin 5: Abortion and Preterm Birth. Available at  https://aaplog.org/wp-content/uploads/2019/12/FINAL-PRACTICE-BULLETIN-5-Abortion-Preterm-Birth.pdf

51 AAPLOG Practice Bulletin 7: Abortion and Mental Health. Available at https://aaplog.org/wp-content/uploads/2019/12/FINAL-Abortion-Mental-Health-PB7.pdf

52 AAPLOG Committee Opinion 8: Abortion and Breast Cancer. Available at: https://aaplog.org/wp-content/uploads/2020/01/FINAL-CO-8-Abortion-Breast-Cancer-1.9.20.pdf

53 Upadhyay U, Desai S,Zlidar V, et al. "Incidence of emergency department visits and complications after abortion." *Obstet Gynecol* 2015;125:175-83. DOI. 10.1097/AOG.0000000000000603. Free full text: https://escholarship.org/uc/item/523956jn

54 Cleland K, Creinin M, Nucotola D. "Significant adverse events and outcomes after medical abortion." *Obstet Gynecol* 2013;121:167-71. DOI: http://10.1097/AOG.0b013e3182755763. Free full text: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3711556/

55 Studnicki J, Longbons T, Fisher J, et al. "Doctors who perform abortions: Their characteristics and patterns of holding and using hospital admitting privileges." *Health Services Research and Managerial Epidemiology*.

2019;6:1-8. doi.org/10.1177/2333392819841211 Free full text:
https://journals.sagepub.com/doi/10.1177/2333392819841211

56 Ireland LD, Gatter M, Chen A. "Medical compared with surgical abortion for effective pregnancy termination in the first trimester." *Obstet Gynecol* 126(1)22-28. DOI: 10.1097/AOG.0000000000000910. Free full text:
https://journals.lww.com/greenjournal/Fulltext/2015/07000/Medical_Compared_With_Surgical_Abortion_for.5.aspx

57 Miech RP. "Pathophysiology of Mifepristone induced septic shock due to *Clostridium sordellii*." *Ann Pharmacother* 2005;39:xxxx. Published online, 26 Jul 2005, www.theannals.com, DOI 10.1345/aph.1G18. Free full text: http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.581.8018&rep=rep1&type=pdf

58 Camilleri C, Beiter R, Puentes L, Scherk P, Sammut S. "Biologic, Behavioral and Physiologic Consequences of Drug-induced Pregnancy Termination at First-trimester Human Equivalent in an Animal Model." *Frontiers in Neuroscience*. 2019;13:544. DOI: 10.3389/fnins.2019.00544. Free full text:
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6549702/

59 Op. cit. Endnote 23, Niinimaki et al.

60 Op. cit. Endnote 24, Mentula et al.

61 Op. cit. Endnote 16, Raymond et al.

62 Raymond EG, Grimes DA. "The comparative safety of legal induced abortion and childbirth in the United States." *Obstet Gynecol* 2012;119:215–9. DOI: 10.1097/AOG.0b013e31823fe923. Free full text:
https://journals.lww.com/greenjournal/fulltext/2012/02000/The_Comparative_Safety_of_Legal_Induced_Abortion.3.aspx

63 "CDC Pregnancy mortality surveillance system" (anon). Available at:
https://www.cdc.gov/reproductivehealth/maternalinfanthealth/pregnancy-mortality-surveillance-system.htm Accessed Oct 15 2019.

64 Horon IL. "Underreporting of Maternal Deaths on Death Certificates and the Magnitude of the Problem of Maternal Mortality." *AJ of Public Health* 2005;95:478-82. DOI:10.2105/AJPH.2004.040063 Full free text:
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1449205/

65 Deneux-Tharaux C, Berg C, Bouvier-Colle MH, et al. "Underreporting of pregnancy related mortality in the U.S. and Europe." *Obstet Gynecol* 2005;106(4):684-692. DOI:10.1097/01.AOG.0000174580.24281.e6 Free full text:
https://journals.lww.com/greenjournal/Fulltext/2005/10000/Underreporting_of_Pregnancy_Related_Mortality_in.5.aspx

66 Gissler M, Berg C, Bouvier-Colle MH, Buekens F. "Methods for identifying pregnancy associated deaths: Population based data from Finland 1987-2000." *Pediatric and Perinatal Epidemiology* 2004;18:448-455. DOI:10.1111/j.1365-3016.2004.00591.x Available at: https://onlinelibrary.wiley.com/doi/full/10.1111/j.1365-3016.2004.00591.x

67 Gissler M, Hemminki E, Longvist J. "Suicides after pregnancy in Finland, 1987-94: Register linkage study." *BMJ* 1996;313(7070);1431-4. DOI: 10.1136/bmj.313.7070.1431 Available at:
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2352979/

68 David A Grimes. https://www.huffpost.com/author/david-a-grimes Accessed Oct 15 2019.

69 AAPLOG Committee Opinion 6  Induced Abortion and the Increased Risk of Maternal Mortality.  Available at: https://aaplog.org/wp-content/uploads/2020/01/FINAL-CO-6-Induced-Abortion-Increased-Risks-of-Maternal-Mortality.pdf

70 "CDC Abortion surveillance system FAQs." Available at:
https://www.cdc.gov/reproductivehealth/data_stats/abortion.htm Accessed Oct 15 2019.

71 "Induced abortion in the U.S." https://www.guttmacher.org/fact-sheet/induced-abortion-united-states Accessed Oct 15 2019.

72 "Abortion reporting requirements." https://www.guttmacher.org/state-policy/explore/abortion-reporting-requirements Accessed Oct 15 2019.

73 Reardon D, Thorp J. "Pregnancy Associated Death in record linkage studies relative to delivery, termination of pregnancy, and natural losses: A systematic review with a narrative synthesis and meta-analysis." *Sage Open Medicine* 2017;5:1-17. DOI: 10.1177/2050312117740490. Free full text:
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5692130/

74 Karalis E, Ulander VM, Tapper AM, Gissler M. "Decreasing mortality during pregnancy and for a year after while mortality after termination of pregnancy remains high: A population based register study of pregnancy associated deaths in Finland 2001-2012." *BJOG* 2017;124:1115-1121. DOI: 10.1111/1471-0528.14484. Free full text: https://obgyn.onlinelibrary.wiley.com/doi/full/10.1111/1471-0528.14484

75 Gissler M, Kauppila R, Merilainen J, Toukamaa H, Hemminki E. "Pregnancy Associated Deaths in Finland 1987-1994." *Acta Obstetricia et Gynecologica Scandinavica* 1997;76:651-657. DOI:10.3109/00016349709024605 Available at: https://obgyn.onlinelibrary.wiley.com/doi/abs/10.3109/00016349709024605?sid=nlm%3Apubmed

76 Gissler M, Berg C, Bouvier-Colle MH, Buekens P. "Pregnancy Associated Mortality After Birth, Spontaneous Abortion or Induced Abortion in Finland. 1987-2000." *AJOG* 2004;190:422-427. DOI:10.1016/j.ajog.2003.08.044 Available at: https://www.ajog.org/article/S0002-9378(03)01136-0/fulltext

77 Op. cit. Endnote 53, Gissler et al.

78 Gissler M, Berg C, Bouvier-Colle MH, Buekens P. "Injury deaths, suicides and homicides associated with pregnancy, Finland 1987-2000." *Eur J of Public Health* 2005;15(5):459-463. DOI:10.1093/eurpub/cki042 Free full text: https://academic.oup.com/eurpub/article/15/5/459/526248

79 Op. cit. Endnote 60, Gissler et al.

80 Reardon DC, Coleman PK. "Short and long term mortality rates associated with first pregnancy outcome: Population register based study for Denmark 1980-2004." *Med Sci Monit* 2012;18(9):71 – 76. DOI:10.12659/msm.883338 Free full text: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3560645/

81 Coleman PK, Reardon DC, Calhoun BC. "Reproductive history patterns and long-term mortality rates: A Danish population-based record linkage study." *Eur J of Public Health* 2013;23(4):569-74. DOI:10.1093/eurpub/cks107 Free full text: https://academic.oup.com/eurpub/article/23/4/569/427991

82 Reardon DC, Ney PG, Scheuren F, et al. "Deaths associated with pregnancy outcome: A record linkage study of low income women." *South Med J* 2002;95:834-841. Available at: https://www.ncbi.nlm.nih.gov/pubmed/12190217

83 American College of Obstetricians and Gynecologists. Committee Opinion 613: "Increasing access to abortion." *Obstet Gynecol* 2014; 124:1060–5. DOI: 10.1097/01.AOG.0000456326.88857.31. Free full text: https://journals.lww.com/greenjournal/fulltext/2014/11000/Committee_Opinion_No__613___Increasing_Access_to.34.aspx

84 Donavan M. "Self-managed medication abortion: Expanding the available options for U.S. abortion care." *Guttmacher Policy Review* 2018;21:41-47. Available at: https://www.guttmacher.org/gpr/2018/10/self-managed-medication-abortion-expanding-available-options-us-abortion-care

85 Tasset J, Harris L. "Harm reduction for abortion in the U.S." *Obstet Gynecol* 2018;131:621-4.  DOI: 10.1097/AOG.0000000000002491. Available at: https://journals.lww.com/greenjournal/Abstract/2018/04000/Harm_Reduction_for_Abortion_in_the_United_States.2.aspx

86 Harper C, Blanchard K, Grossman D, Henderson J, Darney P. "Reducing maternal mortality due to elective abortion: potential impact of misoprostol in low resource setting." *Int J Gynaecol Obstet.* 2007 Jul;98(1):66-9. Epub 2007 Apr 27 DOI:10.1016/j.ijgo.2007.03.009 Available at: https://obgyn.onlinelibrary.wiley.com/doi/abs/10.1016/j.ijgo.2007.03.009

87 Skop I. "Abortion safety: at home and abroad." *Issues in Law and Medicine* 2019;34:43-75. Available at: https://www.ncbi.nlm.nih.gov/pubmed/31179671

88 American Civil Liberties Union (ACLU). CHELIUS V. WRIGHT - COMPLAINT. October 3, 2017. Available at: https://www.aclu.org/sites/default/files/field_document/filed_chelius_v._wright_0.pdf Accessed Oct 15 2019.

89 Mifeprex REMS Study Group. "Sixteen years of over-regulation: time to unburden Mifeprex." *N Engl J Med* 2017;376:790–4. DOI: 10.1056/NEJMsb1612526 Available at: https://www.nejm.org/doi/10.1056/NEJMsb1612526

90 Hyde amendment codification act. https://www.congress.gov/bill/113th-congress/senate-bill/142 Accessed Oct 15 2019.

91 Guttmacher Institute. "State funding of abortion under Medicaid." Available at: https://www.guttmacher.org/state-policy/explore/state-funding-abortion-under-medicaid Accessed Oct 15 2019.

92 Dembosky A. "California again considers making abortion pills available at public colleges." Available at: https://www.npr.org/sections/health-shots/2019/09/05/753784646/california-again-considers-making-abortion-pills-available-at-public-colleges Accessed Oct 15 2019.

93 American College of Obstetricians and Gynecologists. "Ultrasound in Pregnancy, Practice Bulletin Number 175." *Obstet Gynecol* 2016;128(6):1459-60. DOI:10.1097/AOG.0000000000001815 Available at: https://journals.lww.com/greenjournal/Abstract/2016/12000/Practice_Bulletin_No__175__Ultrasound_in_Pregnancy.53.aspx

94 Aiken A. "Self-reported outcomes and adverse events after medical abortion through online telemedicine: population-based study in the Republic of Ireland and Northern Ireland." *BMJ* 2017;357:j2011. DOI: 10.1136/bmj.j2011. Free full text: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5431774/

95 Kerestes AK, Stockdale CK, Zimmerman MB, Hardy-Fairbanks AJ. "Abortion providers' experiences and views on self-managed medical abortion, an exploratory study." *Contraception* 2019;100:89-172. DOI:

https://doi.org/10.1016/j.contraception.2019.04.006  Available at:
https://www.contraceptionjournal.org/article/S0010-7824(19)30143-X/pdf Accessed Oct 15 2019.

[96] Chong E. "Mife by mail, findings from an telemedicine abortion service in the U.S." Available at:
https://fiapac.org/media/docs/20180914-Chong.pdf Accessed Oct 15 2019.

[97] McCammon S. "European doctor who prescribes abortion pills to U.S. women online sues FDA." Available at:
https://www.npr.org/2019/09/09/758871490/european-doctor-who-prescribes-abortion-pills-to-u-s-women-online-sues-fda Accessed Oct 15 2019.

[98] Murtaugh C. "Exploring the feasibility of obtaining mifepristone and misoprostol from the internet."
*Contraception* 2018;97:287-291. DOI: 10.1016/j.contraception.2017.09.016. Epub 2017 Oct 11. Free full text:
https://www.contraceptionjournal.org/article/S0010-7824(17)30475-4/fulltext

[99] Ngoc NT, Blum J, Raghavan S, et al. "Comparing two early medical abortion regimens: mifepristone+misoprostol vs misoprostol alone." *Contraception* 2011 May;83(5):410-7. DOI: 10.1016/j. Free full text:
https://www.contraceptionjournal.org/article/S0010-7824(10)00522-6/fulltext

[100] Grossman D, Baum SE, Andjelic D, et al. "A harm reduction model of abortion counseling about misoprostol use in Peru with telephone and in person follow up: A cohort study." *Plos One* 2018. Jan 10;13(1):e0189195. DOI: 10.1371/journal.pone.0189195. Free full text: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5761856/

[101] Raymond E, Harrison M, Weaver M. "Efficacy of misoprostol alone for first trimester medical abortion: A systemic review." *Obstet Gynecol* 2019;133:137-47. DOI: 10.1097/AOG.0000000000003017. Free full text:
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6309472/

[102] Guttmacher Institute. "Acceptability and feasibility of Mifepristone-Misoprostol for menstrual regulation in Bangladesh." June 2013 Vol 39(2):79-87. Available at:
https://www.guttmacher.org/journals/ipsrh/2013/07/acceptability-and-feasibility-mifepristone-misoprostol-menstrual-regulation Accessed Oct 15 2019.

Downloaded from http://journals.lww.com/greenjournal by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IlQrHD3i3D0OdRyi7TvSFl4Cf3VC4/OAVpDDa8K2+Ya6H015kE= on 03/01/2021

*Original Research*

# Mifepristone Antagonization With Progesterone to Prevent Medical Abortion
## *A Randomized Controlled Trial*

*Mitchell D. Creinin*, MD, *Melody Y. Hou*, MD, MPH, *Laura Dalton*, DO, MBA, *Rachel Steward*, MD, MSc, and *Melissa J. Chen*, MD, MPH

**OBJECTIVE:** To estimate the efficacy and safety of mifepristone antagonization with high-dose oral progesterone.

**METHODS:** We planned to enroll 40 patients in a double-blind, placebo-controlled, randomized trial. We enrolled patients at 44–63 days of gestation with ultrasound-confirmed gestational cardiac activity who were planning surgical abortion. Participants ingested mifepristone 200 mg and initiated oral progesterone 400 mg or placebo 24 hours later twice daily for 3 days, then once daily until their planned surgical abortion 14–16 days after enrollment. Follow-up visits were scheduled 3±1, 7±1, and 15±1 days after mifepristone intake with ultrasonography and blood testing for human chorionic gonadotropin and progesterone. Participants exited from the study when they had their surgical abortion or earlier for gestational cardiac activity absence, gestational sac expulsion, or medically indicated suction aspiration. We assessed the primary outcome of continued gestational cardiac activity at approximately 2 weeks (15±1 day), side effects after drug ingestion, and safety outcomes including hemorrhage and emergent treatment.

**RESULTS:** We enrolled participants from February to July 2019 and stopped enrollment after 12 patients for safety concerns. Mean gestational age was 52.5 days. Two (one per group) voluntarily discontinued 3 days after mifepristone ingestion for subjective symptoms (nausea and vomiting, bleeding). Among the remaining 10 patients (five per group), gestational cardiac activity continued for 2 weeks in four in the progesterone group and two in the placebo group. One patient in the placebo group had no gestational cardiac activity 3 days after mifepristone use. Severe hemorrhage requiring ambulance transport to hospital occurred in three patients; one received progesterone (complete expulsion, no aspiration) and two received placebo (aspiration for both, one required transfusion). We halted enrollment after the third hemorrhage. No other significant side effects were reported.

**CONCLUSION:** We could not estimate the efficacy of progesterone for mifepristone antagonization due to safety concerns when mifepristone is administered without subsequent prostaglandin analogue treatment. Patients in early pregnancy who use only mifepristone may be at high risk of significant hemorrhage.

**CLINICAL TRIAL REGISTRATION:** ClinicalTrials.gov, NCT03774745.

*(Obstet Gynecol 2020;135:158–65)*
*DOI: 10.1097/AOG.0000000000003620*

*From the Department of Obstetrics and Gynecology, University of California, Davis, Sacramento, Planned Parenthood Mar Monte, San Jose, and FPA Women's Health, Sacramento, California.*

*Supported by the Society of Family Planning Research Fund.*

*The authors thank the staff and physicians at the study centers for assisting with referral and conduct of the clinical trial.*

*The findings and conclusions expressed in this article are those of the authors and do not necessarily reflect the views of Planned Parenthood Federation of America, Inc. or FPA Women's Health.*

*Each author has confirmed compliance with the journal's requirements for authorship.*

*Corresponding author: Mitchell D. Creinin, MD, University of California, Davis, Sacramento, CA; email: mdcreinin@ucdavis.edu.*

**Financial Disclosure**
*Mitchell D. Creinin is a consultant for Danco Laboratories, providing medical consultation for clinicians that contact Danco with questions regarding mifepristone. Laura Dalton is an employee of Planned Parenthood. The other author did not report any potential conflicts of interest.*

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. All rights reserved.
ISSN: 0029-7844/20

In the United States, approximately 862,000 abortions occur per year, of which almost 40% occur using medical abortion.[1] The treatment approved by the U.S. Food and Drug Administration for medical abortion is a combination of mifepristone and miso-

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

prostol through 70 days of gestation.[2] Mifepristone acts as a competitive progesterone receptor antagonist and promotes decidual necrosis to weaken implantation, enhances uterine sensitivity to prostaglandins, and softens the cervix.[3] Accordingly, mifepristone has some activity to induce abortion when used alone. However, overall efficacy is generally 80% or less, and these studies typically included patients at less than 49 days of gestation.[4] Medical abortion efficacy is improved significantly with the addition of a prostaglandin analogue.[4] Mifepristone followed in 24–48 hours by misoprostol is 96–97% effective through 70 days of gestation; however, as gestation advances from 49 to 70 days, complete abortion rate decreases and continuing pregnancy rate increases.[2] Approximately 0.3% of patients at 49 days of gestation or less experience a continuing pregnancy compared with 3.1% of patients at 64–70 days.[2] A recent U.K. study of patients who initiated medical abortion at 64–70 days found that 9 of 89 (10%) patients with continuing pregnancies detected at follow-up opted to continue the pregnancy.[5]

Case series have reported that some patients may change their minds about terminating their pregnancies after ingesting mifepristone and before misoprostol treatment.[6–8] Although an exact proportion is unknown, the best estimate is that fewer than 0.005% of patients who use mifepristone choose to continue their pregnancies.[9] Because mifepristone binds strongly to the progesterone receptor and has a long half-life,[4] some scientists believe that this action is potentially irreversible. However, others have questioned this theory and believe that providing high doses of progesterone may antagonize the effects of mifepristone when administered for abortion.[6]

No clinical trials have been performed to adequately study antagonizing mifepristone with progesterone treatment. Case series reported to date have significant limitations, including using investigational treatment (high-dose progesterone) after mifepristone ingestion without consenting patients for this experiment; incomplete reporting of outcomes; use of varying progesterone doses, routes and durations; and lack of control groups to understand true efficacy.[6–8] The largest case series (547 patients evaluated) reported a 48% continuing pregnancy rate using various progesterone regimens, with the highest rates (64–68%) using various intramuscular or oral treatments.[8] To address these issues, we conducted a double-blind placebo-controlled randomized trial to evaluate continuing pregnancy rates, safety, and side effects of high-dose oral progesterone in patients who used mifepristone during early pregnancy.

## METHODS

We conducted this randomized, double-blind, placebo-controlled trial at the University of California, Davis Medical Center. We approached patients who had completed counseling and consent for a surgical abortion and were 63 days of gestation or less about study participation. Inclusion criteria were 18 years or older, English-speaking, singleton pregnancy, and willingness to delay the abortion by approximately 2 weeks. Exclusion criteria were medical contraindications to medical abortion per the mifepristone U.S. Food and Drug Administration label,[2] an allergy to mifepristone or progesterone, or a peanut allergy (on-label contraindication to oral progesterone). The University of California, Davis, Institutional Review Board approved this study and all participants gave written study consent before beginning any study procedures.

The screening visit included obtaining study consent, recording demographic information, soliciting baseline pregnancy symptoms (subjectively rated as none, mild, moderate or severe), and inquiring whether they had used mifepristone or progesterone previously. Patients for whom transvaginal ultrasonography demonstrated gestational cardiac activity and a gestational age 44–63 days of gestation based on Goldstein and Wolfson's criteria[10] could enroll that day. Patients who were at less than 44 days of gestation at screening returned for enrollment, at which time transvaginal ultrasonography was repeated to confirm gestational cardiac activity and gestational age.

Enrolled participants had blood drawn for human chorionic gonadotropin (hCG) and progesterone levels, then swallowed mifepristone 200 mg in front of an investigator. Study treatment (progesterone or placebo) was prepared by the University of California, Davis Investigational Drug Service by placing 38 capsules of progesterone 200 mg or similar-appearing placebo capsules in opaque pill containers. The Investigational Drug Service could not over-encapsulate the drugs due to product size. The Investigational Drug Service performed the randomization allocation using a computer-generated random sequence in blocks of four, sequentially numbered the containers, and maintained the randomization log to ensure drug allocation concealment until study completion. Participants were instructed to start study treatment 24 hours after mifepristone ingestion by taking two capsules twice daily for 3 days, then two

Creinin et al   *Mifepristone Antagonization*   **159**

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



capsules once daily until the study exit visit. We chose this dosing regimen because it was the most effective option previously described in a case series of mifepristone antagonization.[8] Participants received a diary to document any side effects and capsule intake. Participants also received the standard medical abortion bleeding and side effect instructions distributed to medical abortion patients at the University of California, Davis.

Research staff contacted participants 24 hours after mifepristone administration to confirm the start of study treatment. Follow-up visits were scheduled 3 ($\pm1$), 7 ($\pm1$), and 15 ($\pm1$) days after mifepristone intake. Each visit included diary review, assessment of symptoms or drug side effects, ultrasonography to establish presence or absence of gestational cardiac activity, and blood testing for hCG and progesterone. Additionally, a research coordinator independently counted unused study drug to maintain investigator blinding. The patient's planned surgical abortion was scheduled concurrent with her last study visit. Participants exited from the study when they had their surgical abortion, or earlier for gestational cardiac activity absence, gestational sac expulsion, or medically indicated suction aspiration. At the final visit, participants were asked whether they knew what treatment they received or looked up the capsules online for identification.

The primary outcome was continuing pregnancy with presence of gestational cardiac activity after approximately 2 weeks ($15\pm1$ days). Secondary outcomes included expulsion rates over 2 weeks, change in hCG and progesterone levels during treatment, study drug side effects, and safety outcomes (eg, hemorrhage, emergency department visit, emergent suction aspiration). Safety evaluations (adverse events review) were performed by the principal investigator after each patient completed the study and at research review meetings every 2 weeks by the primary study team. The principal investigator was responsible for continued safety oversight and decisions to stop the study for safety reasons.

We estimated a 68% continuing pregnancy rate with oral progesterone treatment based on a report using the same dosing after mifepristone administration in early pregnancy, stating that 68% of patients had pregnancies that continued to 20 weeks of gestation or more.[8] We also estimated that only 25% of patients receiving placebo would have continuing pregnancies.[11] Using 80% power and $\alpha=0.05$, 20 participants per group were required.

We performed an intention-to-treat analysis, using Fisher exact test or $\chi^2$ test as indicated, $t$ test for continuous variables and Mann-Whitney $U$ for comparing median values.

## RESULTS

We enrolled 12 patients from February 2019 to July 2019 (Fig. 1). Patient characteristics are presented in Table 1. Two patients exited the study voluntarily related to side effects; both underwent suction aspiration 3 days after mifepristone administration. The first patient, in the placebo group, was 48 days at enrollment and had a prior medical abortion. She had increased anxiety about bleeding that started 2 days after mifepristone use and requested a suction aspiration. The second patient, in the progesterone group, had three prior pregnancies and mild nausea and vomiting at baseline. She had developed increasing nausea and vomiting after enrolling, resulting in dehydration that required intravenous fluids as an outpatient. She took only two of her four treatment doses before requesting a suction aspiration.

Overall, four of six patients in the progesterone group and two of six patients in the placebo group had continuing pregnancies at 2 weeks. Excluding the two patients who did not finish treatment, these rates are four of five and two of five, respectively. A detailed listing of individual patient characteristics and outcomes is in Appendix 1, available online at http://links.lww.com/AOG/B658.

Four pregnancies did not continue, including one patient at 48 days in the placebo group who had no gestational cardiac activity 3 days after mifepristone use and had an uneventful suction aspiration. Three other patients had severe bleeding requiring ambulance transport to an emergency department. The first patient received progesterone treatment after enrollment at 56 days of gestation. She reported no bleeding at the first follow-up visit 2 days postmifepristone. Shortly after her visit, she started having brisk bleeding and called an ambulance. Transvaginal ultrasound examination in the emergency department found no gestational sac and a heterogenous endometrial lining of approximately 1.5 cm. Heavy bleeding lasted about 3 hours overall, and no intervention was needed. The second patient received placebo and enrolled at 60 days of gestation. She noted new mild bleeding at a follow-up visit 2 days after mifepristone use. The following day, she called an ambulance after onset of heavy vaginal bleeding. In the emergency department, a study physician found significant heterogenous material in the uterine cavity on ultrasound examination with continued brisk bleeding, so a suction

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



**Fig. 1.** Participant flowchart of patients who received mifepristone 200 mg followed by progesterone for up to 2 weeks.
*Creinin. Mifepristone Antagonization. Obstet Gynecol 2019.*

aspiration was performed. Pathology demonstrated normal chorionic villi. The third patient also received placebo and enrolled at 60 days of gestation. She noted new mild spotting at a follow-up visit 2 days after mifepristone use. The following day, she called an ambulance after experiencing hemorrhage. In the emergency department, a study physician evaluated the patient, who had significant brisk bleeding, hypotension, and tachycardia. Transvaginal ultrasound examination showed that the gestational sac was still in the uterine cavity, so an emergent suction aspiration was performed. This patient's hemoglobin level decreased in the emergency department from 9.2 to 7.5 g/dL, and she received a 1-unit transfusion of packed red blood cells. At safety contacts 2 and 4 weeks later, the patient reported no issues. We stopped enrollment for safety reasons after the third patient required emergent evaluation and a transfusion.

Baseline and follow-up serum hCG and progesterone levels are presented in Figures 2 and 3, respectively. Median baseline hCG and progesterone levels for the progesterone group were 76,776 milli-international units/mL (range 21,062–126,647 milli-international units/mL) and 12.4 ng/mL (range 10.5–24.0 ng/mL), respectively. Median baseline hCG and progesterone levels for the placebo group were 153,908 milli-international units/mL (range 25,450–246,638 milli-international units/mL) and 16.3 ng/mL (range 11.2–18.9 ng/mL), respectively. In the progesterone group, progesterone levels increased 240–1,010% within a few days of starting treatment among patients with continuing gestational cardiac activity at 2 weeks; the one patient with hemorrhage demonstrated an increase of only 45% despite being adherent to study drug instructions.

Table 2 describes side effects related to pregnancy or treatment. One patient in the progesterone group noted the onset of severe nausea and vomiting shortly after mifepristone intake that preceded progesterone treatment; otherwise, no appreciable differences in development of new severe side effects were identified between treatment groups. All patients experienced some spotting (n=8) or bleeding (n=9) during treatment, except for the patient with the highest baseline progesterone level (24.1 ng/mL).

Only two participants believed they received progesterone, of whom one did (continuing

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

**Table 1.** Characteristics at Enrollment for Patients Receiving Mifepristone and Randomized to Progesterone or Placebo Treatment

| Characteristic | Total (N=12) | Progesterone (n=6) | Placebo (n=6) |
|---|---|---|---|
| Age (y) | 27.3 (20.9–39.6) | 29.8 (24.6–39.6) | 24.1 (20.9–33.8) |
| Gestational age (d) | 52.5 (47–61) | 49.5 (47–56) | 55 (48–61) |
| BMI (kg/m²) | 24.6 (19.0–52.3) | 24.8 (19.0–36.4) | 24.6 (22.7–52.3) |
|   Obese (30.0 or higher) | 4 (33) | 2 (33) | 2 (33) |
| Race | | | |
|   White | 3 (25) | 0 | 3 (50) |
|   Black or African American | 5 (42) | 4 (67) | 1 (17) |
|   Asian | 4 (33) | 2 (33) | 2 (33) |
| Ethnicity | | | |
|   Hispanic or Latina | 2 (17) | 1 (17) | 1 (17) |
| Marital status | | | |
|   Never married | 7 (58) | 3 (50) | 4 (67) |
|   Married | 2 (17) | 1 (17) | 1 (17) |
|   Divorced or separated | 3 (25) | 2 (33) | 1 (17) |
| Education level | | | |
|   High school graduate | 2 (17) | 0 | 2 (33) |
|   Some college | 9 (75) | 5 (83) | 4 (67) |
|   College graduate | 1 (8) | 1 (17) | 0 |
| Gravidity | 4 (1–12) | 4.5 (1–10) | 3.5 (1–12) |
|   More than 3 prior pregnancies | 7 (58) | 4 (67) | 3 (33) |
| Parity | 1 (0–6) | 1.5 (0–6) | 0.5 (0–3) |
|   Nulliparous | 4 (33) | 1 (17) | 3 (33) |
| Prior abortion | 9 (75) | 4 (67) | 5 (83) |
|   More than 3 prior abortions | 4 (33) | 2 (33) | 2 (33) |
| Past mifepristone use | 4 (733) | 1 (17) | 3 (33) |
| Prior progesterone use | 0 | 0 | 0 |

BMI, body mass index.
Data are median (range) or n (%).

pregnancy at 2 weeks) and one did not (hemorrhage requiring emergent aspiration). The remaining 10 patients were evenly split between placebo and unsure. None of the patients looked on the internet to identify the study capsules they received.

## DISCUSSION

Although the study sample size was powered to demonstrate a difference in continuing pregnancy rates between progesterone and placebo treatment after mifepristone ingestion, we could not evaluate this outcome owing to stopping enrollment for safety reasons. However, we can make a few global and important conclusions from this very small, randomized trial. First, patients who receive high-dose oral progesterone treatment do not experience side effects that are noticeably different than placebo. Although patients using progesterone did report worsening of some pregnancy symptoms such as vomiting and tiredness, these issues were rarely severe.

Second and most important are the lessons about treatment safety. Providing treatment in any medical situation requires a full understanding of the potential benefits and risks. Previous case series reports do not describe outcomes for the one third or more patients without continuing pregnancies after progesterone treatment.[8] Three of 12 patients enrolled experienced very heavy bleeding resulting in ambulance transport to an emergency department, a rate higher than reported with medical abortion, in which 0.6% of patients may have emergency department visits.[12] Patients who use mifepristone for a medical abortion should be advised that not using misoprostol could result in severe hemorrhage, even with progesterone treatment. We stopped the study because of these complications and, thus, could not quantify the full extent of this risk. Because of the potential dangers for patients who opt not to use misoprostol after mifepristone ingestion, any mifepristone antagonization treatment must be considered experimental.

The study has multiple limitations, primarily the inability to safely reach the enrollment goal to fully assess the primary outcome. Additionally, blinding for progesterone capsules is difficult and imperfect; however, we believe we maintained blinding because the

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.





**Fig. 2.** Serum human chorionic gonadotropin (hCG) levels in patients who received mifepristone 200 mg followed by progesterone for up to 2 weeks. *Participants experiencing hemorrhage. †Participant experienced loss of gestational cardiac activity. ‡Value greater than 270,000 (upper limit of hCG test). §Discontinued related to side effects.

*Creinin. Mifepristone Antagonization. Obstet Gynecol 2019.*

patients enrolled had never used progesterone and none looked up the treatment to identify the drug. Of note, the variability in progesterone level among patients in the progesterone group may be explained by differential oral absorption of progesterone.[13] Although one may postulate another route of progesterone administration might affect the outcome, the case reports in the literature suggest similar continuing pregnancy rates after oral and intramuscular treatment.[8]

Our study established outcomes at 2 weeks as a surrogate for ongoing pregnancy; as such, it does not capture those who may still experience pregnancy loss more than 2 weeks after mifepristone exposure.[14] Accordingly, the outcomes described may not reflect the ultimate rate of pregnancies that continue past 20 weeks of gestation. Progesterone levels declined from high peaks to levels near baseline with continued treatment for 2 weeks. These findings raise two opposing questions: First, if progesterone can prevent medical abortion after mifepristone, is treatment necessary for more than 2 weeks? The case report from which the oral progesterone regimen for this study was based used treatment through the "end of the first trimester."[8] Second, do those treated with placebo just expel the pregnancy earlier than those who receive proges-

terone but no overall long-term difference in continuing pregnancy exists?

The context of this study is the question of whether a patient who has taken mifepristone 200 mg for a medical abortion and decides not to proceed with misoprostol treatment will be less likely to expel the pregnancy if she receives high-dose progesterone as compared with no treatment. Although mifepristone can cause abortion when used by itself in early pregnancy, the exact rate is not clear because studies were small and limited primarily to pregnancies of 49 days or less. Medical abortion today is used through 70 days of gestation. Additionally, a background rate of pregnancy loss is present regardless of mifepristone treatment. In patients with gestational





**Fig. 3.** Progesterone levels in patients who received mifepristone 200 mg followed by progesterone (**A**) or placebo (**B**) for up to 2 weeks. *Participants experiencing hemorrhage. †Participant experienced loss of gestational cardiac activity. ‡Discontinued related to side effects.

*Creinin. Mifepristone Antagonization. Obstet Gynecol 2019.*

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

**Table 2.** Side Effects* Noted During Follow-up of Patients in Early Pregnancy Receiving Mifepristone and Randomized to Progesterone or Placebo Treatment for Up to 2 Weeks

| | Reported at Baseline | | Increased From Baseline[†] | | Increased to Severe During Follow-up[†] | |
|---|---|---|---|---|---|---|
| | Progesterone (n=6) | Placebo (n=6) | Progesterone (n=6) | Placebo (n=6) | Progesterone (n=6) | Placebo (n=6) |
| Nausea | 4 (67) | 5 (83) | 2 (33) | 2 (33) | 2 (33) | 1 (17) |
| Vomiting | 2 (33) | 3 (50) | 4 (67) | 0 | 2 (33) | 0 |
| Mastalgia | 4 (67) | 5 (83) | 1 (17) | 0 | 0 | 0 |
| Tiredness | 5 (83) | 4 (67) | 3 (50) | 0 | 0 | 1 (17) |
| Mood changes | 4 (67) | 5 (83) | 0 | 0 | 1 (17) | 0 |
| Reflux | 2 (33) | 2 (33) | 1 (17) | 0 | 0 | 0 |
| Dizziness | 2 (33) | 1 (17) | 0 | 0 | 0 | 0 |
| Bleeding | 0 | 0 | 4 (67) | 4 (67) | 1 (17) | 3 (50) |
| Spotting | 1 (17) | 1 (17) | 3 (50) | 4 (67) | 0 | 0 |
| Cramping | 3 (50) | 2 (33) | 4 (67) | 5 (83) | 0 | 0 |

Data are n (%).
* Subjectively assessed by participant as none, mild, moderate, or severe.
[†] At any time during follow-up.

cardiac activity demonstrated by ultrasonography at 6–10 weeks, 13.4% will spontaneously have an early pregnancy loss.[15]

This study, although small, provides important insight into the safety of mifepristone antagonization with progesterone during early pregnancy. We should not dismiss mifepristone antagonization as impossible; fully understanding outcomes will serve as the best means to accurately inform our patients, the medical community, and legislators. Existing literature before this study is comprised of case reports and series, which are not evidence of efficacy and do not address safety.[6–8] This level of evidence is inadequate to support or refute the benefits and risks of any treatment. Unfortunately, legislators often fail to understand differences in levels of evidence and some states now require physicians who provide medical abortion to counsel patients that the actions of mifepristone can be reversed if they change their mind. In 2015, Arkansas implemented mandatory abortion-reversal counseling, followed by Arizona (later repealed in 2016), South Dakota, Utah, Idaho, and, most recently, North Dakota. Several other states have introduced and passed legislation, although some was vetoed by the governors. Abortion is no different than any other medical treatment when considering clinical practice guidelines; laws should not mandate counseling or provision of any treatment when we do not fully understand treatment efficacy (including best route of administration, dose, and duration) and safety.

The dilemma that has been created around mifepristone antagonization exists only because of the void in high-quality research addressing the issue. For now, such a treatment is experimental and should be offered only in institutional review board–approved human clinical trials to ensure proper oversight.

## REFERENCES

1. Jones RK, Witwer E, Jerman J. Abortion incidence and service availability in the United States, 2017. Available at: https://www.guttmacher.org/report/abortion-incidence-service-availability-us-2017. Accessed October 8, 2019.
2. Danco Laboratories, LLC. Mifeprex®. 2016. Available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf. Accessed October 8, 2019.
3. Spitz IM, Bardin CW. Mifepristone (RU 486)–a modulator of progestin and glucocorticoid action. N Engl J Med 1993;329:404–12.
4. Mahajan DK, London SN. Mifepristone (RU486): a review. Fertil Steril 1997;68:967–76.
5. Hsia JK, Lohr PA, Taylor J, Creinin MD. Medical abortion with mifepristone and vaginal misoprostol between 64 and 70 days' gestation. Contraception 2019;100:178–81.
6. Delgado G, Davenport ML. Progesterone use to reverse the effects of mifepristone. Ann Pharmacother 2012;46:e36.
7. Garratt D, Turner JV. Progesterone for preventing pregnancy termination after initiation of medical abortion with mifepristone. Eur J Contracept Reprod Health Care 2017;22:472–5.
8. Delgado G, Condly SJ, Davenport M, Tinnakornsrisuphap T, Mack J, Khauv V, et al. A case series detailing the successful reversal of the effects of mifepristone using progesterone. Issues Law Med 2018;33:3–13.
9. Grossman D, White K, Harris L, Reeves M, Blumenthal PD, Winikoff B, et al. Continuing pregnancy after mifepristone and "reversal" of first-trimester medical abortion: a systematic review. Contraception 2015;92:206–11.


© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.


10. Goldstein SR, Wolfson R. Endovaginal ultrasonographic measurement of early embryonic size as a means of assessing gestational age. J Ultrasound Med 1994;13:27–31.

11. Maria B, Chaneac M, Stampf F, Ulmann A. Early pregnancy interruption using an antiprogesterone steroid: mifepristone (RU 486). J Gynecol Obstet Biol Reprod (Paris) 1988;17:1089–94.

12. Upadhyay UD, Desai S, Zlidar V, Weitz TA, Grossman D, Anderson P, et al. Incidence of emergency department visits and complications after abortion. Obstet Gynecol 2015;125:175–83.

13. Sitruk-Ware R, Bricaire C, De Lignieres B, Yaneva H, Mauvais-Jarvis P. Oral micronized progesterone. Bioavailability pharmacokinetics, pharmacological and therapeutic implications–a review. Contraception 1987;36:373–402.

14. Bernard N, Elefant E, Carlier P, Tebacher M, Barjhoux CE, Bos-Thompson MA, et al. Continuation of pregnancy after first-trimester exposure to mifepristone: an observational prospective study. BJOG 2013;120:568–74.

15. Papaioannou GI, Syngelaki A, Maiz N, Ross JA, Nicolaides KH. Ultrasonographic prediction of early miscarriage. Hum Reprod 2011;26:1685–92.

**Authors' Data Sharing Statement**

Will individual participant data be available (including data dictionaries)? *Yes.*

What data in particular will be shared? *Data included with the submission in Appendix 1, available online at* http://links.lww.com/AOG/B658.

What other documents will be available? *No.*

When will data be available (start and end dates)? *With publication.*

By what access criteria will data be shared (including with whom, for what types of analyses, and by what mechanism)? *In Appendix 1,* http://links.lww.com/AOG/B658.

**PEER REVIEW HISTORY**

Received September 5, 2019. Received in revised form October 9, 2019. Accepted October 17, 2019. Peer reviews are available at http://links.lww.com/AOG/B659.

# Visit the Green Journal's Website!
# www.greenjournal.org

Access online-only features, including:
- Journal Club questionnaires
- CME for the Clinical Expert Series
- Videos
- Editor's Picks podcasts
- Curated Collections of articles

*rev 12/2019*

© 2019 by the American College of Obstetricians
and Gynecologists. Published by Wolters Kluwer Health, Inc.
Unauthorized reproduction of this article is prohibited.



  

# COMMITTEE OPINION

Number 700 • May 2017                    *(Replaces Committee Opinion Number 611, October 2014)*

**Committee on Obstetric Practice**
**American Institute of Ultrasound in Medicine**
**Society for Maternal–Fetal Medicine**

*This Committee Opinion was developed by the American College of Obstetricians and Gynecologists' Committee on Obstetric Practice, in collaboration with members Christian M. Pettker, MD; James D. Goldberg, MD; and Yasser Y. El-Sayed, MD; the American Institute of Ultrasound in Medicine's liaison member Joshua A. Copel, MD; and the Society for Maternal–Fetal Medicine.*

*This document reflects emerging clinical and scientific advances as of the date issued and is subject to change. The information should not be construed as dictating an exclusive course of treatment or procedure to be followed.*

# Methods for Estimating the Due Date

**ABSTRACT:** Accurate dating of pregnancy is important to improve outcomes and is a research and public health imperative. As soon as data from the last menstrual period, the first accurate ultrasound examination, or both are obtained, the gestational age and the estimated due date (EDD) should be determined, discussed with the patient, and documented clearly in the medical record. Subsequent changes to the EDD should be reserved for rare circumstances, discussed with the patient, and documented clearly in the medical record. A pregnancy without an ultrasound examination that confirms or revises the EDD before 22 0/7 weeks of gestational age should be considered suboptimally dated. When determined from the methods outlined in this document for estimating the due date, gestational age at delivery represents the best obstetric estimate for the purpose of clinical care and should be recorded on the birth certificate. For the purposes of research and surveillance, the best obstetric estimate, rather than estimates based on the last menstrual period alone, should be used as the measure for gestational age.

## Recommendations

The American College of Obstetricians and Gynecologists, the American Institute of Ultrasound in Medicine, and the Society for Maternal–Fetal Medicine make the following recommendations regarding the method for estimating gestational age and due date:

- Ultrasound measurement of the embryo or fetus in the first trimester (up to and including 13 6/7 weeks of gestation) is the most accurate method to establish or confirm gestational age.

- If pregnancy resulted from assisted reproductive technology (ART), the ART-derived gestational age should be used to assign the estimated due date (EDD). For instance, the EDD for a pregnancy that resulted from in vitro fertilization should be assigned using the age of the embryo and the date of transfer.

- As soon as data from the last menstrual period (LMP), the first accurate ultrasound examination, or both are obtained, the gestational age and the EDD should be determined, discussed with the patient, and documented clearly in the medical record. Subsequent changes to the EDD should be reserved for rare circumstances, discussed with the patient, and documented clearly in the medical record.

- When determined from the methods outlined in this document for estimating the due date, gestational age at delivery represents the best obstetric estimate for the purpose of clinical care and should be recorded on the birth certificate. For the purposes of research and surveillance, the best obstetric estimate, rather than estimates based on the LMP alone, should be used as the measure for gestational age.

- A pregnancy without an ultrasound examination that confirms or revises the EDD before 22 0/7 weeks of gestational age should be considered suboptimally dated.

## Introduction

An accurately assigned EDD early in prenatal care is among the most important results of evaluation and history taking. This information is vital for timing of appropriate obstetric care; scheduling and interpretation of certain antepartum tests; determining the appropriateness of fetal growth; and designing interventions to prevent preterm births, postterm births, and related morbidities. Appropriately performed obstetric ultrasonography has been shown to accurately determine fetal gestational age (1). A consistent and exacting approach to accurate dating is also a research and public health imperative because of the influence of dating on investigational protocols and vital statistics. This Committee Opinion outlines a standardized approach to estimate gestational age and the anticipated due date. It is understood that within the ranges suggested by different studies, no perfect evidence exists to establish a single-point cutoff in the difference between clinical and ultrasonographic EDD to prompt changing a pregnancy's due date. However, there is great usefulness in having a single, uniform standard within and between institutions that have access to high-quality ultrasonography (as most, if not all, U.S. obstetric facilities do). Accordingly, in creating recommendations and the associated summary table, single-point cutoffs were chosen based on expert review.

## Background

Traditionally, determining the first day of the LMP is the first step in establishing the EDD. By convention, the EDD is 280 days after the first day of the LMP. Because this practice assumes a regular menstrual cycle of 28 days, with ovulation occurring on the 14th day after the beginning of the menstrual cycle, this practice does not account for inaccurate recall of the LMP, irregularities in cycle length, or variability in the timing of ovulation. It has been reported that approximately one half of women accurately recall their LMP (2–4). In one study, 40% of the women randomized to receive first-trimester ultrasonography had their EDD adjusted because of a discrepancy of more than 5 days between ultrasound dating and LMP dating (5). Estimated due dates were adjusted in only 10% of the women in the control group who had ultrasonography in the second trimester, which suggests that first-trimester ultrasound examination can improve the accuracy of the EDD, even when the first day of the LMP is known.

Accurate determination of gestational age can positively affect pregnancy outcomes. For instance, one study found a reduction in the need for postterm induc-

tions in a group of women randomized to receive routine first-trimester ultrasonography compared with women who received only second-trimester ultrasonography (5). A Cochrane review concluded that ultrasonography can reduce the need for postterm induction and lead to earlier detection of multiple gestations (6). Because decisions to change the EDD significantly affect pregnancy management, their implications should be discussed with patients and recorded in the medical record.

## Clinical Considerations in the First Trimester

Ultrasound measurement of the embryo or fetus in the first trimester (up to and including 13 6/7 weeks of gestation) is the most accurate method to establish or confirm gestational age (3, 4, 7–10). Up to and including 13 6/7 weeks of gestation, gestational age assessment based on measurement of the crown–rump length (CRL) has an accuracy of ±5–7 days (11–14). Measurements of the CRL are more accurate the earlier in the first trimester that ultrasonography is performed (11, 15–18). The measurement used for dating should be the mean of three discrete CRL measurements when possible and should be obtained in a true midsagittal plane, with the genital tubercle and fetal spine longitudinally in view and the maximum length from cranium to caudal rump measured as a straight line (8, 11). Mean sac diameter measurements are not recommended for estimating the due date. Beyond measurements of 84 mm (corresponding to approximately 14 0/7 weeks of gestation), the accuracy of the CRL to estimate gestational age decreases, and in these cases, other second-trimester biometric parameters (discussed in the following section) should be used for dating. If ultrasound dating before 14 0/7 weeks of gestation differs by more than 7 days from LMP dating, the EDD should be changed to correspond with the ultrasound dating. Dating changes for smaller discrepancies are appropriate based on how early in the first trimester the ultrasound examination was performed and clinical assessment of the reliability of the LMP date (Table 1). For instance, before 9 0/7 weeks of gestation, a discrepancy of more than 5 days is an appropriate reason for changing the EDD. If the patient is unsure of her LMP, dating should be based on ultrasound examination estimates (ideally obtained before or at 13 6/7 weeks of gestation), with the earliest ultrasound examination of a CRL measurement prioritized as the most reliable.

If pregnancy resulted from ART, the ART-derived gestational age should be used to assign the EDD. For instance, the EDD for a pregnancy that resulted from in vitro fertilization should be assigned using the age of the embryo and the date of transfer. For example, for a day-5 embryo, the EDD would be 261 days from the embryo replacement date. Likewise, the EDD for a day-3 embryo would be 263 days from the embryo replacement date.

## Clinical Considerations in the Second Trimester

Using a single ultrasound examination in the second trimester to assist in determining the gestational age enables simultaneous fetal anatomic evaluation. However, the range of second-trimester gestational ages (14 0/7 weeks to 27 6/7 weeks of gestation) introduces greater variability and complexity, which can affect revision of LMP dating and assignment of a final EDD. With rare exception, if a first-trimester ultrasound examination was performed, especially one consistent with LMP dating, gestational age should not be adjusted based on a second-trimester ultrasound examination. Ultrasonography dating in the second trimester typically is based on regression formulas that incorporate variables such as

- the biparietal diameter and head circumference (measured in transverse section of the head at the level of the thalami and cavum septi pellucidi; the cerebellar hemispheres should not be visible in this scanning plane)
- the femur length (measured with full length of the bone perpendicular to the ultrasound beam, excluding the distal femoral epiphysis)
- the abdominal circumference (measured in symmetrical, transverse round section at the skin line, with visualization of the vertebrae and in a plane with visualization of the stomach, umbilical vein, and portal sinus) (8)

Other biometric variables, such as additional long bones and the transverse cerebellar diameter, also can play a role.

Gestational age assessment by ultrasonography in the first part of the second trimester (between 14 0/7 weeks and 21 6/7 weeks of gestation, inclusive) is based on a composite of fetal biometric measurements and has an accuracy of ± 7–10 days (19–22). If dating by ultrasonography performed between 14 0/7 weeks and 15 6/7 weeks of gestation (inclusive) varies from LMP dating by more than 7 days, or if ultrasonography dating between 16 0/7 weeks and 21 6/7 weeks of gestation varies by more than 10 days, the EDD should be changed to correspond with the ultrasonography dating (Table 1). Between 22 0/7 weeks and 27 6/7 weeks of gestation, ultrasonography dating has an accuracy of ± 10–14 days (19). If ultrasonography dating between 22 0/7 weeks and 27 6/7 weeks of gestation (inclusive) varies by more than 14 days from LMP dating, the EDD should be changed to correspond with the ultrasonography dating (Table 1). Date changes for smaller discrepancies (10–14 days) are appropriate based on how early in this second-trimester range the ultrasound examination was performed and on clinician assessment of LMP reliability. Of note, pregnancies without an ultrasound examination that confirms or revises the EDD before 22 0/7 weeks of gestational age should be considered suboptimally dated (see also Committee Opinion 688, *Management of Suboptimally Dated Pregnancies* [23]).

## Clinical Considerations in the Third Trimester

Gestational age assessment by ultrasonography in the third trimester (28 0/7 weeks of gestation and beyond) is the least reliable method, with an accuracy of ± 21–30 days (19, 20, 24). Because of the risk of redating

**Table 1.** Guidelines for Redating Based on Ultrasonography ⇦

| Gestational Age Range* | Method of Measurement | Discrepancy Between Ultrasound Dating and LMP Dating That Supports Redating |
|---|---|---|
| ≤13 6/7 wk | CRL | |
| • ≤ 8 6/7 wk | | More than 5 d |
| • 9 0/7 wk to 13 6/7 wk | | More than 7 d |
| 14 0/7 wk to 15 6/7 wk | BPD, HC, AC, FL | More than 7 d |
| 16 0/7 wk to 21 6/7 wk | BPD, HC, AC, FL | More than 10 d |
| 22 0/7 wk to 27 6/7 wk | BPD, HC, AC, FL | More than 14 d |
| 28 0/7 wk and beyond† | BPD, HC, AC, FL | More than 21 d |

Abbreviations: AC, abdominal circumference; BPD, biparietal diameter; CRL, crown–rump length; FL, femur length; HC, head circumference; LMP, last menstrual period.

*Based on LMP.

†Because of the risk of redating a small fetus that may be growth restricted, management decisions based on third-trimester ultrasonography alone are especially problematic and need to be guided by careful consideration of the entire clinical picture and close surveillance.

a small fetus that may be growth restricted, management decisions based on third-trimester ultrasonography alone are especially problematic; therefore, decisions need to be guided by careful consideration of the entire clinical picture and may require close surveillance, including repeat ultrasonography, to ensure appropriate interval growth. The best available data support adjusting the EDD of a pregnancy if the first ultrasonography in the pregnancy is performed in the third trimester and suggests a discrepancy in gestational dating of more than 21 days.

## Conclusion

Accurate dating of pregnancy is important to improve outcomes and is a research and public health imperative. As soon as data from the LMP, the first accurate ultrasound examination, or both are obtained, the gestational age and the EDD should be determined, discussed with the patient, and documented clearly in the medical record. Subsequent changes to the EDD should be reserved for rare circumstances, discussed with the patient, and documented clearly in the medical record. When determined from the methods outlined in this document for estimating the due date, gestational age at delivery represents the best obstetric estimate for the purpose of clinical care and should be recorded on the birth certificate. For the purposes of research and surveillance, the best obstetric estimate, rather than estimates based on the LMP alone, should be used as the measure for gestational age. A pregnancy without an ultrasound examination that confirms or revises the EDD before 22 0/7 weeks of gestational age should be considered suboptimally dated.

The American College of Obstetricians and Gynecologists, the American Institute of Ultrasound in Medicine, and the Society for Maternal–Fetal Medicine recognize the advantages of a single dating paradigm being used within and between institutions that provide obstetric care. Table 1 provides guidelines for estimating the due date based on ultrasonography and the LMP in pregnancy, and provides single-point cutoffs and ranges based on available evidence and expert opinion.

## References

1. Reddy UM, Abuhamad AZ, Levine D, Saade GR. Fetal imaging: executive summary of a joint *Eunice Kennedy Shriver* National Institute of Child Health and Human Development, Society for Maternal–Fetal Medicine, American Institute of Ultrasound in Medicine, American College of Obstetricians and Gynecologists, American College of Radiology, Society for Pediatric Radiology, and Society of Radiologists in Ultrasound Fetal Imaging workshop. Fetal Imaging Workshop Invited Participants. Obstet Gynecol 2014;123:1070–82. [PubMed] [*Obstetrics & Gynecology*] ⇐

2. Wegienka G, Baird DD. A comparison of recalled date of last menstrual period with prospectively recorded dates. J Womens Health (Larchmt) 2005;14:248–52. [PubMed] [Full Text] ⇐

3. Savitz DA, Terry JW Jr, Dole N, Thorp JM Jr, Siega-Riz AM, Herring AH. Comparison of pregnancy dating by last menstrual period, ultrasound scanning, and their combination. Am J Obstet Gynecol 2002;187:1660–6. [PubMed] [Full Text] ⇐

4. Barr WB, Pecci CC. Last menstrual period versus ultrasound for pregnancy dating. Int J Gynaecol Obstet 2004;87:38–9. [PubMed] ⇐

5. Bennett KA, Crane JM, O'Shea P, Lacelle J, Hutchens D, Copel JA. First trimester ultrasound screening is effective in reducing postterm labor induction rates: a randomized controlled trial. Am J Obstet Gynecol 2004;190:1077–81. [PubMed] [Full Text] ⇐

6. Whitworth M, Bricker L, Mullan C. Ultrasound for fetal assessment in early pregnancy. Cochrane Database of Systematic Reviews 2015, Issue 7. Art. No.: CD007058. [PubMed] [Full Text] ⇐

7. Taipale P, Hiilesmaa V. Predicting delivery date by ultrasound and last menstrual period in early gestation. Obstet Gynecol 2001;97:189–94. [PubMed] [*Obstetrics & Gynecology*] ⇐

8. Verburg BO, Steegers EA, De Ridder M, Snijders RJ, Smith E, Hofman A, et al. New charts for ultrasound dating of pregnancy and assessment of fetal growth: longitudinal data from a population-based cohort study. Ultrasound Obstet Gynecol 2008;31:388–96. [PubMed] [Full Text] ⇐

9. Kalish RB, Thaler HT, Chasen ST, Gupta M, Berman SJ, Rosenwaks Z, et al. First- and second-trimester ultrasound assessment of gestational age. Am J Obstet Gynecol 2004;191:975–8. [PubMed] [Full Text] ⇐

10. Caughey AB, Nicholson JM, Washington AE. First- vs second-trimester ultrasound: the effect on pregnancy dating and perinatal outcomes. Am J Obstet Gynecol 2008;198:703.e1–5; discussion 703.e5–6. [PubMed] [Full Text] ⇐

11. Robinson HP, Fleming JE. A critical evaluation of sonar "crown–rump length" measurements. Br J Obstet Gynaecol 1975;82:702–10. [PubMed] ⇐

12. Hadlock FP, Shah YP, Kanon DJ, Lindsey JV. Fetal crown–rump length: reevaluation of relation to menstrual age (5–18 weeks) with high-resolution real-time US. Radiology 1992;182:501–5. [PubMed] ⇐

13. Tunon K, Eik-Nes SH, Grottum P, Von During V, Kahn JA. Gestational age in pregnancies conceived after in vitro fertilization: a comparison between age assessed from oocyte retrieval, crown–rump length and biparietal diameter. Ultrasound Obstet Gynecol 2000;15:41–6. [PubMed] [Full Text] ⇐

14. Sladkevicius P, Saltvedt S, Almstrom H, Kublickas M, Grunewald C, Valentin L. Ultrasound dating at 12–14 weeks of gestation. A prospective cross-validation of established dating formulae in in-vitro fertilized pregnancies. Ultrasound Obstet Gynecol 2005;26:504–11. [PubMed] [Full Text] ⇐

15. Daya S. Accuracy of gestational age estimation by means of fetal crown–rump length measurement. Am J Obstet Gynecol 1993;168:903–8. [PubMed] ⇐

16. Wisser J, Dirschedl P, Krone S. Estimation of gestational age by transvaginal sonographic measurement of greatest

embryonic length in dated human embryos. Ultrasound Obstet Gynecol 1994;4:457–62. [PubMed] [Full Text] ⇐

17. MacGregor SN, Tamura RK, Sabbagha RE, Minogue JP, Gibson ME, Hoffman DI. Underestimation of gestational age by conventional crown–rump length dating curves. Obstet Gynecol 1987;70:344–8. [PubMed] [Full Text] ⇐

18. Pexsters A, Daemen A, Bottomley C, Van Schoubroeck D, De Catte L, De Moor B, et al. New crown–rump length curve based on over 3500 pregnancies. Ultrasound Obstet Gynecol 2010;35:650–5. [PubMed] [Full Text] ⇐

19. Sabbagha RE, Hughey M. Standardization of sonar cephalometry and gestational age. Obstet Gynecol 1978;52: 402–6. [PubMed] [Obstetrics & Gynecology] ⇐

20. Benson CB, Doubilet PM. Sonographic prediction of gestational age: accuracy of second- and third-trimester fetal measurements. AJR Am J Roentgenol 1991;157:1275–7. [PubMed] [Full Text] ⇐

21. Rossavik IK, Fishburne JI. Conceptional age, menstrual age, and ultrasound age: a second-trimester comparison of pregnancies of known conception date with pregnancies dated from the last menstrual period. Obstet Gynecol 1989;73:243–9. [PubMed] [Obstetrics & Gynecology] ⇐

22. Hadlock FP, Deter RL, Harrist RB, Park SK. Estimating fetal age: computer-assisted analysis of multiple fetal growth parameters. Radiology 1984;152:497–501. [PubMed] ⇐

23. Management of suboptimally dated pregnancies. Committee Opinion No. 688. American College of Obstetricians and Gynecologists. Obstet Gynecol 2017;129:e29–32. [PubMed] [Obstetrics & Gynecology] ⇐

24. Hadlock FP, Deter RL, Harrist RB, Park SK. Computer assisted analysis of fetal age in the third trimester using multiple fetal growth parameters. J Clin Ultrasound 1983; 11:313–6. [PubMed] ⇐

Copyright May 2017 by the American College of Obstetricians and Gynecologists. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, posted on the Internet, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without prior written permission from the publisher.

Requests for authorization to make photocopies should be directed to Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400.

ISSN 1074-861X

**The American College of Obstetricians and Gynecologists
409 12th Street, SW, PO Box 96920, Washington, DC 20090-6920**

Methods for estimating the due date. Committee Opinion No. 700. American College of Obstetricians and Gynecologists. Obstet Gynecol 2017;129:e150–4.